STATE OF MICHIGAN
IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT
CRIMINAL DIVISION


PEOPLE OF THE STATE OF MICHIGAN          36th District Court
                                         Case No. 02-69314
            vs.                          Case No. 03-1609

MICHON HOUSTON,
                        Defendant./
_____

                PRELIMINARY EXAMINATION

        BEFORE THE HONORABLE DONALD COLEMAN
              36TH DISTRICT COURT JUDGE
         Detroit, Michigan - January 29, 2003

APPEARANCES:




For the People:        KAM TOWNS P45518
                       Assistant Wayne County Prosecutor




For the defendant:     JAMES PARKER, ESQ. P53832
                       645 Griswold #2350
                       Detroit, MI  48226
                       (313) 965-4384






Reported by:           Sherrayna White Moore, CSR-6485
                       Certified Shorthand Reporter
                       (313)  965-6571

TABLE OF CONTENTS

WITNESSES:                                                          PAGE

JOVAN JOHNSON

    Direct examination by Ms. Towns                          7

    Cross-examination by Mr. Parker                         23

    Redirect examination by Ms. Towns                       45

    Recross-examination by Mr. Parker                       48

EXHIBITS:

    None marked.

1            Detroit, Michigan

2            Wednesday, January 29, 2003

3            about 2:30 p.m.

4            ---    ---    ---

5            THE CLERK:  This is Case Number

6    02-69314 State of Michigan versus Michon

7    Houston.  The defendant is charged count one,

8    firearms--no, premeditated murder first degree;

9    count two, firearms possession by a felon; count

10   three, felony firearm; habitual offender forth

11   offense notice.

12           MS. TOWNS:  Kam Towns, assistant

13   prosecuting attorney on behalf of the People.

14           MR. PARKER:  James Parker on behalf

15   of Mr. Houston, your Honor.  We make a motion

16   for sequestration in this matter.

17           MS. TOWNS:  I would join in that

18   motion with the exception of the officer in

19   charge who is seated to my right, Sergeant Danny

20   Marshall who is also another homicide officer

21   and an officer by the name of Lance Reynolds who

22   is not involved in this case at all.

23           THE COURT:  The Court will grant the

24   motion to sequester.  If you think you might be

25   a witness in the People versus Michon Houston

                                                  3

1    today or at sometime in the future; it doesn't

2    matter if it's for the defense or the

3    prosecution, if you think you might be a witness

4    in this case you must step out of the courtroom

5    at this time; otherwise, you will be precluded

6    from testifying at any point in the future.

7              MS. TOWNS:  Could I in addition to,

8    exempt the mother of the deceased, Cynthia

9    Thomas.  Her testimony will be limited at trial

10   to the identification of her son's body.

11             THE COURT:  She may remain.

12             MS. TOWNS:  There's been a series of

13   stipulations as it relates to this case.  First

14   of all, as it relates to count two, felon in

15   possession, I have certified copies which I

16   presented to defense counsel of the defendant's

17   prior convictions, and I believe we're

18   stipulating to the following:  That on the date

19   of 7/12/2000 on Case Number 00-6090 the

20   defendant was convicted in Wayne County of

21   receiving and concealing stolen property between

22   one thousand and twenty thousand dollars; that

23   being a felony.  In addition, on the same date,

24   File Number 00-6075 in Wayne County the

25   defendant was convicted of delivery of less than

4

1   fifty grams of a controlled substance, that

2   being cocaine, also a felony; and lastly, on

3   Case Number 99-6527 on the date of August 23,

4   1999 the defendant was convicted of possession

5   of less than 25 grams of controlled substance,

6   also a felony.

7   I believe there's been a stipulation

8   as it relates to count two based on the

9   aforementioned Information and the copy of the

10  certified documents.  Is that correct, Counsel?

11  MR. PARKER:  My objection to that is

12  that for this particular matter felon in

13  possession, I think you only need one

14  conviction, and I'm questioning why we read two

15  or three convictions into the record.  Why are

16  we doing this where-

17  THE COURT:  I suppose that you would

18  be willing to stipulate at least one predicate

19  for purposes of the felon in possession of

20  firearm as established by defendant's history.

21  MR. PARKER:  Exactly, but I'll

22  certainly also be putting the People on notice

23  and the fact that I believe you know as we

24  started piling this up I think that's

25  prejudicial because it only takes one for them

5

1    to establish the felon in possession charge.

2                THE COURT:  Very well.  The Court

3    will accept the stipulation that there is a

4    predicate underlined felony conviction that

5    would support the element for felon in

6    possession of a firearm.

7                MS. TOWNS:  Thank you.  I believe

8    there's also been a stipulation as it relates to

9    the testimony of Dr. Hlavata, H-l-a-v-a-t-a.  If

10   Dr. Hlavata were here she would indicate that

11   she examined the 30-year old body of Carlton

12   Thomas on File Number 02-8524.  Dr. Hlavata, as

13   I read from the court file, indicates that Mr.

14   Thomas died of multiple, specifically four,

15   gunshot wounds; one to the left knee, two to the

16   abdomen and one to the right cheek.  There was

17   no evidence of close-range firing on the skin

18   surrounding any of the entrance wounds.  The

19   majority of the wound tracks were from front to

20   back and left to right when the body is viewed

21   in the anatomical position.  No bullets or parts

22   of bullets were recovered from the wound tract.

23   She further concluded that the manner of death

24   is homicide.

25                A further stipulation that the body

6

1    of Mr. Carlton, subsequent to the shooting, was

2    identified by his mother, Ms. Cynthia Thomas.

3    Is that a correct and proper stipulation?

4            THE COURT:  As to those two

5    stipulations indicated on this record, in

6    addition to the first one that has already been

7    agreed upon, do you stipulate for the limited

8    purpose of examination as to the manner and

9    cause of death as to the identification?

10            MR. PARKER:  Yes, we do, your Honor.

11    We'll stipulate for preliminary examination

12    purposes only.

13            THE COURT:  The stipulation will be

14    accepted then at this time.  You may proceed.

15            MS. TOWNS:  Thank you.  They're

16    bringing the witness out, Judge.  Your Honor,

17    prior to this witness testifying, I would ask

18    that the Court instruct the defendant to remove

19    the Band-Aid from his face.  It bears on the

20    issue of identification.

21            THE COURT:  So ordered.  All right.

22    You may proceed at this time.

23            JOVAN JOHNSON,

24    having been first duly sworn, was called as a

25    witness at 2:42 p.m., and testified as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MS. TOWNS:
 3   Q.   Good afternoon, sir.  I'm going to have you sit back
 4        in your chair and tell the judge your name and your
 5        age.
 6   A.   Jovan Johnson, 22.
 7              THE COURT:  Mr. Johnson, you're
 8        going to have to keep your voice up because it's
 9        difficult for me to hear you sitting here, and
10        everybody at these tables have to hear you.  Do
11        you understand, sir?
12              THE WITNESS:  Yes.
13              THE COURT:  And the court reporter
14        has to take it down, so I definately need you to
15        keep your voice up.  Let's proceed.
16   BY MS. TOWNS:
17   Q.   Could you say your name again and your age for the
18        record, please.
19   A.   Jovan Johnson, age 22.
20   Q.   Mr. Johnson, do you also have a nickname that they
21        call you, sir?
22   A.   Yes, ma'am.
23   Q.   What is that, please?
24   A.   Jay Dub (ph).
25   Q.   Would that be Jay D-u-b?
```

8

1    A.    Yes.

2    Q.    You have to answer so the court reporter can take

3          down your response, sir.  Sir, do you know somebody

4          by the name of Michon Houston also known as Shawn?

5    A.    Yes, ma'am.

6    Q.    And do you see that person that you know as Michon

7          Houston or Shawn in court today?

8    A.    Yes, ma'am.

9    Q.    Could you point to him and tell me where he's seated

10         and what he's wearing, please?

11   A.    Seated right there with the green county suit on.

12                      MS. TOWNS:   Indicating for the

13              record, the witness has identified the defendant

14              Michon Houston in this case.

15   BY MS. TOWNS:

16   Q.    Could you tell me by what name you know the

17         defendant?

18   A.    Shawn.

19   Q.    I'm going to draw your attention to the date of

20         September 6, 2002.  Were you with the defendant,

21         Michon Houston on that day, sir?

22   A.    Yes, ma'am.

23   Q.    And could you tell me did there come a time when you

24         went over to the area of West Buena Vista (ph) and

25         Lynwood, sir?

```
 1    A.    Pardon me.  I didn't hear you.

 2    Q.    I can't hear you, sir.

 3    A.    Could you repeat that.

 4    Q.    Did there come a time when you already indicated you

 5          were with the defendant on the day of September 6th?

 6          Do you recall telling us that?

 7    A.    Yes, ma'am.

 8    Q.    Did there come a time when you and the defendant went

 9          over to the area of West Buena Vista and Lynwood on

10          that date, sir?

11    A.    Yes, ma'am.

12    Q.    Do you know about what time it was, sir?

13    A.    Around about five.

14                      THE COURT:  Around about what time,

15          sir?

16                      THE WITNESS:  Five o'clock, sir.

17  BY MS. TOWNS:

18    Q.    Five o'clock in the evening or in the morning?

19    A.    In the morning.

20    Q.    And could you tell me how did you get over to that

21          address?

22    A.    We drove.

23    Q.    And who was driving the car, sir?

24    A.    Powder.

25    Q.    Was that a male or female, sir?
```

```
 1    A.    Female.

 2    Q.    Could you describe--first of all, do you know

 3          Powder's real name, sir?

 4    A.    No, ma'am.

 5    Q.    Could you describe what Powder looks like?

 6    A.    Short white girl.

 7    Q.    Do you know any relationship at all that exists

 8          between Powder and the defendant, sir?

 9    A.    I guess they was kicking it, going together.  I guess

10          they was going together.

11                        MR. PARKER:  That's speculation.

12          From that answer I see speculation here.

13                        THE COURT:  I'll allow the answer to

14          stand.  The inquiry was what do you know.  He

15          said they were kicking it and I guess they were

16          going together.  That's a sufficient answer.

17          Let's proceed.

18    BY MS. TOWNS:

19    Q.    You indicated that Powder was driving; is that

20          correct?

21    A.    Yes, ma'am.

22    Q.    Who was in the car, sir?  You've got to speak up,

23          sir.

24    A.    Who was in the car?

25    Q.    Yes.
```

11

```
 1   A.    Me, Shawn and Powder.

 2   Q.    When you say Shawn you're talking about the

 3         defendant, correct?

 4   A.    Yes, ma'am.

 5   Q.    Where did you go when you got over to West Buena

 6         Vista and Lynwood, sir?

 7   A.    Went to the house we be sitting on the porch in the

 8         neighborhood.

 9                       THE COURT:  Went to the house that?

10                       THE WITNESS:  Porch that we be

11         sitting on.

12   BY MS. TOWNS:

13   Q.    Do you know who lived at that house that you went to,

14         sir; that porch?

15   A.    This lady named Lisa.

16                       MR. PARKER:  I can't hear.

17                       THE WITNESS:  A lady named Lisa.

18                       THE COURT:  A lady named Lisa lives

19         there?

20                       THE WITNESS:  Yes.

21                       THE COURT:  You said that's a porch

22         that you all sit on, true?

23                       THE WITNESS:  Yes, sir.

24   BY MS. TOWNS:

25   Q.    When you get to that address do all three of you get
```

```
 1            out of the car; you, Powder and the defendant?

 2   A.   Yes, ma'am.

 3   Q.   What do you all do?

 4   A.   Went on the porch.

 5   Q.   And do you remain outside on the porch once you get

 6        up on the step, sir?

 7   A.   Yes, ma'am.

 8   Q.   And at that point do you see someone?

 9   A.   Yes, ma'am.

10   Q.   You have to speak up, sir.

11   A.   Yes, ma'am.

12   Q.   And where do you see that person, sir?

13   A.   Across the street.

14   Q.   And what is across the street?

15   A.   A field.

16   Q.   Is that a vacant lot; a field, sir?

17   A.   Yes.

18   Q.   And, at the time you see this person across the

19        street are you, Powder and Shawn still on the front

20        porch, sir?

21   A.   Yes, ma'am.

22   Q.   Okay.  Do you or the defendant say anything when you

23        see that person across the street?

24   A.   Yes, ma'am.

25   Q.   And what do you say?
```

1    A.    I asked him what he need.

2    Q.    And does the defendant say anything to him, sir?

3    A.    We both asked him.

4    Q.    Speak up, please.

5    A.    We both asked him what he want.

6    Q.    And what does that mean, sir?  Why did you ask him,

7          you and the defendant?

8    A.    Did he want any crack.

9    Q.    I'm sorry?

10   A.    Did he want any drugs.

11   Q.    Are you personally aware of what the defendant does

12         for a living, sir?

13   A.    I know he sells drugs for a living.

14   Q.    I'm sorry?

15                     THE COURT:  You sell--you know he

16         sells drugs for a living?

17                     THE WITNESS:  Yeah.

18   BY MR. TOWNS:

19   Q.    When you and the defendant yelled to this person

20         across the street what happens then, sir?

21   A.    He had caught him before I did.

22   Q.    When you say he had got him, who are you talking

23         about?

24   A.    To give him the crack before I could give it to him.

25   Q.    And when you say he got to him before you, who are

14

```
 1        you talking about?

 2   A.   Shawn.

 3   Q.   Does Shawn come off the porch?

 4   A.   Yes, ma'am.

 5   Q.   Okay.  And when he comes off the porch where are you

 6        and Powder?

 7   A.   On the porch.

 8   Q.   And where do you see the defendant go when he comes

 9        off the porch, sir?

10   A.   Across the street.

11   Q.   And is that where this person is, sir?

12   A.   Huh?

13   Q.   Is that where that person is in the field?

14   A.   Yes, ma'am.

15   Q.   And what do you see the defendant do when he gets

16        across the street into the field where this

17        individual is?

18   A.   They was talking.

19   Q.   And could you describe the individual that the

20        defendant was talking to; male or female?

21   A.   Male.

22   Q.   And did you ever see that man before?

23   A.   Probably once or twice.

24   Q.   And could you describe what that man looks like?

25   A.   Heavy set, brown skin guy--not heavy set, but he
```

15

```
 1          wasn't skinny.

 2     Q.   And can you hear what the defendant is saying when

 3          he's talking to this man across the street in the

 4          field?

 5     A.   No.  I wasn't really paying attention.

 6     Q.   I'm sorry?

 7     A.   I did not really pay attention.

 8     Q.   And at some point did it change as far as the

 9          defendant just talking to this guy?

10     A.   Yes, ma'am.

11     Q.   What did the defendant do, sir?

12     A.   Started shouting.

13     Q.   Started shouting?

14     A.   Yes, ma'am.

15     Q.   Could you hear what he was saying when he was

16          shouting, sir?

17     A.   Yes, ma'am.

18     Q.   What was he saying?

19     A.   Bitch, bitch.

20     Q.   And what was the defendant doing, sir, when he was

21          yelling bitch, bitch at him?

22     A.   He was--they was running around the tree.

23     Q.   Who was running in the front and who was running

24          behind, sir?

25     A.   The guy that got shot was running in the front and
```

16

1      Shawn was running behind him.

2  Q.  Would it be fair to say that he was chasing him?

3  A.  Yeah.

4  Q.  And what happens as he chases him around the tree,

5      sir?

6  A.  What you say?  What happened after?

7  Q.  Yes.  After he's chasing him around the tree and

8      yelling bitch, bitch, what happens next?

9  A.  He shot him.

10  Q.  Could you tell me how many times did he shoot him?

11      And, when you say he shot him, you're still talking

12      about Shawn, sir?

13  A.  Yes, sir.

14  Q.  And approximately how many times does he shoot the

15      man when he was standing over him, sir?

16  A.  I don't really know.

17  Q.  I'm sorry?

18  A.  I don't really know for sure.

19  Q.  Do you remember giving a statement to the police,

20      sir, on the 17th of November 2002?

21  A.  Yes, ma'am.

22              MS. TOWNS:  Approaching the witness.

23  BY MS. TOWNS:

24  Q.  You read your statement, sir.  Would it refresh your

25      memory as it relates to how many times he shot him

1       and was standing over him?

2    A.   I have two or three.

3    Q.   I'm going to direct your attention to this area.

4       Just read it to yourself, sir.  Did you have a chance

5       to read that, Mr. Johnson?

6    A.   Yes, ma'am.

7    Q.   Does that refresh your memory, sir, as to how many

8       times the defendant shot this man after he had fallen

9       down?

10    A.   Yes, ma'am.

11    Q.   How many times did he shoot him?

12    A.   Two or three times.

13    Q.   At the time you were witnessing this are you still on

14       the porch with Powder?

15    A.   Yes, ma'am.

16    Q.   And do you ever see that--strike that.  After the

17       defendant shoots at this man two or three times what

18       does he do?

19    A.   After he shot at him two or three times?

20    Q.   Yes.  After he stood over him and shot him two or

21       three times what does Shawn do?  Does he stay in the

22       field?

23    A.   Come across the street.

24    Q.   And does he come across the street to where you are

25       on the porch?

```
1    A.   Yes, ma'am.

2    Q.   I'm going to ask you to speak up, please, sir.

3    A.   Yes, ma'am.

4    Q.   What does he say, if anything, to you when he comes

5         across the street?

6    A.   Go see if he was dead.

7    Q.   What do you say to him when he asked you to go see if

8         he's dead?

9    A.   Told him no.

10   Q.   And then what does the defendant say when you say no?

11   A.   Told me bitch go look.

12   Q.   And, when he says to you bitch go look, do you go

13        across the street?

14   A.   Yes, ma'am.

15   Q.   Where do you find the man, sir?

16   A.   Laying in the field.

17   Q.   And do you go up to that individual?

18   A.   Yes, ma'am.

19   Q.   And what do you do, sir, when you get over to where

20        the man is?

21   A.   I looked at him and asked him was he all right and he

22        had moved.

23   Q.   I'm sorry?

24   A.   He had moved and I went back across the street.

25   Q.   So, at the time you're talking to him, did you
```

19

```
 1              determine he was still breathing, sir?

 2   A.   What it look like, yeah.

 3   Q.   And you indicated he moved; is that correct?

 4   A.   Yes, ma'am.

 5   Q.   What part of his body did he move?

 6   A.   His upper body.

 7   Q.   And you go back across the street to where the

 8        defendant is?

 9   A.   Yes, ma'am.

10   Q.   Where is he when you get back across the street?

11   A.   Standing in the driveway.

12   Q.   And where is Powder?

13   A.   Still on the porch.

14   Q.   And do you say anything to the defendant as far as

15        the condition of the man across the street?  What do

16        you say to him?

17   A.   I said he was dead.

18   Q.   Then what does the defendant say, sir?

19   A.   Nothing.  He went and got the car.

20   Q.   He went and got the car?

21   A.   Yes, ma'am.

22   Q.   Where was the car parked, sir?

23   A.   Like it was across the street.  I don't really

24        remember.

25   Q.   And does he say anything to you as it relates to the
```

1     car?  What does he say to you as it relates to the

2     car?

3  A.  Told me to get in.

4  Q.  And does he direct anybody else to get in, sir?

5  A.  Powder.

6  Q.  What does he say to Powder?

7  A.  He said get in, asked her to get in the car.

8  Q.  And does she get in the car, sir?

9  A.  No, ma'am.

10  Q.  Do you get in the car?

11  A.  Yes, ma'am.

12  Q.  And do the two of you drive away, sir?

13  A.  Yes, ma'am.

14  Q.  Where are you seated in the car?

15  A.  In the front seat.

16  Q.  And who's driving the car, sir?

17  A.  Shawn.

18  Q.  And where do you go at that point?

19  A.  Like towards Dexter.

20  Q.  And does the defendant drop you off somewhere?

21  A.  Yes, ma'am.

22  Q.  Where does he drop you off?

23  A.  Tussey and Dexter.

24  Q.  Could you tell me how long you have known the

25     defendant Michon Houston or the person you know as

1           Shawn?

2    A.    I'm really not too sure.

3    Q.    Well, have you known him for months or years, sir?

4    A.    Probably a few months.

5    Q.    Would that be a few months before this shooting

6          happened in September?

7    A.    Yes, ma'am.

8    Q.    How long had you known Powder?

9    A.    I had just met her the summer.

10   Q.    The summer?

11   A.    Yes, ma'am.

12   Q.    Do you recall describing the defendant Shawn to the

13         police officer, sir; Do you remember telling the

14         police what Shawn looks like?

15   A.    When was this?

16   Q.    When you gave your statement to the police, sir.

17   A.    Yes, ma'am.

18   Q.    Do you remember telling what he looked like?

19   A.    Yes, ma'am.

20   Q.    And did you tell them anything about tatoos, sir?

21   A.    Yes, ma'am.

22   Q.    And what did you tell the police as it relates to

23         tatoos?

24   A.    He has tatoos under his eye.

25   Q.    And you already pointed out the defendant here in

                                                            22

```
 1          court; is that correct?

 2    A.    Yes, ma'am.

 3    Q.    Do you see tatoos under the defendant's eyes?

 4    A.    Yes, ma'am.

 5    Q.    And you described those tatoos in your statement as

 6          what, sir?

 7    A.    Tatoos of tears.

 8    Q.    How would you describe the tatoos on the defendant's

 9          face now?

10    A.    Tatoo tears.

11                          MS. TOWNS:  I  have no additional

12          questions.  Thank you, sir.

13                          MR. PARKER:  May I, please?

14                          THE COURT:  Your witness.

15

16                      CROSS-EXAMINATION

17    BY MR. PARKER:

18    Q.    Mr. Johnson, you said you knew Mr. Houston for how

19          long?

20    A.    I don't remember for sure.

21    Q.    You said what, a couple of months?

22    A.    I knew him before he went to prison, but we wasn't

23          kicking it like that until like around about the

24          beginning of summer.

25    Q.    But you had known him before this incident happened
```

23

1       like years, right?

2  A.   Yeah, I met him before.

3  Q.   You met him before.  Okay.  So let's talk about this

4       day when this event happened.  What day did it

5       happen?  Do you remember?

6  A.   I don't remember the exact day.

7  Q.   You don't remember the exact day?

8  A.   No, sir.

9  Q.   Do you remember telling the police what day you

10      thought it was or them telling you what day you

11      thought it was?

12  A.   They told me what day it was.

13  Q.   Oh, they told you what day it was.  Okay.

14  A.   They reminded me the day.

15  Q.   Well, your statement says Saturday, but you're

16      telling me and you're telling this Court that the

17      police told you what day too, right?

18  A.   I said a Saturday.

19  Q.   But you're also telling this Court that the police

20      told you certain things too; is that correct?

21  A.   Yes, sir.

22  Q.   About this incident?

23  A.   Yes, sir.

24  Q.   About this homicide?

25  A.   Yes, sir.

24

| | | |
|---|---|---|
| 1 | Q. | Now, when this event happened it happened 5 o'clock |
| 2 | | in the morning; is that fair, somewhere around there? |
| 3 | A. | Yes, sir. |
| 4 | Q. | So let's talk about where you were coming from. |
| 5 | | Where were you coming from before you got to that |
| 6 | | particular house? |
| 7 | A. | The Zodiac. |
| 8 | Q. | What's the Zodiac?  Can you tell the Court what the |
| 9 | | Zodiac is? |
| 10 | A. | It's an after hour motorcycle club. |
| 11 | Q. | How long had you been at the Zodiac? |
| 12 | A. | I don't really know that for sure. |
| 13 | Q. | Could it have been hours? |
| 14 | A. | It was hours. |
| 15 | Q. | Were you drinking? |
| 16 | A. | Yes, sir. |
| 17 | Q. | Doing any drugs? |
| 18 | A. | No, sir. |
| 19 | Q. | Just doing a lot of drinking? |
| 20 | A. | It was fair. |
| 21 | Q. | I can't hear you. |
| 22 | A. | It was fair. |
| 23 | Q. | It was what? |
| 24 | A. | Yeah, we was drinking. |
| 25 | Q. | And you said that Powder was driving? |

25

1   A.   That I can remember, yes, sir.

2   Q.   That you remember.  Do you remember what type of car

3        she was driving?

4   A.   No, sir, not exactly.

5   Q.   You described a situation later on after this event

6        happened where you leave the scene and you say you

7        leave in a car that Mr. Houston is driving now?

8   A.   Yes, ma'am--I mean, yes, sir.

9   Q.   Is this the same car that you went to the Zodiac in?

10  A.   Yes, sir.

11  Q.   But you don't know or remember what type of car it

12       was?

13  A.   It's made like a Taurus.  I don't know what kind of

14       car it was, if it was exactly a Taurus.

15  Q.   You've never been in this car before?

16  A.   Not until that day.

17  Q.   So this was the first time in this car?

18  A.   Yes, sir.

19  Q.   And Powder was driving it the first time and then the

20       next time Mr. Houston is driving it; is that fair?

21  A.   Yes, sir.

22  Q.   You talk about getting to that location, the porch as

23       you described it, and you say it belongs, this house,

24       belongs to a lady named Lisa; is that fair?

25  A.   Yes, sir.

26

1    Q.    Do you know Lisa's last name?

2    A.    No, sir.

3    Q.    Do you know Lisa's relationship to that house?

4    A.    She lives there.

5    Q.    She lives there but do you know that she owned the

6          house?  Does she just stay there paying rent?

7    A.    No, sir, she doesn't own it.

8    Q.    She doesn't own it?

9    A.    No, sir.

10   Q.    You know that?

11   A.    Yes, sir.

12   Q.    Had you been to that house many times fore?

13   A.    Yes, sir.

14   Q.    So you've been to this house.  So you're out there

15         selling drugs; is that a fair statement?

16   A.    No, sir.

17   Q.    And how many times prior to that day September 6th

18         were you out there selling drugs?

19                        MS. TOWNS:  Relevancy, drugs?

20                        THE COURT:  Sustain the objection.

21   BY MR. PARKER:

22   Q.    This event happened September 6th.  You made a

23         statement to the police officers; is that correct?

24   A.    Yes, sir.

25   Q.    Do you remember what date you made a statement to the

```
 1            police officers?

 2   A.    Not exactly.

 3   Q.    If I show you a piece of paper with a statement that

 4         supposedly had your signature on it, do you think

 5         that might refresh your memory?

 6   A.    Might.

 7                         MR. PARKER:  May I approach?

 8                         THE COURT:  You may.

 9   BY MR. PARKER:

10   Q.    Is that your statement, sir?

11   A.    Yes, sir.

12   Q.    Is that the date?

13   A.    Yes, sir.

14   Q.    Does that refresh your memory as to what the date was

15         that you gave this statement?

16   A.    Yes, sir.

17   Q.    What date was that?

18   A.    11/7.

19   Q.    Okay.

20                         MS. TOWNS:  No-

21                         THE WITNESS:  17th.  I'm sorry about

22         that.

23                         THE COURT:  Is that what you meant,

24         11/17?

25                         THE WITNESS:  Yes, sir.
```

```
 1   BY MR. PARKER:

 2   Q.   Obviously there's some time in between September 6th

 3        and 11/17; is that fair?

 4   A.   Yes, sir.

 5   Q.   Had you talked to the police about this incident

 6        between September 6th?

 7   A.   No, sir.

 8   Q.   Not at all; never talked to anybody about this

 9        incident?

10   A.   No, sir.

11   Q.   Do you know a person named Paul Lee?

12   A.   Yes, sir.

13   Q.   How do you know Mr. Lee?

14   A.   My friend.

15   Q.   He's a friend.  How long have your known Mr. Lee?

16   A.   About three years.

17   Q.   Do you know if Mr. Lee was questioned about this

18        particular incident?

19   A.   No, sir.

20   Q.   Do you know where Mr. Lee lives?

21   A.   Yes, sir.

22   Q.   Let's talk about September 6th.  Who else was out

23        there that you observed?  You talked about Powder?

24   A.   Yes, sir.

25   Q.   Anybody else out there?
```

```
 1   A.   No, sir.

 2   Q.   Did you see anybody else out there?

 3   A.   No, sir.

 4   Q.   Sir, do you have any prior convictions?

 5                        MS. TOWNS:  Objection to the form of

 6             the question.  It's improper.

 7                        THE COURT:  Sustain the objection.

 8   BY MR. PARKER:

 9   Q.   Well, do you have any prior convictions going back

10        ten years for truth and veracity?

11   A.   What you say?

12   Q.   Do you have any prior convictions dating within the

13        last years that involve dishonesty?

14   A.   No, sir.

15   Q.   None whatsoever?

16   A.   Not that I can think of.

17   Q.   None that you can think of?

18   A.   No, sir.

19   Q.   You gave a statement on November 17th?

20   A.   Yes, sir.

21   Q.   Did you just go to the police station and give a

22        statement?

23   A.   No, sir.

24   Q.   What was the nature of the circumstances of you

25        coming to give that statement?
```

30

1    A.    Homicide came and got me out of the county.

2    Q.    Homicide came to get you?

3    A.    Yes, sir.

4    Q.    Did you ask to speak to any of the officers?

5    A.    No, sir.

6    Q.    Were you in lock-up at the time?

7    A.    Yes, sir.

8    Q.    And you never said I want to speak to anybody about

9          this particular incident?

10   A.    No, sir.

11   Q.    So, when these Homicide officers came and got you,

12         did they question you?

13   A.    Yes, sir.

14   Q.    Do you remember what date they came and got you out

15         of your cell?

16   A.    I think it was the 17th.

17   Q.    You think it was the 17th?

18   A.    Yeah, that's what the statement is.

19   Q.    Well, that's what the statement says?

20   A.    It was the 17th.

21   Q.    It was the same day you gave the statement?

22   A.    Right.

23   Q.    So they came and got you.  How soon later did you

24         give the statement after they came and got you?

25   A.    I don't know for sure.

31

1    Q.   Well, when they were asking you to give a statement,

2         did they just say will you just give us a statement

3         about this and you gave a statement; how did you

4         give a statement?

5    A.   How did I give a statement?

6    Q.   Yes.   Did they question you?

7    A.   Yes, sir, they questioned me.

8    Q.   Well, did they tell you about certain things that

9         happened?

10   A.   Yes, sir.

11   Q.   And, what did they tell you, that you're involved in

12        it?

13   A.   Yes, sir.

14   Q.   And did they threaten you that if you didn't give a

15        statement that they would charge you with this

16        murder?

17   A.   Yes, sir.

18   Q.   They told you those things, right?

19   A.   Yes, sir.

20   Q.   They gave you the date and the areas and the time

21        this event happened; is that a fair statement?

22   A.   Yes, sir.

23   Q.   And they gave you this information before you gave

24        them any information; is that fair?

25   A.   Yes, sir.

                                                    32

1    Q.   They gave you these types of bits of information

2         before you signed your name to this piece of paper?

3                        MS. TOWNS:   I'm sorry.   This has

4              been asked and answered.   This is a preliminary

5              examination.

6                        THE COURT:   I'll allow this

7              question.   You may.

8    BY MR. PARKER:

9    Q.   Before you signed this piece of paper the officers

10        gave you information about the incident?

11   A.   Yes, sir.

12   Q.   You said that you were across the street making

13        observations of what you saw Mr. Houston do; is that

14        fair?

15   A.   Yes, sir.

16   Q.   But yet you say that when you see this person come up

17        that you were able, what, just to say what you want

18        and that person was able to see or hear because you

19        said you were on the porch; is that fair?

20   A.   Yes, sir.

21   Q.   So you're on the porch and you're able to say what do

22        you want and that person is able to hear because you

23        described it as being across the street, right?

24   A.   Yes, sir.

25   Q.   So they were able to hear?

33

1  A.    I think he heard.  I don't know if he heard me or

2        not.  I don't know at this point.

3  Q.    Then you say after the prosecutor questioned you that

4        you never actually interacted with this person

5        because Mr. Houston did; is that fair?

6  A.    Yes, sir.

7  Q.    So what?  Are you in competition for sales?

8                      MS. TOWNS:   Judge, relevance.

9                      THE COURT:   I'll overrule the

10       objection.

11 BY MR. PARKER:

12 Q.    Are you all in competition for this particular sales

13       out there?

14 A.    It's not competition, but I would have rather had the

15       money.

16 Q.    Not competition but you'd rather have the money.  You

17       say that you observed Mr. Houston go across the

18       street and you say that he chased this person; is

19       that fair?

20 A.    Yes, sir.

21 Q.    And you described him as chasing him around you say a

22       tree?

23 A.    Yes, sir.

24 Q.    Now, how wide, do you remember, is that street?

25 A.    I didn't have no rulers, sir.  I don't know all about

                                                            34

1    that.

2  Q.  You know trees--you know that area, right?

3  A.  I don't know, sir.

4  Q.  Have you seen that tree before?

5  A.  Yes, sir.

6  Q.  Because you've been across that street looking at

7      that tree for many a day, right?

8  A.  Yes, sir.

9  Q.  Is it a wide tree versus a small tree like this

10     microphone?  Is it a wide tree?

11 A.  It's a wide tree.

12 Q.  So when you say Mr. Houston you described him as

13     chasing him around this tree.  Is he going all the

14     way around in a circle or just go around once?  Do

15     you remember?

16 A.  Like a half a circle.

17 Q.  Then you say you see Mr. Houston chase him?

18 A.  He was behind him.

19 Q.  And you saw--you described Mr. Houston shooting at

20     him; is that fair?

21 A.  Yes, sir.

22 Q.  Let's talk about how many shots you heard at what

23     point in time.  He's chasing him.  He's behind him.

24     Do you hear or do you see shots the first time or

25     heard the shorts?  You heard a shot?

1    A.    Yes, sir.

2    Q.    How many did you hear?

3    A.    Around about two or three.

4    Q.    About two or three.  And then what?  Do you see this

5          person fall down?

6    A.    Yes, sir.

7    Q.    So that two or three shots.  Then what happened next?

8    A.    He stood over him.

9    Q.    Now, when he's standing over him, are you still on

10         the porch?

11    A.    Yes, sir.

12    Q.    Now, when you describe this field being across the

13         street, I take it it's just a regular street; it's a

14         side street or a residential street?

15    A.    Residential street.

16    Q.    Residential street.  You know on a residential street

17         you have your street; you usually have maybe that

18         front part of the cross; you have your sidewalk and

19         you have grass, that type of situation?

20    A.    Yes, sir.

21    Q.    You're describing this thing happening in a field?

22    A.    Yes, sir.

23    Q.    Is this field--would this field be a place where

24         houses normally be that probably aren't there

25         anymore?

1    A.   Yes, sir.

2    Q.   How far into the field is this tree that you're

3         describing?

4    A.   The middle of the field.

5    Q.   If a house was there, based on those houses that were

6         on that particular block, where do you think that

7         tree would be?  Would it be like in the-

8                        THE COURT:  Your inquiry has to be

9              the distance of the tree from where the house

10             was?

11                       MS. TOWNS:  I think he said if a

12             house was there, first of all, relevance.

13                       THE COURT:  I'll sustain the

14             objection on the form of the question.

15             Distance and feet obviously fall into ability to

16             observe, so you certainly may make that inquiry.

17   BY MR. PARKER:

18   Q.   I'm just trying to get some type of feel for where

19        that tree is.  How far do you think that tree is from

20        the sidewalk?  Let's just start there.

21   A.   If a house was there it would have been in the

22        backyard.

23   Q.   Is there an alley that runs out there to  behind that

24        field?

25   A.   Yes, sir.

1    Q.    So that would be in the backyard.  So all the time

2          you're making these observations across the street on

3          this front porch-

4    A.    Yes, sir.

5    Q.    It's five o'clock in the morning.  I take it it's

6          dark outside, right?

7    A.    Yes, sir.

8    Q.    Is there any lighting around there?

9    A.    Street lights.

10   Q.    Are there street lights in that field?

11   A.    No, sir.

12   Q.    So you're making these observations.  You either hear

13         or see a couple of shots being fired.  Can you see

14         the person that's being shot at?  Is he on the

15         ground?

16   A.    Yes, sir.

17   Q.    Can you see him on the ground from where you are?

18   A.    Yes, sir.

19   Q.    Can you tell whether or not he's on the ground laying

20         face down or face up?

21   A.    Face up.

22   Q.    At that point in time do you hear or see any other

23         shots?

24   A.    Yes, sir.

25   Q.    How many?

                                                        38

1   A.   About two or three.

2   Q.   All right.  Then at that point in time Mr. Houston

3        comes back?

4   A.   Yes, sir.

5   Q.   Now, these shots, are these shots from a very loud

6        gun or a very silent gun in your opinion?

7   A.   It was a loud gun.

8   Q.   You heard gunshots before, haven't you?

9   A.   Yes, sir.

10  Q.   Do you carry a gun?

11                     MS. TOWNS:  Relevance.

12                     THE WITNESS:  No, sir.

13                     THE COURT:  I'll allow the answer to

14        stand.

15  BY MR. PARKER:

16  Q.   You heard the gun.  Did anybody come out; meaning

17       people like neighbors, or in these houses because

18       there's houses next to this field; is that correct?

19  A.   Yes, sir.

20  Q.   And you say at least a total of what, four, five,

21       six, maybe more, shots had been fired?

22  A.   Yes, sir.

23  Q.   And these are loud shots?

24  A.   Yes, sir.

25  Q.   At this point in time Mr. Houston comes back.  He

                                                      39

| | |
|---|---|
| 1 | talks to you.  He has you go do something.  So how |
| 2 | long do you think you were out there before you |
| 3 | eventually left that scene from the time those shots |
| 4 | were first fired? |
| 5 | A. Probably around about two or three minutes. |
| 6 | Q. Two or three minutes? |
| 7 | A. Yes, sir. |
| 8 | Q. So shots were fired.  Mr. Houston comes back, says |
| 9 | something to you.  You go across the street, right? |
| 10 | A. Yes, sir. |
| 11 | Q. And do you talk to this person lying on the ground? |
| 12 | A. Yes, sir. |
| 13 | Q. And then you come back? |
| 14 | A. Yes, sir. |
| 15 | Q. Are you running? |
| 16 | A. I don't remember that for sure. |
| 17 | Q. You're saying this took a period of two or three |
| 18 | minutes? |
| 19 | A. Yes, sir. |
| 20 | Q. All right.  Then you get into the car? |
| 21 | A. Yes, sir. |
| 22 | Q. Mr. Houston goes and gets the car you described; is |
| 23 | that correct? |
| 24 | A. Yes, sir. |
| 25 | Q. What do you mean he goes and gets the car?  Was the |

40

| | | |
|---|---|---|
| 1 | | car there or not there? |
| 2 | A. | Across the street. |
| 3 | Q. | Well, you first described the shooting as one where |
| 4 | | you see Mr. Houston shoot the guy from behind; is |
| 5 | | that correct? |
| 6 | A. | From behind. |
| 7 | Q. | Meaning that this guy has his back turned running |
| 8 | | away from Mr. Houston? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And Mr. Houston is shooting at him? |
| 11 | A. | Yes, sir. |
| 12 | Q. | And you say he falls at that time? |
| 13 | A. | Yes, sir. |
| 14 | Q. | And then you describe Mr. Houston as shooting this |
| 15 | | person.  How close was Mr. Houston or this person |
| 16 | | shooting at this person on the ground? |
| 17 | A. | He was across from him. |
| 18 | Q. | Let's talk about it in terms of where you're sitting |
| 19 | | versus say where this door is of your witness booth; |
| 20 | | is it that close? |
| 21 | A. | About the same distance. |
| 22 | Q. | About the same distance. |
| 23 | | MR. PARKER:  Can I have a |
| 24 | | measurement?  I'm saying two feet or less than |
| 25 | | two feet. |

41

1              MS. TOWNS:  I really don't

2      understand what the witness is talking about

3      from.

4              THE COURT:  First of all, the

5      distance indicated would be a distance of 18 to

6      24 inches, and that would be from the door to

7      where you're sitting?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Now, go ahead with your

10     inquiry.  You have redirect on the issue of

11     where he was standing where the shots were

12     fired.  That's the issue that's being addressed

13     now.

14             MR. PARKER:  Thank you.

15  BY MR. PARKER:

16  Q.   So you're saying somebody is shooting over this

17  person on the ground?

18  A.   Yes, sir.

19  Q.   And can you see the position of the gun as the shots

20     are being fired?

21  A.   No, sir.

22  Q.   You can't see the position?

23  A.   No, sir.

24  Q.   You couldn't tell whether they were down or up or

25     anything like that?

                                                    42

```
 1   A.   A little down.

 2   Q.   It was down?

 3   A.   Yes, sir.

 4   Q.   It was dark outside, right?

 5   A.   Yes, sir.

 6   Q.   Did you see flashes or sparks or that kind of thing?

 7   A.   No, sir.

 8   Q.   But you just heard the noise and you saw?

 9   A.   Yes, sir.

10   Q.   You said that you eventually left that area, that

11        scene, in a car driven by Mr. Houston; is that

12        correct?

13   A.   Yes, sir.

14   Q.   How did he drive away?  Do you remember?  Was

15        there--was it fast?  Did he just cruise away?

16   A.   Fast.

17   Q.   How do you know it was fast?

18   A.   I was in the car with him.

19   Q.   You were in the car.  Did you hear any noise;

20        screeching of the tires, that type of fast of just

21        driving away briskly?

22   A.   Pulling off pretty fast.  I don't remember hearing

23        any squeaks, though.

24   Q.   When you went to see that person on the ground did

25        you search that person to see if he had any money?
```

```
 1    A.    No, sir.

 2    Q.    Do you know a person named Crooks(ph)?

 3    A.    Crooks?

 4    Q.    Yes.  Also known as Country (ph)?

 5    A.    Yes, sir.

 6    Q.    How do you know him?

 7    A.    One of the guys on the block.

 8    Q.    One of the guys on the block?

 9    A.    Yes, sir.

10    Q.    Do you all have a long relationship?

11    A.    No, sir.

12    Q.    On-going relationship?

13    A.    No, sir.

14    Q.    Do you all do things together, like sell drugs?

15    A.    We sell drugs.

16    Q.    So you would know him automatically, right?

17    A.    Yeah, been on the block.

18    Q.    But you would never have any problem recognizing him;

19          is that a fair statement?

20    A.    Yes, sir.

21    Q.    When the police arrested you and they got you in

22          jail, did you give them your correct name?

23    A.    Yes, sir.

24    Q.    You've always given the police your correct name?

25                        MS. TOWNS:   Relevance on always.
```

44

1                         THE COURT:   Sustain the objection.

2    BY MR. PARKER:

3    Q.   And it's your testimony that you never were

4         questioned about this incident prior to those police

5         officers coming to get you out of the jail or the

6         homicide investigators coming to get you out of jail?

7    A.   Yes, sir.

8                         MR. PARKER:   I have no further

9         questions, your Honor.

10                        THE COURT:   Thank you.

11

12                     REDIRECT EXAMINATION

13   BY MS. TOWNS:

14   Q.   Mr. Johnson, defense counsel asked you if you know a

15        guy named Paul Lee.   Do you remember him asking you

16        that?

17   A.   Yes, ma'am.

18   Q.   And he asked you do you know if Paul Lee talked to

19        the police and said no.   Do you remember telling us

20        that?

21   A.   Yes, ma'am.

22   Q.   Does that mean no you don't know whether he talked to

23        the police or no he did not talk to the police?

24   A.   I don't know.

25   Q.   And when the police spoke with you did they tell you

                                                           45

```
 1            what to say in your statement, sir?
 2    A.      No, ma'am.
 3    Q.      Did anybody force you to write anything down in your
 4            statement, sir, right here, your statement?
 5    A.      No, ma'am.
 6    Q.      Now, you indicated--could you tell me if I am the
 7            defendant and I'm standing right here, sir, could you
 8            tell me approximately where the body of the man was
 9            when he was shooting over him?  If you look down here
10            on the floor please and direct me, if I am the
11            defendant with the gun in my hand, could you show me
12            where the body is.
13    A.      Where the microphone stand at.
14    Q.      And when we talk about the microphone stand right
15            here, sir?
16    A.      Yes, ma'am.
17    Q.      And is that the position where the gun was in
18            relationship to the body?
19    A.      Yes, ma'am.
20    Q.      I'm sorry?
21    A.      I don't really know because I couldn't see how
22            exactly the gun was faced.
23    Q.      But when you say the distance from me and the
24            microphone which I would estimate-
25                             THE COURT:  Well, are you talking
```

```
 1              about the open space between her feet and the

 2              microphone?

 3    BY MS. TOWNS:

 4    Q.   Look where my feet are, sir.  Is the body where the

 5         microphone is closer or farther away?

 6    A.   About the same length right there where you at.

 7                        THE COURT:  Indicating for the

 8              record, two and a half feet.

 9    BY MS. TOWNS:

10    Q.   You didn't willingly come forward and tell the police

11    what you saw; isn't that correct?

12    A.   Yes, ma'am.

13    Q.   Why was that--why didn't you come forward and say

14         that you witnessed this murder?

15    A.   Scared.

16    Q.   What you are scared of, sir?

17    A.   For my life.

18    Q.   When you were out there, did you stand and take a

19         look all around the streets and the alleys to see who

20         was out there?

21    A.   No, ma'am.

22    Q.   So, if other people were out there in the alley or

23         the street, you don't know if they were there?  Can

24         you tell me that or not?

25    A.   No, ma'am.
```

```
 1                         MS. TOWNS:  I have no additional

 2            questions.  Thank you, sir.

 3                         MR. PARKER:  Just briefly.

 4

 5                     RECROSS-EXAMINATION

 6   BY MR. PARKER:

 7   Q.   Sir, but you were out there how long before this

 8        person that we're talking about came up; and the

 9        decedent in this case, how long had he been out

10        there?

11   A.   About an hour.

12   Q.   It's five o'clock in the morning.  Was there a lot of

13        traffic out there?

14   A.   No, sir.

15   Q.   And you had been out there for a few hours; is that

16        correct?

17   A.   I don't know the exact time.

18   Q.   Somewhere around an hour?

19   A.   About a half hour.

20   Q.   This is a place where you had been many times?

21   A.   Yes, sir.

22   Q.   So you know the surrounding--you know who lives in

23        these houses that you're standing and sitting in

24        front of?

25   A.   Yes, sir.
```

48

1    Q.   So you know everybody out there basically?

2    A.   Yes, sir.

3    Q.   All right.  But you didn't really see anybody out

4         there at the time?

5    A.   No, sir.

6    Q.   Now, while you were out there making these

7         observations, were you also drinking at that time?

8    A.   No, sir.

9    Q.   Now, the prosecutor asked you did anybody threaten

10        you to make a statement or anything like that, did

11        they?

12   A.   No, sir.

13   Q.   You don't think they did?

14   A.   No, sir.

15   Q.   Do you think the fact that you're in jail--are you

16        expecting something for testifying?

17   A.   No, sir.

18   Q.   You don't expect anything positive to happen?

19   A.   No, sir.

20   Q.   So you're just testifying because you want to?

21   A.   It's a messed up situation.

22   Q.   It's a messed up situation?

23   A.   Yes, sir.

24   Q.   It's a messed up situation, but you just told this

25        court a little while ago that you felt they were

49

1      going to charge you with the crime; isn't that fair?

2   A.   Yes, sir.

3   Q.   Is it?

4   A.   Yes, sir.

5   Q.   So they did tell you that, right?

6                    MS. TOWNS:  Judge, I object.  It's

7        been asked and answered.  He doesn't like the

8        answer so he keeps trying to ask him the

9        questions-

10                    THE COURT:  This is recross based

11       upon redirect, and I don't know that there was

12       any inquiry in this area.  I'm trying to give

13       you some latitude.

14                    MR. PARKER:  Thank you.  I

15       appreciate that, your Honor, but I thought the

16       prosecutor did ask whether or not this witness

17       is testifying freely or voluntarily or were they

18       threatened or whatever.

19                    THE COURT:  That was on direct.

20       That was not on redirect.

21                    MR. PARKER:  I thought we brought

22       that up on redirect.  Okay.

23  BY MR. PARKER:

24  Q.   But I didn't understand the question--the answer to

25       the question about had you been drinking when you got

                                                        50

```
 1          to the location when you were selling the drugs?
 2    A.    No, sir.
 3    Q.    And you didn't hear anybody else after those gunshots
 4          went off or you didn't see anybody out there?
 5    A.    No, sir.
 6                         MR. PARKER:  I have no further
 7          questions.
 8                         MS. TOWNS:  I have no additional
 9          questions.
10                         THE COURT:  Thank you, Counsel.  You
11          may step down at this time, sir.
12                         MS. TOWNS:  Your Honor, we would
13          move for the defendant to be bound over on the
14          counts charged in the Warrant; count one, first
15          degree premeditated murder.  There's been
16          stipulations as it relates to count two, Judge,
17          and count three, use of a firearm during the
18          course of a felony.
19                         MR. PARKER:  I object to the
20          bindover, your Honor.  I feel that the witness'
21          credibility is very much at--the history in the
22          case is that this person first talks about being
23          threatened that he could be charged with this
24          particular crime, and then certainly after being
25          questioned by the prosecutor changed his
```

degree count involves requisite enhancement of

premeditation.   The shooting of the decedent and

then upon the decedent being on the ground

coming to where he was on the ground and firing

additional shots would be enough to satisfy the

premeditation element for purposes of the

preliminary examination.   Obviously this is not

a finding beyond a reasonable doubt, but in a

probable cause hearing certain probable cause to

believe the defendant committed the crimes

contained in the Warrant and Complaint while in

the city of Detroit.   Therefore, the defendant

will stand bound over to the Wayne County

Circuit Court for further proceedings.   The date

set for the Arraignment on the Information is?

            OFFICER BORDEN:   February 9th at 9

a.m.

            MS. TOWNS:   Thank you, your Honor.

                (The proceedings concluded at

                approximately 3:31 p.m.)

                ---    ---    ---

1                    C E R T I F I C A T E

2

3

4

5    STATE OF MICHIGAN)

6                    )

7    COUNTY OF WAYNE  )

8

9

10

11              I certify that this transcript,

12        consisting of 54 pages, is a complete, true, and

13        correct transcript of the proceedings and

14        testimony taken in this case on January 29,

15        2003.

16

17

18

19

20    _2·24·03_                Sherrayna White Moore

21        DATE                 Sherrayna White Moore
                               421 Madison, Suite 4066
22                             Detroit, Michigan  48226

23

24        Mechanically reproduced copies of this
          transcript are not certified unless the
25        certificate page bears an original signature.
                                                    54