*248742*

1   STATE OF MICHIGAN

2   IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

3

4   THE PEOPLE OF THE STATE OF MICHIGAN

5   .vs                                   Case No. 03-001609

6

7   MICHON DESMOND HOUSTON,

8        Defendant.
                                         /

9

10   JURY TRIAL

11

12        PROCEEDINGS HAD in the above-entitled cause before

13   the HONORABLE VERA MASSEY JONES, Circuit Judge, Detroit,

14   Michigan on Thursday, April 3rd, 2003.

15

16   APPEARANCES:

17

18   For the People:      RODNEY P. HASSINGER (P-40573)
                          Wayne County Assistant Prosecutor
19                        1441 St. Antoine Street
                          Detroit, MI 48226
20                        (313) 224-5777

21

22   For the Defendant:   DAVID E. LANKFORD (P-43536)
                          645 Griswold Street, Suite 2350
23                        Detroit, MI 48226
                          (313) 965-4834

24

25

1

# TABLE OF CONTENTS

PAGE

WITNESSES:  PEOPLE

DR.  PAUL NORA
        Direct Examination by Mr. Hassinger          29
        Cross-Examination by Mr. Lankford            50
        Redirect Examination by Mr. Hassinger        61
        Recross-Examination by Mr. Lankford          63


OFFICER MICHAEL CARPENTER
        Direct Examination by  Mr. Hassinger         68
        Cross-Examination by Mr. Lankford            84


LAVERO CROOKS
        Direct Examination by Mr. Hassinger          98
        Cross-Examination by Mr. Lankford           121
        Redirect Examination by Mr. Hassinger       152
        Recross-Examination by Mr. Lankford         154

JOVAN JOHNSON
        Direct Examination by Mr. Hassinger         158
        Cross-Examination by Mr. Lankford           177
        Redirect Examination by Mr. Lankford        212


OFFICER MICHAEL BASTIANELLI
        Direct Examination by  Mr. Hassinger        213
        Cross-Examination by Mr. Lankford           216

OFFICER MELVIN WILLIAMS
        Direct Examination by  Mr. Hassinger        217
        Cross-Examination by Mr. Lankford           229


Opening Statement by the People                       8
Opening Statement by the Defendant                   22


EXHIBITS:                                        RECEIVED
PX #1        Diagram                                  37
PX #2        Sketch                                   71
PX #3-9      Photographs                              83

1                     Detroit, Michigan

2                     Thursday, April 3, 2003

3                     Morning session

4                     - - -

5        THE COURT: Okay, gentlemen, we got jurors

6  who are inside.  I want to know what we're going to

7  do?

8        MR. LANKFORD: Mr. Lankford on behalf of

9  Mr. Michon Houston, good morning.

10       MR. HASSINGER: Rod Hassinger on behalf of

11  the People, good morning, Your Honor.

12       Judge, we have present today --

13       THE COURT: I know you got your witnesses.

14  Are we getting ready to start?

15       MR. HASSINGER: Yes.  Mr. Lankford needed

16  to address the Court on one issue.

17       THE COURT: Can we do that after we begin

18  because I tell the jurors they're supposed to be

19  here at 9:00 o'clock.  I do not like keeping them

20  waiting.  What I would like to do is bring them

21  out. I want you to have all your witnesses come in

22  so we can introduce them to the jurors.

23       I'm going to then swear them, and then I

24  want you to be ready to make opening statements, or

25  do you have to address me before you make opening

1    statements?

2              MR. HASSINGER: I don't need to address

3    you before opening statements.

4              THE COURT: Do you need to address me

5    before opening statement?

6              MR. LANKFORD: I feel I do briefly, yes,

7    Your Honor.

8              THE COURT: Okay, that will be fine.  Then

9    we'll do opening for the People, and then we'll

10   send them back in. Okay?

11             MR. HASSINGER: One request, Judge.  One

12   of the witnesses is upstairs on the second floor.

13             THE COURT: Both of them are still in

14   custody, right?

15             MR. HASSINGER: We have detainers for both

16   the witnesses.

17             THE COURT: Yes, that's right. Okay. We

18   got to get lawyers for them.  Mr. Cook, you got a

19   client.

20             MR. HASSINGER: I was just wondering if we

21   could bring the witnesses down for when the jury

22   comes out.

23             THE COURT: That's what I just said.  I

24   want all of the witnesses here so they can be

25   introduced to the jurors.  Okay.

1           MR. LANKFORD: We move to sequester.

2           THE COURT: I will order sequestration

3     after the witnesses have been introduced to the

4     jurors.

5           MR. HASSINGER: Thank you, Judge.

6           THE COURT: Okay. You may bring the jurors

7     in.

8           THE BAILIFF: All rise.

9           (Jury enters courtroom at 9:21 a.m.)

10          THE COURT: Do I have your stipulation

11    that all of our jurors are here and in their proper

12    places?

13          MR. HASSINGER: The People so stipulate.

14          MR. LANKFORD: Defense too, Your Honor.

15          THE COURT: Ladies and gentlemen, I want

16    to thank you all for being here so promptly. I

17    apologize for keeping you waiting, but I had

18    ordered the People to get as many of their

19    witnesses here at 9:00 o'clock today before you

20    were here so they could be introduced to you, and

21    it took a few minutes for some of them to get

22    notice. You took a few minutes to get here. At

23    this time I ask to please introduce the witnesses

24    who may be called to testify. When your name is

25    called, ask them to stand.

1      MR. HASSINGER: Thank you, Your Honor.

2   First, I'd like to introduce the officer in charge

3   from Detroit Homicide, Sergeant Danny Marshall.

4   Sergeant Marshall will be assisting me in Mr.

5   Michon Houston's trial.  He's the officer in

6   charge.

7          Mr. Javon Johnson, would you please stand

8   up, sir.  Thank you.

9          Mr. Lavero Crooks would you please stand

10  up, sir.

11         Judge, in addition we have Officer Fred

12  Mcintyre.  We have Officer Charles Adams.  Officer

13  Olivia Moss.  We have our evidence technician

14  Michael Carpenter.  We also have Officer

15  Bastianelli, and then we have Officer Williams.

16         Judge, those are the witnesses we have

17  present here this morning.

18         THE COURT: All right.  At this time the

19  Court will order sequestration of all witnesses,

20  both those for the prosecution and defense.  That

21  means they may not be in the courtroom unless

22  they're on the witness stand testifying. Please

23  see to it.

24         MR. HASSINGER: Judge, may there be an

25  exception for the officer in charge in this case?

1          THE COURT: Except for the officer in

2    charge of the case.

3          MR. HASSINGER: Thank you, Your Honor.

4          THE COURT: Okay.

5          MR. HASSINGER: All of the witnesses in

6    the case, we'll have them step out in the hall.

7          THE COURT: Ladies and gentlemen, did any

8    of you recognize any of the persons who was just

9    introduced as persons that you might know?

10         THE JURY: No.

11         THE COURT: All right, swear the jury

12   panel, please.

13         THE CLERK: Could you all please stand and

14   raise your right hand.  Do you solemnly swear or

15   affirm to truthfully deliberate this case according

16   to the evidence and the laws of this state?

17         THE JURY: Yes.

18         THE CLERK: Thank you.

19         THE COURT: Are the People ready to

20   proceed with opening?

21         MR. HASSINGER: Yes, Judge, could we approach

22   briefly?

23         THE COURT: Sure.

24         (Discussion at bench outside the hearing

25           of the jury)

1          (Back on the record)

2          THE COURT: You may, counsel, proceed.

3          MR. HASSINGER: Thank you, Your Honor.

4          Good morning, ladies and gentlemen of the

5     jury.  Before I get into my actual opening

6     statement I want to thank all of you for being down

7     here today.  Okay.  I know you all have other

8     places you'd rather be than sitting down here on

9     jury duty.

10         It takes something out of your life to be

11    down here and I want you to know that I appreciate

12    it.  I appreciate the fact that you're going to

13    take the time this case takes to put in the effort

14    of being a juror on this case and I appreciate

15    that.

16         Again, my name is Rod Hassinger and I'm

17    and Assistant Wayne County Prosecuting Attorney,

18    and it's my duty and my obligation to prove this

19    case to you beyond a reasonable doubt.  So hold me

20    to that.  It's my job.  He who accuses must prove.

21    That's my obligation and I want you to hold me to

22    it.  Okay.

23         In this particular case we are charging

24    this gentleman with murder in the first degree.

25    He's also charged with two other counts.

1    He's charged with being a felon in possession of a

2    firearm.  And also a third count of felony

3    firearm.  So those are the three counts that you'll

4    have to deliberate when you go into that jury room.

5         And when all the evidence in this case is

6    done, and when you've heard all the testimony, seen

7    all the exhibits and when you go in that jury room

8    to decide this case, I'm going to be asking you to

9    come back with three counts of guilty as charged

10   against him.

11        A few procedural matters I want to

12   address. In my 14 years of doing this, typically in

13   cases like this, we'll put on the witnesses. You'll

14   see the exhibits, and you'll go into the jury room

15   and decide the case. And a lot of times you'll send

16   out a note right away saying we want to see all the

17   reports.  We want to see all the written

18   statements, all the written reports that everybody

19   did in this case.

20        Ladies and gentlemen, that's not evidence

21   in this case.  The judge is going to tell you what

22   the evidence is.  And the evidence is the testimony

23   you're going to hear from the witnesses on the

24   witness stand. That's what you need to use to make

25   your decision in this case. A lot of paperwork is

1    done just to help witnesses refresh their memory

2    when they get up on the stand, but it's not

3    admissible evidence.  So you need to rely and

4    listen to the witnesses as they testify to make

5    your decision in this case.

6          Secondly, a lot of times a jury will send

7    out a note saying we want the transcripts of all

8    the testimony that we heard in the case. And

9    although that is available, it's very hard for this

10   young lady here to create all that for you because

11   she basically takes down all the testimony in a

12   shorthand form. Okay.  And it takes hours and hours

13   to create a transcript.

14         Again, I'm just saying all this to let

15   you know how important it is for you to listen to

16   testimony from the witness stand.

17         And amongst all of you, paying attention

18   to that evidence I know that you can come back with

19   a verdict in this case, so that's just a little

20   procedural matter.  I like to tell that to all

21   juries because sometimes there's a misconception

22   that we can just hit a button on the computer and

23   they'll be a transcript of all the testimony.  It's

24   just not that easy.  So please pay attention to the

25   testimony because that's the evidence in this case.

1       Now, you already heard a little bit about

2   this case, although what you heard was not evidence.

3   The judge read you the charges.  We told you that

4   it's alleged this all happened back on September

5   6th of last year over on West Buena Vista near

6   Linwood in the city of Detroit.  And that's on the

7   criminal information that charges Mr. Houston with

8   what he did.

9       But ladies and gentlemen, what this case

10  really involves are drugs, guns, and the whole

11  underworld cultural of that type of community.

12      As a prosecutor, I don't get to go out

13  and pick who the victim of the crime is.  As a

14  prosecutor, I don't get to go out and pick who the

15  witnesses are going to be.  Whoever is there when

16  it happens, those people are the witnesses. We have

17  to deal with that.  We have to be up-front about

18  it.  You're going to hear some of these witnesses

19  are also drug dealers. All right.  And you have to

20  accept these people for who they are. They're going

21  to get up there and tell you what happened. They're

22  going to tell you about who they are, and so you

23  have to understand that.

24      Usually in some type of drug relating

25  killing the witnesses are either going to be drug

1      users or other drug dealers.   That's common sense.

2      That's what your everyday life and experiences

3      should tell you.

4              I'm not going to have the president of

5      United States, although maybe you wouldn't find him

6      to be a credible witness either, but I'm just

7      telling you I don't get to pick witnesses. I bring

8      the witnesses in.   I let them tell you what they

9      saw, what they observed, so you can make a decision

10     in this particular case.

11             The victim in this case was a young man

12     30 years old.   His name was Carlton Thomas.   And

13     you're going to hear that about five a.m., back on

14     September 6th, Mr. Thomas was cutting through a

15     field approaching some houses on Buena Vista, and

16     he was going over there to buy some crack cocaine.

17             On a porch at one of those houses on

18     Buena Vista was the defendant who was dealing drugs

19     back on that date at that time.   On that same porch

20     with him was his girlfriend Christina Eshelman, who

21     is known on the street as Powder.   And also with

22     him was a gentleman who on the street was known as

23     JW, but his real name was Jovan Johnson.

24             When Jovan Johnson and Mr. Houston see

25     the victim coming through the field, they yell out

1   to him.  They ask him what does he need.  What's he

2   want.  What's up. All right.  And, in fact, Mr.

3   Houston goes over to victim as he's coming through

4   the field so he can get the business and he can

5   deal him some drugs.

6          And you're going to hear that in this

7   particular case Mr. Carlton Thomas didn't want to

8   deal with Mr. Houston.  He tells Mr. Houston I'll

9   spend money where I want to spend it.  I'm not

10  dealing with you.

11         And that gets Mr. Houston irate.  He gets

12  upset and he gets a gun.  You'll hear testimony

13  about a 40 caliber gun in this particular case.

14  And what he does is he gets a gun and he points it

15  at the victim.  The victim sees this.  The victim

16  starts running away from him, and he starts

17  shooting at him.  And the victim gets shot and Mr.

18  Carlton Thomas falls to the ground by a tree out

19  there on that field.

20         Mr. Houston at that time approaches Mr.

21  Thomas.  He turns him over.  Looks at him.  Tells

22  the people back up on the porch that he shot him in

23  the face and proceeds to shoot him three more

24  times.  Twice in the abdomen and once in the leg.

25         Mr. Houston calmly walks back at that

porch that he had been up on there, and he tells
Mr. Javon Johnson go check him out. Go see if he's
dead.  And Mr. Johnson really doesn't want to have
anything to do with it but he does.  He goes over
to that location, and when he gets over there he
realizes Mr. Thomas is actually still alive.  He's
not dead yet.  He's clinging to life at that point.

Mr. Johnson actually says some words to
him, and Mr. Thomas actually moves a little bit so
he knows he's still alive.  But Mr. Johnson goes
back to Mr. Houston and tells him he's dead.

At that point Mr. Houston and Mr. Johnson
leave the area in a car. They try and get Powder
also known as Christina Eshelman to leave with them
but she doesn't want to go with them.  She stays
there, and they leave that location.

Little did they know that there was
another witness to this crime.  Little did they
know that seated in a vehicle was a gentleman by
the name of Lavero Crooks.  He was sitting out
there in his car and he witnessed pretty much this
entire transaction go down.

He hears the words that are spoken.  He's
going to come in and tell you that he witnesses Mr.
Houston shoot Mr. Thomas and kill him, which will

1   lead to his death, shots that will lead to his

2   death.

3           When the second round of shots starts,

4   Mr. Crooks leaves the scene in his car.  But he was

5   out there and he witnessed it all, and he's going

6   to tell you exactly what happened.

7           The police officers get to the scene a

8   little while later.  And when they first get there

9   Mr. Thomas is still alive.  They conveyed Mr.

10  Thomas to the hospital where he's pronounced dead.

11  They try and do the whole medical procedures to see

12  if they can save his life, but too little too late.

13  The wounds are just too devastating for Mr. Thomas

14  to recover from.

15          The police start their investigation.

16  They eventually talk to these witnesses. They

17  eventually get Mr. Houston under arrest and that's

18  how we end up where we are today, ladies and

19  gentlemen.

20          I want to go back to the law for a minute

21  because I told you what I believe is the evidence

22  you're going to hear in this particular case.  And

23  really this whole incident took no more than five

24  to ten minutes, but we're going to do a trial on

25  this that's probably going to take two to four

1    days. You got to remember this whole incident was a

2    matter of minutes.

3            So what are we talking about here.  We're

4    talking about murder in the first degree. Now a lot

5    of us, we get our legal education from watching tv

6    and you think about premeditated murder when you

7    think about somebody planning over the course of

8    years that just killed somebody, that's what we

9    think about is premeditated murder.

10           But actually the judge is going to tell

11   you the law in this case. And the law is actually

12   very different than you might assume premeditate

13   murder to be.  Because premeditation and

14   deliberation really means having the ability and

15   the chance to have a second thought about doing

16   these things, having the ability to reflect on your

17   actions.

18           An example might be you're driving your

19   car down the road and you're coming up to an

20   intersection and the light turns yellow. You

21   decided first off you're going to stop, and then

22   you realize, well, I think I got time to get

23   through that intersection and you done it and you

24   go through the intersection.  Well, that's the

25   process of deliberating in your mind of making a

1    willful decision. Stopping and reflecting upon your

2    action.

3         It might be equivalent of shooting

4    somebody initially and going over there and turning

5    him over and standing over that person and deciding

6    to shoot him two or three more times. And that's

7    what we're talking about here in this case when we

8    talk about thinking about your actions about

9    premeditations and about deliberation.

10        We're not saying this is something that

11   Mr. Houston planned out over the course of weeks or

12   months, ladies and gentlemen. But he had the time

13   to reflect upon his actions. He did and he

14   continued to injury and shoot Mr. Thomas, and these

15   wounds end up causing his death.

16        The other counts are pretty simple in

17   this case, ladies and gentlemen. Count two is the

18   felon in possession of a firearm. In this case

19   there's going to be a stipulation between defense

20   counsel and myself. And what a stipulation is, it's

21   an agreement between defense and the prosecution.

22   And we're going stipulate that time this incident

23   occurred the defendant did not have a right to have

24   a gun, okay, because of his prior record. So

25   that's all that count is, is he had a weapon when

1   he wasn't allowed to because of his prior record.

2   Count three is called felony firearm and

3   that's another simple count because all we're

4   saying is when Mr. Houston committed a crime of

5   first degree murder, or felon in possession, he had

6   a firearm that did that crime.

7   Again, it's going to be uncontroverted in

8   this case that a firearm was used. You're going to

9   hear from the medical examiner in this case, that

10  Mr. Thomas had at least four bullet wounds through

11  his body. There's going to be no doubt in your mind

12  that a gun was used in this particular case.

13  Again, ladies and gentlemen, I want to

14  thank you for being here today, being on time.

15  We're not going to try to waste any of your time

16  for this case. We're going to move on as fast and

17  as expeditiously as we possibly can.

18  I'm going to ask you to consider all the

19  evidence that you hear in this particular case and

20  hear all the evidence. I'm asking you to come back

21  with a verdict consistent with the evidence and

22  that verdict will be that the Defendant, Michon

23  Houston is guilty of murder in first degree; being

24  in position of firearm while being a convicted

25  felon, and felony firearm.

1          Thank you very much, ladies and

2    gentlemen.

3          THE COURT: We're going to rise and have

4    the jury step in the jury room.  Everyone rise.

5          THE BAILIFF: All rise, please.

6          THE COURT: Jurors are free to step in

7    that jury room.

8          (Jury exits courtroom @ 9:32 a.m.)

9          THE COURT: You may be seated.  Go ahead,

10   counsel, you wanted to address the court before

11   your opening.

12         MR. LANKFORD: Yes, Judge, basically

13   here's what I have, this cases occurred in

14   September 6th of 2002.  One of the alleged

15   witnesses in this, Lavero Crooks, the man who was

16   supposedly sitting in the car in the wee hours of

17   morning and then drove off.  Mr. Crooks is a

18   complainant against Mr. Houston on another case.

19   That incident date being approximately two months

20   later, sometime the early part of November.

21         My concern is that on the one hand I

22   think it's important pointing out that Mr. Crooks

23   doesn't come forward for two months.  In fact, he

24   doesn't come forward with any information.

25         THE COURT: What is it you want me to get

1    into?

2         MR. LANKFORD: Well, I guess the thing is

3    I don't want to be trying the Lavero Crooks case

4    here today, but I do think that I should be allowed

5    to bring --

6         THE COURT: If you bring it up, you may

7    open the door. Now I just have to see how far you

8    go with it. I am not your lawyer.

9         MR. LANKFORD: I understand that.

10        THE COURT: I'm the Judge. I'm here to see

11    that both sides get a fair shake.  Now, I haven't

12    heard if he's going to object to you bringing it

13    in, and I don't think he could object because it

14    shows bias of the witness.

15        MR. LANKFORD: Right.

16        THE COURT: But if you open the door, you

17    open the door.

18        MR. LANKFORD: Well, the way I was going

19    to phrase it.

20        THE COURT:  Excuse me.  I'm not going to

21    give you any legal advice because that's not what I

22    get paid for. I get paid to rule balls and strikes

23    here.

24        MR. LANKFORD: What I am inquiring, okay,

25    is if this court, if I simply said you didn't come

1  forward until you had a beef with Mr. Houston, if

2  this court is viewing this as me flinging the door

3  open.

4           THE COURT: I don't know, I don't know

5  what kind of an answer he's going to get and then I

6  don't know how he's going to counter. See, you got

7  to wait until we get there.  I can't see into the

8  future.

9           MR. LANKFORD: Right.

10          THE COURT:  Now, I don't know why we

11  needed this for -- well, you can bring it up in

12  opening statement, that way if that's what you want

13  to do and then we'll see what develops because the

14  prosecutor may be intending to cut you off at the

15  pass by bringing up the bias himself.  Because he's

16  going to get an opportunity for direct examination

17  of the witness, right?

18          MR. LANKFORD: That's true.

19          THE COURT: So now tell me, why are we

20  talking now?

21          MR. LANKFORD: Well, because some judges

22  will give me an indication whether they think what

23  Mr. Johnson consider to be a minor opening of the

24  door, flings it open in its entirety.

25          THE COURT: I have no idea.  I have to

1   hear what develops during the trial because I have

2   no idea what the prosecutor's tactic is going to

3   be.  I'm quite sure that he would have or the only

4   thing he wants to know is judge are you going to

5   say we can't bring it up at all.  I'm not saying

6   that because it goes to the bias of the witness.

7   Then he gets to deal with it any way he wants.  Now

8   are you ready to rise for our jurors?

9           MR. LANKFORD: Yes, Your Honor.

10         THE COURT: Okay, ready to move along?

11         MR. HASSINGER: Yes, Your Honor.

12         MR. LANKFORD: Yes, Your Honor.

13         THE COURT: Okay, let's bring in the jury.

14         (Jury enters courtroom)

15         THE COURT: The jury may be seated when

16   you come in. You may be seated.

17         MR. LANKFORD: Ladies and gentlemen of the

18   jury, good morning.  You can say good morning when

19   we're altogether.  All right.  My name is David

20   Lankford.  I represent Mr. Houston.  And you heard

21   one version of the facts.  What a surprise there's

22   a second version.  It is true that Carlton Thomas

23   was shot to death in the early morning hours of

24   September 6th, 2002 in an area near Linwood and

25   West Buena Vista.  A vacant field.

1          We are here to determine whether or not

2     this man did it.  And I'm going to submit now, no

3     way.  Basically you might as well know going in,

4     okay, that you are dealing with perhaps characters

5     that you don't normally deal with in your life.

6     Including Mr. Houston.  You already heard the judge

7     tell you he's got a prior and he's got a prior drug

8     offense.

9          The People are going to say look this is

10    what's known as a civilian driven case, two, maybe

11    three witnesses, depending.  The police essentially,

12    you know, we found a man who had been shot.  We had

13    him transported to a hospital where he expired.

14    Came out, took some photographs.  Trying to find

15    whatever evidence we could.  But for the better

16    part we canvased the neighborhood, talked to the

17    few people.  Talking to the woman that apparently

18    lives in the house.  The rear of that house or

19    apartment building would overlook the field. Talked

20    to some other people.

21         And for essentially two months they have

22    a homicide and they got no suspects.  That's where

23    they are.  Don't know when they closed him in the

24    file.  They put it in close.  And it's terrifying.

25    Sometimes I guess when you do this on a regular

1    basis you realize how mean the streets can be. You

2    guys will probably hear and see some things that

3    you don't normally see in your lives, that you may

4    intentionally try to avoid depictions of violence

5    of this nature.  And it's not pretty.

6           The other thing that is terrifying is how

7    easy it is to get charged with a crime.  Any crime.

8    Because what happens is for two months the police

9    sit with this homicide and no suspects.  And

10   everybody in the neighborhood seems to know one

11   another.  Tenisha Watson, Christina Eshelman,

12   Michon Houston, Jovan Johnson, Lavero Crooks, Keith

13   Lee.  They all seem to know each other.  They're

14   all somehow associated with the drug world.

15          Two months later Jovan Johnson, I guess

16   they call their star witness, Jovan Johnson manages

17   to get himself in police custody.  He's in there.

18   They want to figure out because he's got some

19   connection to this Buena Vista and Linwood area.

20   Homicide detectives go and talk with him.  They go

21   and talk with him.  For two months the man doesn't

22   know anything about anything until the homicide

23   detectives show up to talk with Mr. Jovan Johnson.

24          They talked with him basically that

25   they're talking about Saturday, September 6th, he

1    seem to know the date. They talk to him about the

2    fence and what happened, this incident, the

3    homicide and some of you want to call it squeezing

4    or sweating or just making the man nervous.

5         Mr. Johnson appears to get the

6    impression, that gee, they're looking at me.

7    They're looking at me as the gun man. I don't want

8    that, so let me give you a name.  Let me give you a

9    name. Okay.

10        The name he gives is Michon Houston.  But

11   remember folks, I don't have to prove he didn't do

12   it and I don't have to prove who did.  They have to

13   prove that he did it. Okay.

14        Mr. Johnson basically says Michon Houston

15   is the man, two months later under these circumstances.

16        Now, there's another person named Lavero

17   Crooks. Lavero Crooks hangs out in the area.  He's

18   in the drug game too, or appears to be.

19        And Mr. Crooks doesn't say anything for

20   two months.  He doesn't know anything. But then he

21   hangs with Jovan Johnson.  They appear to know each

22   other well enough maybe because they're competitors,

23   who knows.  But now similarly two months later when

24   they talk to Lavero Crooks also known as Country,

25   at least that's what he's known by to Jovan

1    Johnson.  He comes up with the same thing. Oh yeah,

2    he shot Houston.  Michon Houston, yeah, that's

3    right, Michon Houston.  Two months ago I saw it

4    too.

5          He didn't come forward.  He didn't tell

6    anybody that he happened to be in a car parked

7    there in the wee hours of the morning, 5:00 o'clock

8    in the morning.  But I saw it too, yeah and yeah

9    that's the guy. So basically what you'll have to

10   do, you know, this is fairly straight forward here.

11   Think to yourself, number one, if you really saw

12   this why two months.  Why aren't you on the phone

13   that night or perhaps the next day as soon as you

14   feel comfortable, anonymous, okay, I know something

15   about that.  For two months nobody does that.

16          Then in particularly with regards to

17   Jovan Johnson, when you look into his credibility,

18   his honesty, whether or not this man is telling the

19   truth or lying, look at his reasons.  He thinks

20   he's going to be charged with first disagree murder

21   and he doesn't want that. The bottom line is, you

22   know, ultimately being a civilian driven case, I

23   see absolutely no reason why this man should be a

24   higher priority or suspect than either Jovan

25   Johnson or Lavero Crooks.  That's where we are.

1          He didn't shoot the man.  He indicated

2     that he never had a gun.  Yeah, he's got a prior

3     felony.  I'm going to stipulate to that.  But

4     unless you believe the testimony of Jovan Johnson

5     and Lavero Crooks, you cannot find proof beyond a

6     reasonable doubt. You cannot find proof beyond a

7     reasonable doubt on murder, that this is entitled

8     to not guilty on all three counts.

9          Thank you for your time.

10          THE COURT: Ready to call your first

11     witness?

12          MR. HASSINGER: Yes, Judge.

13          THE COURT: You may.  Who are you

14     calling?

15          MR. HASSINGER: I'm going to see if the

16     medical examiner is out in the hall, Judge.

17          THE COURT: Wonderful.

18          MR. HASSINGER: Thank you, Judge.

19          THE CLERK: Raise your right hand,

20     please.  Do you solemnly swear or affirm that the

21     testimony you're about to give before the court to

22     be the truth under the pains of penalty of perjury?

23          DR. PAUL NORA:  I do.

24          THE CLERK: Thank you.

25          THE COURT: Please be seated right there.

1     We're going to ask the officer to adjust the

2     microphone for you.  You're going to actually speak

3     right into it.  Counsel, whenever you're ready.

4              MR. HASSINGER: Judge, before I begin

5     questioning this witness, there's one stipulation

6     that counsel and I would like to enter into about

7     one witness's testimony.

8              THE COURT: All right, go ahead.

9              MR. HASSINGER: That would be listed on

10    the witness list is Cynthia Thomas.  And, Judge, we

11    have a stipulation that if I called Cynthia Thomas

12    to the stand,  she would come into court and she

13    would testify that she was the mother of the

14    deceased in this case Mr. Carlton Thomas.  And that

15    unfortunately she had to go to the Wayne County

16    Morgue on September 7th, I believe, 2002 and she

17    positively identified the body there at the morgue

18    as her son Carlton Thomas and that was the person

19    who was killed on September 6th, Judge.

20             THE COURT: Is that a correct statement of

21    this stipulation?

22             MR. LANKFORD: Agreed, Your Honor.

23             THE COURT: All right, we will accept the

24    stipulation and the witness may remain in the

25    courtroom if she is here.

1        MR. HASSINGER: Thank you, Judge.

2        THE COURT: Now you may proceed.

3        MR. HASSINGER: Thank you, Your Honor.

4              DR. PAUL NORA

5    was thereupon called as a witness by the People

6    herein and having been duly sworn, was examined and

7    testified as follows:

8              DIRECT EXAMINATION

9    BY MR. HASSINGER:

10   Q.   Good morning, sir.  Would you please introduce

11        yourself to our jury?

12   A.   My name is Dr. Paul Nora.  I'm with the Wayne

13        County Medical Examiner's Office, forensic

14        pathology.

15   Q.   Can you tell the jury what forensic pathology is,

16        sir?

17   A.   Forensic in general is the interaction between

18        science and the legal system, and forensic

19        pathology in particular is the evaluation of

20        illnesses and injuries as they relate to death.

21   Q.   Sir, have you ever testified as an expert in court

22        before?

23   A.   Yes, I did.

24   Q.   Can you tell us approximately how many times you've

25        testified as an expert?

1    A.    This will be the ninth time.

2    Q.    The ninth time.  The other eight you were

3          recognized as an expert in this area?

4    A.    Correct.

5    Q.    And, again, what is your expertise?

6    A.    Forensic pathology.

7    Q.    Did you bring some reports here with today

8          regarding some type of autopsy that you

9          participated in?

10   A.    Yes, I did.

11                 THE COURT: Excuse me.

12                 MR. HASSINGER: I'm sorry, Judge.

13                 THE COURT: Are those -- you got some

14         officers in here.

15                 MR. HASSINGER: They're not witnesses on

16         the case, Judge.

17                 THE COURT: Please approach for a moment.

18                 MR. HASSINGER: Yes ma'am.

19                 (Discussion at bench out of the

20                  hearing of the jury.)

21                 (On the record.)

22                 MR. HASSINGER: Thank you, Your Honor.

23                 THE COURT: You may continue, counsel.

24   BY MR. HASSINGER:

25   Q.    Sir, can you tell us what type of training and

1      experience you've had in order to become a forensic

2      pathologist?

3    A.   After medical school, which I graduated Wayne State

4         University, I did a three year anatomic pathology

5         training program at the Detroit Medical Center.

6         And now I'm in my fourth year, the specialty year

7         in forensic pathology.

8              MR. HASSINGER: Judge, at this time I'd

9         like to turn the witness over to defense to see if

10        they wish to voir dire on the expertise.

11             MR. LANKFORD: I'll just briefly conduct,

12        Dr. Nora.

13             THE COURT: All right.

14             MR. LANKFORD: Good morning, Dr. Nora.

15             THE WITNESS: Good morning.

16             MR. LANKFORD: I take it your education

17        would be essentially that you had to complete under

18        grad after high school, correct?

19             THE WITNESS: Correct.

20             MR. LANKFORD: And then med school?

21             THE WITNESS: Correct.

22             MR. LANKFORD: And then you did went into

23        the residency?

24             THE WITNESS: Three year anatomic pathology

25        residence, correct.

1           MR. LANKFORD: And the hospital that that

2      was done at?

3           THE WITNESS: Detroit Medical Center.

4           MR. LANKFORD: All right, and when did you

5      complete that residency?

6           THE WITNESS: June 30th of last year.

7           MR. LANKFORD: Okay, and then from there

8      you went immediately to the Wayne County Medical

9      Examiners office?

10          THE WITNESS: Correct.

11          MR. LANKFORD: And you say the essential

12     function of the Medical Examiner's Office is to

13     determine cause and the manner of the death and

14     nonnatural deaths; would that be fair?

15          THE WITNESS: That's correct.

16          MR. LANKFORD: And that's how you've been

17     employed now for the last nine months?

18          THE WITNESS: That's correct.

19          MR. LANKFORD: And during that period of

20     time approximately how many autopsies would you say

21     you've done?

22          THE WITNESS: I was between 319 and 320

23     when I was called this morning.

24          MR. LANKFORD: You're right in the middle

25     of one.  Okay, I have no further questions on very

1    voir dire.  Thank you.

2              THE COURT: Your motion?

3              MR. HASSINGER: Judge, at this time I'm

4    going to move to have the court recognize the

5    witness as an expert in the area of forensic

6    pathology.

7              MR. LANKFORD: No objection, Your Honor.

8              THE COURT: We will take his testimony as

9    an expert in forensic pathology.

10             MR. HASSINGER: Thank you, Your Honor.

11   BY MR. HASSINGER:

12   Q.   Sir, I'd like to turn your attention to a

13        particular autopsy.  It would be your case number,

14        I believe, 02-8524.  Did you bring the records

15        concerning that autopsy, sir?

16   A.   Yes, I did.

17   Q.   And can you tell us what your role in that autopsy

18        was?

19   A.   I'm the fellow involved and so I did the autopsy

20        under the supervision of my attending that day who

21        happened to be Dr. Hlavaty.

22   Q.   Can you tell the jury what you do first when you

23        are assigned an autopsy?

24   A.   An autopsy is basically broken down into a couple

25        of different stages.  The first stage is called the

1        external examination in which the whole group of

2        pathologist at that office that day evaluate the

3        body externally to review any injuries or any signs

4        of disease or illness.

5                     Then if there's photographs that are

6        necessary that need to be taken, photographs are

7        taken by the photographer and then we proceed with

8        the autopsy itself which has to do with the

9        internal examination.

10   Q.   Can you tell us what date this occurred?

11   A.   We performed this autopsy on September 7th, 2002.

12   Q.   And did you eventually determine the identity of

13        the body you were performing the autopsy on?

14   A.   We identified the body as Carlton Milton Thomas.

15   Q.   Can you tell us what your examination of the

16        external body revealed?

17   A.   The external evaluation revealed a normally

18        developed, normally nourished black male who was

19        approximately 30 years of age, which was the stated

20        age.  The body measured 61 inches in length and

21        weighed 152 pounds.  In addition to a number of

22        scars and treatment modalities from the hospital we

23        also found four gun shot wounds.

24   Q.   Now, did it appear to you that the body had been at

25        the hospital prior to coming to the Wayne County

1       Medical Examiner's Office?

2   A.   That's correct.

3   Q.   And do you, in fact, get any records from the

4       hospital, what occurred there so you can review

5       them for your autopsy?

6   A.   If necessary.

7   Q.   Okay, was it necessary in this case?

8   A.   I don't believe we had the medical records on this

9       case.

10   Q.   Okay, was it necessary?

11   A.   No.

12   Q.   Now, you said that there were a total of four gun

13       shot wounds on the body?

14   A.   Correct.

15   Q.   In order for your reports, do you number the gun

16       shot wounds?

17   A.   Yes, we arbitrarily number them just so we have a

18       way of describing them in the text of our report.

19   Q.   And also do you create some type of diagram where

20       you can roughly indicate where gun shot wounds are

21       on a body?

22   A.   That's correct.

23   Q.   And did you perform such a diagram in this

24       particular case?

25   A.   Yes, we did.

1    Q.    And do you have that diagram with you here today?

2    A.    Yes, I do.

3               MR. HASSINGER: May I approach the

4    witness, Your Honor?

5               THE COURT: You may.

6               THE WITNESS: There is one correction I'd

7    like to make on the diagram.  We have two exit

8    wound twos and there should, of course, only be one

9    exit wound number two.

10              Down at the knee there should be an

11    entrance one and then it says right next to it,

12    exit two, if I'm correct; is that correct?

13              MR. LANKFORD: Correct.

14              THE COURT: Excuse me, have you seen

15    this?

16              MR. LANKFORD: Yes, I have, thank you,

17    Your Honor.

18              THE COURT: Okay, go ahead.

19    BY MR. HASSINGER:

20    Q.    I'd like to hand this diagram back to you.  Sir,

21    I'd like to show you what I've had marked as

22    People's Proposed Exhibit Number 1. Can you tell us

23    does this appear to you to be a blown up copy of

24    this sketch that was prepared in this particular

25    case?

1     A.   Yes, it is.

2                MR. HASSINGER: Judge, I had a chance to

3  show this to defense counsel earlier.  I believe

4  there's no objection to the admission of this

5  exhibit.

6                MR. LANKFORD: That's correct, Your Honor.

7                THE COURT: Then it will be admitted into

8  evidence.

9                MR. HASSINGER: So this would be Exhibit

10  Number 1, Your Honor.

11               THE COURT: Right.

12               (PX #1 received into evidence)

13               MR. HASSINGER: Your Honor, I'd like to

14  put this exhibit on the easel here and have it in a

15  way hopefully everybody can observe it.

16               THE COURT: Okay, you don't have to worry

17  my being able to observe it, but you must have it

18  in a such a way -- counsel, you're going to

19  probably want to move so you can observe it.

20               MR. LANKFORD: Thank you.

21               THE COURT: Can all of our jurors see the

22  diagram that's been placed?

23               Okay, go ahead.

24               MR. HASSINGER: Judge, may I ask if the

25  witness leave the stand and come down to the

1        diagram?

2                    THE COURT: He may.

3                    MR. HASSINGER: Thank you.

4    BY MR. HASSINGER:

5    Q.    Doctor, I'm going to ask to come down and use this

6          diagram please to help the jurors understand the

7          case.

8                    Now, you said that you did label the

9          wounds you saw and let's start with, what did you

10         label as gun shot wound number one?

11   A.    Gun shot wound number one was the wound to the

12         knee.  And in this situation we use a circle as the

13         entrance wound.  And if there's a corresponding

14         exit wound you use an X.  And as I mentioned this

15         is a printed error here.

16                   So this particular wound exited on this

17         side of the left knee and moved towards the middle

18         of the body and then exited it on the inner aspect

19         of the left knee.

20   Q.    Doctor, I got a marker here and I'm going to ask

21         you to make the correction.  You say there's an

22         incorrect numbering there?

23   A.    Right.

24   Q.    Would you make the correction for us.

25   A.    If you see here this says entrance gun shot wound

1    number one, and this says exit gun shot wound

2    number two.  Well, it should be number one. And

3    exit gun shot wound number two is actually up here

4    in association with the entrance gun shot wound up

5    here.  Okay.

6  Q.  Thank you, Doctor.

7         And, again, when you number these,

8    Doctor, you're not indicating, are you, that this

9    is the order the gun shots happened, are you?

10 A.  Correct, we're just arbitrarily numbering so we can

11   identify them in our report.

12 Q.  So you're saying that the gun shot number one

13   entered slightly below the knee on the front of the

14   leg; is that correct?

15 A.  Correct.

16 Q.  And did it exit on the side?  I can't quite see

17   from your diagram.

18 A.  It exits right here and it exited on the inside of

19   the left knee.

20 Q.  Inside of the left knee?

21 A.  Correct.

22 Q.  Now, let's move on. Did you label one of the gun

23   shot wounds as gun shot wound number two?

24 A.  Correct.

25 Q.  Can you show you on the diagram gun shot wound

1     number two?

2   A.   Again, the circle represents the entrance wound in

3     this instance, and this occurred on the left side

4     above the hip, and the exit, this is now the

5     posterior aspect of the body diagram.  The exit is

6     also on the left side just above the buttock.

7   Q.   So can you tell us what direction that bullet was

8     traveling?

9   A.   Gun shot wound number two traveled from front to

10    back which we can see on the body diagram very

11    easily. And in this situation somewhat left to

12    right, so it was further out on this aspect of the

13    drawing then it was on this aspect of the drawing.

14       And also slightly downward, meaning that

15    in the measurement from the shoulder to the entrance

16    and the exit and had gone sliding down.

17   Q.   Can you tell us which shot you labeled as gun shot

18    wound number three?

19   A.   Gun shot wound number three is this particular

20    wound here and that exit again in the back on this

21    side.

22   Q.   Now, what's different about gun shot wound three as

23    opposed to gun shot wound number two in terms as

24    the way the bullet traveled?

25   A.   Gun shot number two is where you can see this is

|   |   |   |
|---|---|---|
| 1 | | the left side of the front of the body.  This is |
| 2 | | left side of the back of the body, so it stayed on |
| 3 | | the left listed side of the body. |
| 4 | | Gun shot wound number three begins on the |
| 5 | | left side of the body but ends on the right side of |
| 6 | | the back to this point right here. |
| 7 | Q. | And finally there's a fourth gun shot wound, |
| 8 | | Doctor? |
| 9 | A. | Correct. |
| 10 | Q. | Can you describe that gun shot wound for us, |
| 11 | | please? |
| 12 | A. | This one's a little bit atypical or more difficult |
| 13 | | to describe because there is a tendency for bullets |
| 14 | | once they entered and exited the body they can |
| 15 | | reenter and then re-exit the body. And so one |
| 16 | | bullet wound can actually be four different wounds |
| 17 | | or three different wounds depending on the course |
| 18 | | and the entry trajectory of the bullet.  So in this |
| 19 | | particular instance it should be identified the |
| 20 | | initial entrance wound high on the right cheek. |
| 21 | | And then the first exit wound is a little |
| 22 | | lower on the right cheek.  And then right next to |
| 23 | | the exit wound from the first time there's another |
| 24 | | entrance wound and then it goes underneath the lip |
| 25 | | and then exits to the front of the lip. |

1          And so we have an entrance and exit, a

2     reentrance right next to the first exit and the

3     another exit.  We describe that as only one because

4     of the proximity of the wounds and in fact that

5     there's a straight line between the original exit

6     or the original entrance and the last exit.

7  Q.  Doctor, can you tell us were any bullets recovered

8     from the body of Mr. Thomas?

9  A.  No bullets or part of bullets were recovered from

10     the wound tracks.

11  Q.  And you describe in your report these wounds as

12     through and through wounds; what does that mean?

13  A.  Through and through means it enters and exits the

14     body, so in this instance we have an entrance and

15     an exit, an entrance and an exit, and an original

16     entrance and then finally an ending exit.

17  Q.  So this isn't a situation where any bullets were

18     actually lodged in any part of the body?

19  A.  That's correct.

20  Q.  Now, I want to go to gun shot wound number four for

21     a moment because I'm trying to figure out how a

22     wound like this can have been caused, and I'm

23     curious and I want you to tell me in your expert

24     opinion if this is a possibility for how a wound

25     like this could be caused.

1     Say I was running away from somebody,

2  somebody over here on this side of the room, okay.

3  And say for a moment I look back with my head at

4  the person I was running from.  In such a manner

5  I'm turning head the opposite direction of the way

6  my body is facing.  That person shot at that time,

7  is that a way I can get this wound number four.

8 A. If you're running this way towards me but you're

9  looking back this way?

10 Q. Correct.

11 A. Then if anybody shot from this direction, I would

12  not expect the trajectory of the built to be from

13  back to front.  I would expect the trajectory of

14  the bullet to be from front to back.

15 Q. Okay.

16 A. In this particular instance our other trajectory is

17  coming from back to front.

18 Q. So can you think of a way that this type of wound

19  could occur?

20 A. In most instances when we have an entrance exit,

21  reentrance re-exit, it's because of a folding in

22  the skin.  If a person tipped in a particular

23  fashion, the easiest place, of course, is the

24  abdomen.  If you're bent over and the abdomen rolls

25  on itself and then you have an entrance and exit,

1    and then you get the roll and it exits and then it

2    enters the roll below that first roll and it then

3    exits.

4           So it's usually some form of the skin

5    being in a position where the first exit and the

6    entrance are in close proximity.

7  Q.  So all we can really tell for gun shot wound number

8    four that it hits him there and basically in the

9    high check bone area?

10  A.  Correct.

11  Q.  And we don't really know -- you can't give us

12    anymore of an expert opinion of how the rest of the

13    wound occurred?

14  A.  In terms of the position of the body, no, I cannot.

15  Q.  Thank you, Doctor.

16           THE COURT: You may resume the seat.

17           MR. HASSINGER: You can have your seat

18    again.  Thank you.

19  BY MR. HASSINGER:

20  Q.  So you first observe these four different wounds in

21    you exterior analysis; is it correct?

22  A.  That's correct.

23  Q.  What do you do next, sir?

24  A.  After the external examination is completed we make

25    a Y incision in the chest and abdomen and remove

1     the abdomen block and then make scalp incision and

2     remove the skull cap in brain.

3  Q.  Were you able to determine the cause death in this

4     particular case?

5  A.  Yes, the cause of death was multiple gun shot

6     wounds.  In this instance four.

7  Q.  Were any one of these gun shot wounds more

8     significant in your medical opinion?

9  A.  Yes.  Gun shot wound number one involved only the

10    soft tissues of the knee.

11        Gun shot wound number two only involved

12    the soft tissues of the abdomen and back.

13        Gun shot number three was the most

14    serious wound because it traversed the abdominal

15    cavity, and in doing it hit the vena cava which is

16    the largest vein in the body that's coming up from

17    the lower extremities.  And it also hit the right

18    hip before it exited loss.  So those two particular

19    wounds caused a significant amount of bleeding into

20    the abdominal cavity.

21        The fourth wound, although in a terrible

22    place probably didn't cause as much injury as the

23    third wound because it only hit the upper jaw and

24    then dislodged some teeth, so there was a fracture

25    of the upper jaw.  But other than that, the third

1      wound is the one that was the problematic one.

2    Q.   Did you make any other observations about any other

3      damage to the exterior of Mr. Thomas' body?

4    A.   Yes, we noted a couple of scrapes on each knee,

5      abrasions.

6    Q.   And did you -- go ahead, I'm sorry.

7    A.   They are also indicated on the diagram.

8    Q.   I see some markings diagram on the knee area; are

9      these the abrasions you're referring to?

10   A.   Correct.

11   Q.   Can you tell were these old abrasions or did they

12     appear to be fresh abrasions?  Can you tell those

13     things?

14   A.   Yes, we can tell and these certainly appear to be

15     terminal at the time of the patient's demise.

16   Q.   So you're saying these occurred relatively closely

17     around the time the patient passed away?

18   A.   That's correct.

19   Q.   Would that be consistent with someone falling on

20     their knees?

21   A.   Absolutely.

22   Q.   Doctor, can you explain to the jury what the

23     expression of close-range firing means?

24   A.   When a gun is discharged, there is soot and

25     unburned and burned gun powder that comes out of

1    barrel as well as the bullet coming out of the

2    barrel.  Based on distance from a given target, you

3    can see either the soot or the gun powder as it

4    exits the barrel.  As that distance becomes

5    greater, of course, there's less likelihood of

6    seeing the soot or the gun power on the particular

7    target.

8            So the closer you are to a target, the

9    more likely you are to see close-range firing

10   evidence which is the soot and the gun powder.

11   Q.   Did you examine Mr. Thomas' body for evidence of

12        close-range firing?

13   A.   Correct.  On the present entrance wounds, there was

14        no evidence of close-range firing on any of the

15        wounds.

16   Q.   And what does that mean to you, sir?

17   A.   In particular it's difficult to tell if the body is

18        covered with clothing, then of course that gun

19        powder and soot may not reach the body at all.  So

20        it could still be close-range, but it's being

21        blocked by something.

22            If, however, there's no clothing or

23        covering over that particular portion of the body

24        without ever going close-range firing, you will

25        then find that that gun was discharged a distance

47

```
 1        away from the person such that there could be no

 2        soot or gun powder.

 3   Q.   In this case did you make any effort to determine

 4        what type of clothing the victim was wearing when

 5        this occurred?

 6   A.   No clothing was received with the body.

 7   Q.   But certainly when you examine the facial wound

 8        there was no evidence of close-range firing; is

 9        that correct?

10   A.   That's correct.

11   Q.   And you knew that this shooting occurred the day

12        before you did the autopsy on September 6th,

13        correct?

14   A.   That's correct.

15   Q.   Okay.

16             Did your office do any type of testing to

17        see what if any type of drugs or alcohol what the

18        victim Thomas could have had in his system when

19        this occurred?

20   A.   Yes, we did our usual routine toxicology evaluation.

21   Q.   And do you have the results here with you today?

22   A.   Yes, I do.

23   Q.   Tell us, please, if any drugs or alcohol were in

24        his system?

25   A.   Alcohol was present and both cocaine and the
```

1       metabolites of cocaine were present.

2  Q.   Can you tell us what level of alcohol?

3  A.   The level of alcohol in the blood was .07.  The

4       level of alcohol in the urine was .2, and the level

5       of alcohol in the fluid of the eye was .12.

6  Q.   Can you tell us what's significant about those

7       different variations from a medical point?

8  A.   Well, of course, a level in the blood stream will

9       go up and then come down as drinking occurs and

10     then stops.  And as their body metabolizes the

11     alcohol after ingestion of drinking, the blood

12     level will come down.

13         What happens in the urine and in the

14     vitreous, the vitreous follows the blood alcohol

15     concentration but it lags it, it doesn't follow it

16     directly.  In other words, there's a time lapse

17     between the highest peak in the blood and highest

18     peak in the vitreous, but it follows the same

19     course.

20         In the urine you get concentration of

21     alcohol because urine is one of the ways we excrete

22     the alcohol and so we generally have a higher

23     concentration in the urine after a person had been

24     drinking for a while because the body is starting

25     to excrete it.

1   Q.   The fact being the alcohol blood level is less than

2        urine, would that indicate that the drinking had

3        been done some time prior?

4   A.   Correct.

5   Q.   Tell us about what's medically significant about

6        the cocaine level?

7   A.   Any cocaine level is abnormal, of course, because

8        we don't have cocaine in our system.  The fact that

9        cocaine, the actual cocaine molecule as well as the

10       breakdown products of that molecule will indicate

11       that the use of the cocaine was very resent prior

12       to the death.

13  Q.   Doctor, is there anything else medically

14       significant to you in your autopsy that you

15       performed on Mr. Carlton Thomas?

16  A.   No.

17            MR. HASSINGER: Thank you. Judge, at this

18       time I'll turn over the witness for cross-

19       examination.

20            THE COURT: Cross-examination.

21            MR. LANKFORD: Thank you.

22                    CROSS-EXAMINATION

23  BY MR. LANKFORD:

24  Q.   Good morning again, Doctor?

25  A.   Good morning.

1    Q.    Let's start with talking about close-range firing.

2          I guess there would be -- and let me just make

3          sure, I mean, it's fairly obvious to you as a

4          forensic pathologist on each of these four wounds,

5          which are the entrance and which are the exit,

6          correct?

7    A.    That's correct.

8    Q.    I mean they are obvious when you look at them as

9          trained as you are, correct?

10   A.    Nothing's ever obvious.

11   Q.    But you can definitely discern the difference on

12         this case.

13   A.    Yes.

14   Q.    Now, on these I'm going to use later, but on three

15         of the four you clearly have a front to back

16         entrance path, correct?

17   A.    That's correct.

18   Q.    Now, you were talking about close-range firing.  I

19         take it there would be three types of entrance

20         wounds.  One would be like in this one where

21         there's no evidence of any close-range fire,

22         correct, sir?

23   A.    Okay.

24   Q.    Is that right?

25   A.    Uh-huh.

1          THE COURT: Does that mean yes? You said

2     uh-hum, does it mean yes?

3          THE WITNESS: Yes.

4          THE CLERK: Thank you.

5  BY MR. LANKFORD:

6  Q.   And then would have, I take it, that after a

7       certain distance, you know, and I'm going to get to

8       that in a minute, but we would be unable to tell

9       whether a wound came from seven feet or 70 feet,

10      right, sir?

11 A.   That's correct.

12 Q.   Okay.

13          Then we have, I believe, a second type

14      where you might have what's known as close-range in

15      the sense that you get some soot, some gun powder

16      actually embedded in the skin; is that right?

17 A.   That's correct.

18 Q.   And there was no evidence -- is that also sometimes

19      called skipping?

20 A.   Correct.

21 Q.   In this situation you didn't find any evidence of

22      that type of close-range firing on any of the four

23      wounds?

24 A.   That's correct.

25 Q.   And in this situation, again, assuming logically

1            that Mr. Thomas was clothed at the time of the

2            shooting, you didn't receive any clothing?

3    A.      We did not receive any clothing.

4    Q.      Right, that would be something outside the medical

5            examiner, right?

6    A.      If the body comes to the Medical Examiner's Office

7            first then, of course, we get the clothing.  In

8            most instances, however, when the body goes to the

9            hospital first, the hospital in doing its

10           evaluation of the patient and treatment of the

11           patient takes all of the clothing, and we tend not

12           to see that.

13   Q.      That's just out of your hands at that point, right?

14   A.      Correct.

15   Q.      And clothing could be a barrier to the gun powder,

16           the soot that you've indicated, nylon or cotton it

17           might be on that rather than on the body, right,

18           sir?

19   A.      Just about anything could be a barrier in terms of

20           clothing or even not clothing.

21   Q.      But as to gun shot number four the one of the face

22           that you said probably broke the jaw and knocked

23           out some teeth, that one you had no idea whether or

24           not there was any clothing on the face, right, sir?

25   A.      Correct.

1    Q.    But, again, as to the facial wound, no evidence of

2            close-range firing?

3    A.    That's correct.

4    Q.    And then we have discussed that close-range fire

5            would essentially be -- let me go back.  There

6            would be a third type of wound, I guess, called a

7            contact wound?

8    A.    That's correct.

9    Q.    Okay.

10           Contact wounds would be -- I hate to do

11          this, but basically up close and personal, right?

12    A.    That's correct.

13    Q.    There's going to be a whole different type of

14          marking on the skin when a firearm is depressed

15          against skin at the time of discharge, right?

16    A.    That's correct.

17    Q.    Now, going back in this case to the intermediary

18          one, the close-range firing.  Essentially there

19          would be -- you're talking a foot and a half to two

20          feet kind of thing?

21    A.    That's correct.

22    Q.    Okay.

23           No more than that because then we're

24          talking about the distance firing, right?

25    A.    Again, it depends on the weapon.

1    Q.    Sure.

2    A.    You know, the longer the barrel the more likelihood

3          you're going to have a longer distance.  The

4          shorter the barrel the more likely you'll have a

5          shorter distance.  But two feet is generally the

6          outside for what we consider for handguns.

7    Q.    And generally let's assume a handgun here, the

8          shooting occurred within, let's say a foot away, 12

9          or 15, normally you would find this gun power that

10         you had talked about, right?

11   A.    Yes.

12   Q.    Now, taking each of these injuries -- I want to

13         make sure that I understand taking them separate,

14         and obviously you indicated number four would have

15         been extremely painful, but in and of itself

16         probably not going to cause death, right?

17   A.    Correct.

18   Q.    Number two, while in a vital area appears to

19         basically just gone through the left leg?

20   A.    That's correct.

21   Q.    And not hit anything vital?

22   A.    That's correct.

23   Q.    Number three though traversed from one side to the

24         other, the lower abdomen and all kinds of damage,

25         right?

1    A.   That's correct.

2    Q.   Now, number four also, number four -- I'm sorry,

3         number one, the one to the knee, you can see an

4         entrance wound that looks like above the knee cap,

5         right, somewhere near there?

6    A.   A little bit left and below.

7    Q.   And coming out on the inside of that knee?

8    A.   Correct.

9    Q.   And that one in and of itself unless it hit like

10        the artery probably wouldn't account for death

11        either, right?

12   A.   No.

13   Q.   But in one, in that particular one, again, I think

14        we talked about all three from the neck down were

15        all front to back?

16   A.   That's correct.

17   Q.   Now, the knee I take it though you're going to hit

18        ligaments, tenons, muscles that kind of thing?

19   A.   In this instance it just went through the skin.

20   Q.   Really?

21   A.   Yes.

22   Q.   Okay, okay.

23             Now, you were asked some questions -- I'm

24        sorry, no, bullets in the body, right?

25   A.   That's correct.

1    Q.    Okay, in other words, those little lead slugs that

2            are so dangerous, right?

3    A.    Correct.

4    Q.    Because each of these wounds what you described as

5            through and through?

6    A.    That's correct.

7    Q.    Meaning that they had passed entirely out of the

8            body?

9    A.    Correct.

10   Q.    Now, with regards to the wound to the face, you

11          were asked if a person was -- and the wound that

12          was slightly back to front, correct?

13   A.    It's back to front.

14   Q.    Right to left?

15   A.    May I stand to look at this?

16              THE COURT: Yes.

17              THE WITNESS: Yes, right to left and then

18          slightly downwards.

19   BY MR. LANKFORD:

20   Q.    Slightly downward, okay.

21           So certainly if a person were looking

22          behind them over their left shoulder as opposed to

23          over the right shoulder, that's impossible, isn't

24          it, that wound to the cheek would be impossible if

25          you're looking behind to your left, correct?

1   A.   If you were looking behind to your left, I wouldn't

2        expect there to be entrance wound on your right

3        cheek, that's correct.

4   Q.   And what we're talking about when we talk back to

5        front, I mean, we're not talking like from the

6        brain stem?  We're talking about on the side on the

7        cheek bone area?

8   A.   When we discussed the trajectory of any bullet we

9        use has it moved from behind the midline as we draw

10       a line through the body from top to bottom, has it

11       moved from behind to forward.

12  Q.   No matter how much movement is on that plane you

13       would consider right to left, front to back

14       whatever, right?

15  A.   Correct.

16  Q.   But my point is --

17  A.   Even for an inch.

18  Q.   Right, if it was only an inch.  But this wasn't

19       from directly behind clearly, correct, sir?

20  A.   Based on the other trajectories right to left and

21       slightly downward, I would not say it was directly

22       behind him.

23  Q.   And in addition you did indicate slightly downward,

24       right?

25  A.   Correct.

1    Q.   It would indicate to me that even if you were

2          turned that there must have been some tucking of

3          the neck, correct, to get that effect of it

4          slightly downward?

5    A.   That's certainly a possibility.

6    Q.   Now, you had indicated some abrasions on the knees,

7          correct, sir?

8    A.   Correct.

9    Q.   That could be from falling, perhaps, right?

10   A.   Correct.

11   Q.   That could also be possibly from crawling or being

12         dragged on your torso?

13   A.   That's a possibility, yes, sir.

14   Q.   Okay, and you personally are not familiar with the

15         scene, right?

16   A.   No.

17   Q.   Okay, so you wouldn't know whether there's heavy

18         wood chips, concrete?

19   A.   I did not do the scene investigation.

20   Q.   You don't know the source of the abrasions, right,

21         sir?

22   A.   Correct.

23   Q.   I just want to clarify.  You indicated that there

24         was at least with regards to wound number three, I

25         believe it was, right, number three, clear evidence

```
 1              of medical intervention, right, sir?

 2     A.    That's correct.

 3     Q.    Okay, such as IV line holes, that type of thing?

 4     A.    Yes.

 5     Q.    Just one second, please.

 6                   Just following up the drugs or alcohol.

 7           You indicated types of cocaine, sir?

 8     A.    No.  One cocaine and then the metabolites.

 9     Q.    Okay, metabolites I'm not familiar with that, sir?

10     A.    A metabolite is a breakdown product of cocaine as

11           it is broken in the system, and there are two

12           metabolites on our toxicology report.

13     Q.    And those levels simply detect positive or

14           negative?

15     A.    That's correct.

16     Q.    They don't detect a numeric value?

17     A.    They're given in their value but any value of

18           cocaine that reached metabolites is abnormal in the

19           body.

20     Q.    Okay, that would a positive, correct, sir?

21     A.    Correct.

22                   MR. LANKFORD: Nothing further, thank you.

23                   THE COURT: Any redirect?

24                   MR. HASSINGER: Just briefly, Judge.

25                          REDIRECT EXAMINATION
```

BY MR. HASSINGER:

Q.   Doctor, I gave you a hypothetical about looking
     back at somebody turning my head over my right
     shoulder and if this shot number four would be
     consistent and you said shots likely.  Now, I'm
     curious would it be more consistent instead of
     somebody being directly behind me if it was
     somebody seated up in the area where the deputies
     are seated; could that be a possibility for that
     shot?

A.   So you're position is moving this way?

Q.   Yes.

A.   So your chest is facing the direction you're
     going?

Q.   Yes.

A.   And you're now looking towards the deputy?

Q.   Correct.

A.   And the deputy fires the shot from his location?

Q.   Exactly.

A.   Again, I would expect the trajectory to be from
     front to back because he's in front of you with
     reference to the positioning of your face.

Q.   Okay.

A.   Okay.

Q.   Is there a way that my face could be positioned

1    that it would be consistent?

2 A. With you moving this way?

3 Q. Correct.

4 A. If you turned your chest towards this wall, and

5    then you look the other way.

6 Q. Right.

7 A. And you look down a little bit in terms of the

8    trajectory, now that could certainly if the sheriff

9    was in the position of the shot fired, that is

10    going to enter on the right check where we would

11    expect it to be and then could move in a direction

12    towards the midline of your face.

13 Q. So basically like I'm positioned right now in the

14    courtroom?

15 A. Correct.

16 Q. Can you give us a medical opinion if any of these

17    shots are consistent with somebody being on the

18    ground laying on their back?  Can you tell us if

19    there's any way medically to say if any of these

20    shots are consistent or inconsistent with someone

21    laying on the ground?

22 A. Laying on their back?

23 Q. Correct.

24 A. Because the wounds in the knee and both abdominal

25    wounds are from front to back, it would be possible

1       to be lying down on their back and have those

2       wounds.  The trajectories would be a little bit

3       difficult because especially with the knee, you'd

4       have to come from a very low angle in order to make

5       that wound.

6              But because they're all front to back, if

7       a person was lying on the ground on their back,

8       those would be possible.

9   Q.   So you don't believe that's possible with the

10      facial wound?

11  A.   If they were truly lying on their back, even if

12      they turned their head to the left away from where

13      the wound would be coming, I'd be hard pressed to

14      say I could have a back to front trajectory in that

15      instance.

16              MR. HASSINGER: Thank you, Your Honor.

17              THE COURT: Any recross limited to what

18      was brought out on redirect?

19              MR. LANKFORD: Yes.

20                    RECROSS-EXAMINATION

21  BY MR. LANKFORD:

22  Q.   Briefly, the scenarios that have been spelled out

23      as far as the deputies being over there or turning,

24      these are all hypotheticals, right, sir?

25  A.   Yes.

1   Q.   Okay.

2              You answered the best you can given the

3        scenario that's been given to you, correct?

4   A.   Correct.

5   Q.   Whether that scenario is accurate or not you don't

6        know?

7   A.   Absolutely.

8   Q.   All right.  Now, also, following up on one other

9        thing.  Let's say I am laying on the ground, okay,

10       gun shot wound one, two, and three, all right, I'm

11       laying on the ground, okay, I am shot then twice in

12       the leg --

13             THE COURT: Excuse me. Counsel, your

14       hypothetical sure isn't clear to me because you

15       said let's take it you're laying on the ground and

16       you're talking about one, two, and three, and I

17       don't know what you mean by that.  Does it mean

18       they've already occurred or they're about to

19       occur?

20             MR. LANKFORD: Okay, great.  Point taken,

21       thank you.

22   BY MR. LANKFORD:

23   Q.   I just want to preface this. The wound track on gun

24       shot wounds two and three were different

25       directions, correct?  I mean, one was straight

1      through and one was more less side to side?

2   A.  Gun shot two, wound number two track from front to

3      back, left to right and slightly downward.

4              Gun shot wound number three tracked from

5      front to back, left to right and is more level.

6   Q.  Sure, and very distinct left to right on gun shot

7      wound number three?

8   A.  A much greater left to right on gun shot wound

9      three than on gun shot wound number two, correct.

10  Q.  Now, assume that I am laying on the ground when gun

11     shot wound two, three, and four are administered?

12  A.  Are you on your front or on your back?

13  Q.  I'm laying on my back?

14  A.  You're laying on your back, okay.

15  Q.  And that would be consistent, sir?

16  A.  If the person was lying on their back and then gun

17     shots wound one, two, and three were administered,

18     that's a possibility, because one, two, and three

19     are from front to back.

20  Q.  Okay, and in that scenario, sir, you indicated

21     these are through and through wounds, correct?

22  A.  Correct.

23  Q.  Meaning that a spent slug would have exited each of

24     those locations, correct?

25  A.  Yes.

1       MR. LANKFORD: Nothing else.  Thank you.

2       THE COURT: We thank and excuse the

3   doctor.  You're free to go.

4       Ladies and gentlemen, it's time for us to

5   take our coffee break.  I'm going to caution you

6   may not discuss this matter among yourselves nor

7   with anyone else.  I'm going to ask you to go out

8   and have a nice coffee break and to be back at five

9   minutes to the hour by that clock.  We'll rise for

10  you to go for coffee.  Everyone rise.

11      Jurors are free to go for coffee be back

12  at five minutes to the hour.  Spectators may not

13  leave the courtroom until after the jurors have had

14  the opportunity to leave.

15      (Jury exits courtroom at 10:40 a.m.)

16      THE COURT: Now, you may be seated. Are

17  there two witnesses yes or no?

18      MR. HASSINGER: Yes, Judge.

19      THE COURT: And Mr. Cook is going to

20  represent the guy who's in the back there or where-

21  ever he is.

22      MR. HASSINGER: He's on the second floor,

23  Mr. Crooks.

24      THE COURT: Second floor, and they'll take

25  you there back there.  And we got to get a lawyer

1   to represent -- oh counsel, how are you.

2              We got a client for you.  We'll tell him

3   where he is.  He gets the second one.  He's out in

4   the hallway  with the cops.  Okay.  We're going to

5   take a short break.  We're going to take coffee

6   break for the court reporter and myself.

7              (Court is in recess)

8              (Court reconvenes)

9              (Jury enters courtroom)

10             THE COURT: All rise for the jury.  You

11  may call your next witness, counsel.

12             MR. HASSINGER: Thank you, Judge.  The

13  People call Officer Carpenter.

14             THE CLERK: Raise your right hand,

15  please.  Do you solemnly swear or affirm that the

16  testimony you're about to give in the matter now

17  pending before the court to be the truth under the

18  pains of penalty of perjury?

19             MR. CARPENTER: Yes.

20             THE CLERK: Thank you.

21             THE COURT: Please be seated right there.

22  I'm going to ask you to speak right into that

23  microphone.

24             Counsel, whenever you're ready.

25             MR. HASSINGER: Thank you, Your Honor.

OFFICER MICHAEL CARPENTER

1    was thereupon called as a witness herein and having

2    been duly sworn, was examined and testified as

3    follows:

DIRECT EXAMINATION

BY MR. HASSINGER:

Q.   Good morning, sir.  Would you please introduce
yourself to our jury.

A.   Good morning, Michael Carpenter.

Q.   Sir, how are you employed?

A.   I'm a Detroit Police Officer.

Q.   And what is your current assignment?

A.   The Evidence Technician Unit.

Q.   Were you assigned to the Evidence Technician Unit
back on September 6th, 2002?

A.   Yes, I was.

Q.   And at that time how long had you been assigned to
the Evidence Technician Unit?

A.   About a year and a half at that point.

Q.   Can you explain to the jury the job of an evidence
technician?

A.   My job is to go to crime scenes or suspected crime
scenes and collect evidence in the form of
photographs, measurements, sketches or any type of
evidence that could be connected to the crime.

1   Q.   Do you have any formal training as an evidence

2        technician, sir?

3   A.   Yes.

4   Q.   Can you tell us what your formal training would be?

5   A.   I went through the evidence technician class with

6        the Detroit Police Department and on the job

7        training 90 days before we go out on our own.

8   Q.   What does the class consistent of, sir?

9   A.   Photography, fingerprint techniques, any type of

10       evidence collection including fluids, photography.

11  Q.   I'd like to take you back to September 6th of last

12       year.  Were you called to a potential crime scene

13       some time in the early morning hours roughly

14       between six and seven a.m. over on west Buena Vista

15       and Linwood in the City of Detroit?

16  A.   Yes.

17  Q.   Can you tell the jury approximately when it was you

18       got that assignment?

19  A.   If I look at my report I'll give you the exact

20       time.

21  Q.   Would that help refresh your memory?

22  A.   Yes.

23  Q.   Please do.

24  A.   Seven o'clock a.m.

25  Q.   Do you recall to time you actually got to scene?

1   A.   Seven thirty a.m.

2   Q.   And what do you do when you get to that location?

3   A.   I talk to the officer in charge at the scene and

4        we're guided by them about what happened and what

5        type of work they'd like done.

6   Q.   What type of work were you requested to do?

7   A.   To take photographs and make measurements of a

8        sketch.

9   Q.   Did you, in fact, make a sketch of this crime

10       scene?

11  A.   Yes.

12  Q.   Did you bring that sketch with you here today?

13  A.   Yes, I did.

14                MR. HASSINGER: May I approach the

15       witness,   Your Honor?

16                THE COURT: Yes.

17  BY MR. HASSINGER:

18  Q.   May I see the sketch you prepared, sir?

19  A.   Here's a copy of it.

20  Q.   Is this copy exactly as the sketch that you

21       prepared?

22  A.   I've added a few measurements on it for my own, so

23       yes, it's accurate.

24  Q.   And you've signed this sketch indicating it's your

25       work?

1    A.    Yes.

2                    MR. HASSINGER: Judge, I've previously

3          shown defense counsel what I'm going to have

4          marked as Proposed Exhibit Number Two.

5    BY MR. HASSINGER:

6    Q.    Sir, I'd like to show you what's been marked

7          People's Proposed Exhibit Number Two.  Sir, can you

8          identify this for me, please?

9    A.    Yes, that's a blow up of sketch.

10   Q.    Does it appear to be accurate except for the

11         increase in size of the sketch that you prepared?

12   A.    Yes.

13                   MR. HASSINGER: Judge, I'm going to move

14         for the admission of People's Proposed Exhibit

15         Number Two.

16                   MR. LANKFORD: No objection, Your Honor.

17                   THE COURT: It will be admitted into

18         evidence.

19                   (PX #2 received into evidence)

20                   MR. HASSINGER: Again, Judge, I'm going to

21         place it here on the easel in hopes that everybody

22         can see.

23                   Judge, I'm going to ask you if the

24         officer can have permission to step from the stand

25         and approach the exhibit?

1                    THE COURT: He may.

2       BY MR. HASSINGER:

3       Q.    Officer Carpenter, come to the exhibit for us and

4             let me give you something to use as a pointer.

5             Now, one thing I want you to point out for us,

6             first, can you tell us what direction north is in

7             your sketch that you prepared?

8       A.    Okay, north is down.

9       Q.    So south would be up and if I'm correct, west would

10            be going to our right?

11      A.    Yes.

12      Q.    And east would be going to our left?

13      A.    Correct.

14      Q.    I just want everyone to be straight on the

15            directions here.

16                    Can you indicate for us if the road Buena

17            Vista is indicated on your sketch?

18      A.    That's this roadway that runs east and west.

19      Q.    And how about Linwood, where is Linwood on your

20            sketch?

21      A.    It's the end of the sketch, this side.  This is

22            Linwood here.

23      Q.    And let's start with, did you find any place in

24            this crime scene where you found what you believe

25            to be blood?

1    A.    Yes.

2    Q.    Can you indicate were that was, sir?

3    A.    It was right under this tree here.

4    Q.    And you have an arrow with blood written on your

5          sketch pointing to that area?

6    A.    Correct.

7    Q.    Describe that area that's by Buena Vista and what

8          you have listed there as an alley on the east side;

9          what is in that area there, sir?

10   A.    A lot of vacant lots.  There used to be house in

11         this area and they've all been torn down.  There's

12         vacant lots in between houses on the other side.

13   Q.    Specifically in that first vacant lot you were

14         indicating where the blood was found?

15   A.    Yes.

16   Q.    In that square area there bounded by the fence on

17         the west side and the alley on the east side, are

18         there actually any houses in that rectangular area?

19   A.    No, there isn't.

20   Q.    Now, there seems to be a path that cuts through

21         that square area I just referred to.  Is that

22         indicated on your diagram?

23   A.    Yes, it is.

24   Q.    Can you point to us and describe that for us,

25         please?

1   A.   This is a trail right here, it appears that

2        pedestrians would walk down the alley and cut the

3        corner and wore a path in the grass.

4   Q.   Now, you've indicated on the diagram some blood and

5        I believe you said it was by a tree; is that

6        correct?

7   A.   Correct.

8   Q.   How many trees are there in that rectangular vacant

9        lot with the dirt path?

10  A.   Two.

11  Q.   And are they both indicated by the term tree on

12       your diagram?

13  A.   Yes, this round area here would be the base of the

14       tree, and this is roughly the cover of the leaves

15       overhead.

16  Q.   The foliage perhaps?

17  A.   Yes.

18  Q.   Now, do you recall, this was September 6th, do you

19       recall what the weather was like when you went to

20       this crime scene?

21  A.   Yes, it was clear, warm.  I believe about 70

22       degrees according to my report.

23  Q.   Now, what did you know about this alleged crime

24       when you got to the crime scene and talked to the

25       officer in charge or the police that were there?

1       What was your understanding what had occurred?

2  A.   That there was a possible shooting and EMS had

3       conveyed the victim from that spot of blood under

4       the tree.

5  Q.   What did you do based on understanding that there

6       was a possible shooting in that area?

7  A.   I photographed the area.  I made measurements. I

8       searched for evidence.

9  Q.   Now, when you say search for evidence, can you tell

10      the jury what you did, please?

11  A.   I searched that area hoping to find some type of

12      firearm's evidence, either shell casings or bullets

13      and I found nothing.

14  Q.   Can you tell us if there was something impeding you

15      or that wasn't helping you in trying to find

16      evidence in that lot?

17  A.   Well, we didn't know exactly where the shooting had

18      occurred in relation to the field.  We knew it

19      happened there some where because of the

20      information we had.  And the grass probably hadn't

21      been cut all year.  Maybe once in the year.  It was

22      tall grass. It was all bent.  There was a lot of

23      debris out there.  Unless we knew exactly where to

24      look it would be very difficult to find anything

25      out there.

1    Q.    Where you saw the blood next to the tree, did you

2          see any evidence that anything had been dragged

3          through that area through that grass?

4    A.    No.

5    Q.    You took photographs of that area also?

6    A.    Yes, sir.

7    Q.    I want to ask you some distances in relation to the

8          sketch that you did.  I see you've labeled some

9          addresses on the north side of Buena Vista.  Are

10         those residences there, the three rectangular areas

11         that have numbers in them?

12   A.    Yes, these would be the houses on the north side of

13         Buena Vista.

14   Q.    And in your sketch how many houses do you depict

15         across from the field where the blood was located?

16   A.    Four.

17   Q.    Can you describe for the jury what type of housing

18         that is?

19   A.    It's residential housing.  I believe several of

20         them are -- I know this for sure there is more than

21         one residence.  They're flats, I believe.

22   Q.    Did you measure from the sidewalk on the south side

23         of Buena Vista back to where the blood was located

24         by the tree?

25   A.    Yes.

1   Q.   What was the distance?

2   A.   From the street it's 72 feet.

3   Q.   Now, from the street do you mean from the curb?

4   A.   Yes, it would the south curb of Buena Vista to the

5       blood spot.

6   Q.   Can you give us an approximation of how much

7       additional distance there would be to the porch

8       area of the residences on the north side of Buena

9       Vista?

10   A.   The street was approximately 30 feet wide.  There

11       was another five foot berm, a six foot sidewalk,

12       and I believe 15 feet to the houses, so approximately

13       15 feet, fifty-five, 56 something like that

14       additional.

15   Q.   So if it's 70 from the curb to the blood, then

16       we're talking about 120 feet approximately?

17   A.   Approximately.

18   Q.   Give or take?

19   A.   Give or take.

20   Q.   Was anything else significant to you about the

21       actual sketch that you did there?

22   A.   This bicycle as depicted here in the street I

23       picked up for possible evidence.

24   Q.   Okay, there was a bicycle in the street?

25   A.   Yes.

1   Q.   Were there any street lights that you saw along

2        Buena Vista?

3   A.   Yes, this is a street light right here.

4   Q.   That's basically across from the address of 2638

5        Buena Vista?

6   A.   Yes.

7   Q.   Why don't you resume your seat then, please.

8             Do you recall how many photographs you

9        took of the crime scene and the area around it?

10  A.   I used a roll of 24.

11            MR. HASSINGER: May I approach the

12       witness, Your Honor?

13            THE COURT: Yes, you may.

14  BY MR. HASSINGER:

15  Q.   Sir, I'm going to hand you an envelope and ask you

16       if you've ever seen that before, please?

17  A.   Yes.

18  Q.   And what is that, sir?

19  A.   This is our identifier that we use to identify the

20       photos that were taken at the scene.

21  Q.   Sir, I'd like to show you some photographs and ask

22       you if you've ever seen these before.  Sir, I'd

23       like to show you what's been marked as People's

24       Proposed Exhibit Number Three.

25            MR. HASSINGER: Judge, I got three through

```
 1          nine here which are photographs.  And just for the
 2          record, I've shown them all to defense counsel.
 3                    THE COURT: Thank you.
 4     BY MR. HASSINGER:
 5     Q.   I'd like to show you what's been mark People's
 6          Proposed Exhibit Number Three, can you tell what is
 7          depicted in that picture?
 8     A.   This is the field on Buena Vista and Linwood.
 9     Q.   Officer, it probably would be helpful if you came
10          back up to the diagram and just show the jury where
11          you took the picture from in relation to diagram?
12     A.   This picture's taken from approximately to this
13          curb line here facing this direction, facing south.
14     Q.   Sir, does that photograph accurately depict the
15          location you saw back on that date?
16     A.   Yes.
17     Q.   I'd like to show you what's marked as People's
18          Proposed Exhibit Number Four.  Can you tell me
19          what's shown in that picture?
20     A.   This is a picture from within the field and
21          basically the northerly direction.
22     Q.   Now, where would you be taking that picture from in
23          relation to where perhaps the blood evidence is?
24     A.   In this area right here.  There's a pile of
25          debris.  They've probably taken a few feet away by
```

1        the City.

2    Q.   Again, does that picture fairly and accurately

3        reflect the way the scene looked back on September

4        6th?

5    A.   Yes.

6    Q.   People's Proposed Exhibit Number Four, again can

7        you tell us --

8             THE COURT: Wait a minute I thought we did

9        four.

10            MR. HASSINGER: You're right, Judge, it's

11       Proposed Exhibit Number Five. Sorry.

12   BY MR. HASSINGER:

13   Q.   Can you tell us what is shown in that picture?

14   A.   That's another picture from in the field facing

15       across the street.

16   Q.   Can you see any of the residences on the northbound

17       of Buena Vista in that picture?

18   A.   Yes.  You can see the edge of 2648, and you can see

19       all of 2638, and you can see all of 2626.

20   Q.   Does that fairly and accurately reflect the scene

21       as you saw it back on September 6th?

22   A.   Yes.

23   Q.   Proposed Exhibit Number Six, can you tell us what

24       that is, sir?

25   A.   That's a close-up of the suspended blood by the

1        tree.

2    Q.    And does that picture fairly and accurately reflect

3        what you saw back on September 6th?

4    A.    Yes.

5    Q.    Proposed Exhibit Number Seven, sir, can you tell us

6        what's in that photograph?

7    A.    That's a picture facing southeast.

8    Q.    And where did you take that that photo from?

9    A.    This side of the trail.  You can see --

10              THE COURT: Excuse me, we couldn't

11    understand you.

12              THE WITNESS: I'm sorry. It's a picture

13    from back in --

14              THE COURT: Remember, they're just as

15    important as we are.

16              THE WITNESS: It's a picture from in front

17    of the tree in this direction.  You can see the

18    trail running across from at the front of the

19    picture.

20  BY MR. HASSINGER:

21    Q.    Can you see any of the residences in that

22        photograph?

23    A.    Yes, you can see 2626 Buena Vista.

24    Q.    Does that photograph fairly and accurately depict

25        the scene you saw back on September 6th?

1    A.    Yes.

2    Q.    I'd like to show you Proposed Exhibit Number Eight,

3          sir, can you tell us about that photo?

4    A.    This is a picture of the field from within the

5          street.  I was standing in the street facing south

6          towards the two trees.

7    Q.    Could you point approximately where in the street

8          you would have been, what address would you have

9          been closest to?

10   A.    I was standing across from 2638 approximately

11         because you can see the bicycle in the picture and

12         the tree.  You can just barely see the edge of this

13         pole.

14   Q.    And that's the pole with the public light fixture?

15   A.    Correct.

16   Q.    And then finally, sir, Proposed Exhibit Number

17         9, can you tell me what's in that picture?

18   A.    This is a picture facing northbound from within the

19         field.  That was approximately in front of the

20         trees and you can see 2638 and 2648 and the very

21         edge of 2626 in the picture and the bicycle in the

22         street.

23   Q.    Does this photo accurately reflect the scene you

24         saw back on that day?

25   A.    Yes.

1          MR. HASSINGER: Judge, at this time move

2     for admission of Proposed Exhibits 3 through 9.

3          MR. LANKFORD: No, objection, Your Honor.

4          THE COURT: They will be admitted into

5     evidence.

6          (PX #1-9 received into evidence)

7          MR. HASSINGER: Judge, may they be

8     published to the jury?

9          THE COURT: Yes.

10         MR. HASSINGER: Judge, can you explain to

11    the jury that they may pass the pictures around?

12         THE COURT: Yes.  Ladies and gentlemen,

13    when he says published them what he means for you

14    to do is if you take a look at the first one and

15    pass it down so that the others will then pass it

16    all the way through until it get up to our juror

17    who is in seat 14 and then she'll hand them to the

18    prosecutor.

19         MR. HASSINGER: Thank you, Your Honor.

20    BY MR. HASSINGER:

21    Q.   So Officer Carpenter --

22         THE COURT: Wait.

23         MR. HASSINGER: I'm Sorry, Judge.

24         THE COURT: You can't do two things at

25    once.

1           MR. HASSINGER: That's true, Judge, sorry.

2     BY MR. HASSINGER:

3     Q.    Officer Carpenter, besides preparing this sketch,

4           taking the measurements and the photographs, is

5           there anything else significant about the evidence

6           tech work you did back on this day?

7     A.    No.

8     Q.    One final question.  I asked you if there was any

9           evidence of anything being dragged back by where

10          you found that blood area?

11    A.    Yes.

12    Q.    Did you see any trail of any type of blood back

13          there in that area?

14    A.    No.

15          MR. HASSINGER: Thank you, Your Honor.

16          THE COURT: Cross-examination.

17          MR. LANKFORD: Thank you.

18                    CROSS-EXAMINATION

19    BY MR. LANKFORD:

20    Q.    Good morning, officer Carpenter?

21    A.    Good morning.

22    Q.    Sir, may I see the photographs?

23    A.    Absolutely.

24    Q.    You do realize that this was an overgrown field,

25          right, sir?

1    A.   Yes, sir.

2    Q.   It was poorly tended, would that be fair?

3    A.   Yes, sir.

4    Q.   And then much of that is depicted in these

5         photographs, right?

6    A.   Yes, sir.

7    Q.   However, and you were unable to find any casings or

8         slugs, would that be fair?

9    A.   Yes, sir.

10   Q.   Would it also be fair to say though that you do

11        look, don't you, sir?

12   A.   Yes, sir.

13   Q.   Okay.

14             And an alleged slug itself may be the

15        size of the last portion of your finger, correct?

16   A.   Yes, sir, depending on the caliber.

17   Q.   Right, and a casing may be more like at least

18        length-wise two thirds of your little finger, would

19        that be fair?

20   A.   It depends on the caliber.

21   Q.   Okay.

22             And you are, Officer Carpenter, you are a

23        badged officer, correct?

24   A.   Yes, sir.

25   Q.   You are not a civilian employee, correct?

1    A.    Correct.

2    Q.    You carry a firearm?

3    A.    Yes, sir.

4    Q.    You're familiar with a revolver, right, sir?

5    A.    Yes, sir.

6    Q.    And a revolver, I take it just so I'm sure, would

7          be one of those little things like the old westerns

8          with the six shooter, the round cylinder that you

9          can see?

10   A.    Correct.

11   Q.    And that type of weapon, would it be fair to say,

12         once the round is discharged that the casing

13         remains in the cylinder?

14   A.    Yes, sir.

15   Q.    Okay.

16              You are also familiar with the concept of

17         the semiautomatic?

18   A.    Yes, sir.

19   Q.    That's probably what you carry, right?

20   A.    Yes.

21   Q.    Okay.

22              A semiautomatic doesn't have that

23         cylinder, correct?

24   A.    Correct.

25   Q.    The feed into the fire mechanism is by way of a

1        magazine or a clip?

2    A.  Correct.

3    Q.  Usually in the butt end of the gun, right?

4    A.  Yes, sir.

5    Q.  Okay.

6            When those are fired, when a semi is

7        fired, there's an ejection port, isn't there?

8    A.  Yes, sir.

9    Q.  Typically to the right, correct?

10   A.  Typically.

11   Q.  Okay.

12           Meaning that when a firearm, a

13       semiautomatic pistol is fired, the bullet comes

14       down the barrel and the casing kicks off to the

15       side, right?

16   A.  It kicks out of the weapon either the side or

17       behind.

18   Q.  But a casing itself unlike with a revolver kicks

19       out, doesn't it?

20   A.  Yes, sir.

21   Q.  And these are brass type of metal, at this point,

22       hollow, right?

23   A.  Normally they're brass.  It could be aluminum or

24       steel.

25   Q.  Okay.

1           And despite looking, you did not find any

2     casing or slug?

3 A.   No, sir.

4 Q.   Okay, I want to go through these photos kind of one

5     at a time.

6           MR. LANKFORD: If I may approach, Your

7     Honor?

8           THE COURT: You may.

9 BY MR. LANKFORD:

10 Q.   Okay, sir, the first one I want to show you it's

11     not necessarily the sequence.  The first one, sir,

12     that's People's now Exhibit Number Eight; is that

13     correct?

14 A.   Correct.

15 Q.   You indicated that is the street that's on Buena

16     Vista facing south into the field, would that be

17     fair?

18 A.   Yes.

19 Q.   Okay, that does show two trees, right?

20 A.   Yes, sir.

21 Q.   The one furthest to the right would be the one in

22     which you found blood drops; would that be fair?

23 A.   Yes, sir.

24 Q.   I take it Mr. Thomas' body had been removed by

25     other personnel by the time you arrived?

1    A.    Yes, sir.

2    Q.    Was there however a crime scene set up by other

3          members of the police department?  In other words,

4          you tape it off so civilians don't come traipsing

5          through and knocking things around?

6    A.    It wasn't tapped off, but there were officers out

7          there.

8    Q.    Okay, to prevent, again, anybody from coming or

9          going that didn't belong out there, right?

10   A.    Yes, sir.

11   Q.    Okay.

12                So let's assume the shooting occurred at

13         five and you got the call around seven, and arrived

14         shortly after, right?

15   A.    Yes, sir.

16   Q.    And when you arrive, the police have secured the

17         scene, correct?

18   A.    Yes.

19   Q.    It wasn't like when you came out there was nobody

20         out there or anything like that, right?

21   A.    Correct.

22   Q.    Now, when you look at that, sir, you can see the

23         bike, correct?

24   A.    Yes, sir.

25   Q.    I take it that the pole that you described, the

89

1           light pole, would have been to your left in that

2           photograph?

3    A.    Yes, sir.

4    Q.    And the debris pile that you described would have

5           been to your right, slightly to your right?

6    A.    Yes, sir.

7    Q.    Are either one of those visible in that photograph?

8    A.    You can just barely see the edge of the street

9           corner.

10   Q.    When you arrived it was light outside, correct,

11          sir?

12   A.    Yes, sir.

13   Q.    The lighting condition -- whether that light was

14          actually on or not, okay, at some point earlier you

15          wouldn't know, would you?

16   A.    No, sir.

17   Q.    Now, looking at those they show two trees.  Let's

18          take a look at those.  Do you know what I mean

19          deciduous or evergreen type trees?

20   A.    Yes.

21   Q.    Do those appear to be evergreen type trees?

22   A.    No.

23   Q.    There's some brownish back towards the back that

24          looks like something that's been --

25   A.    I think that's in the alley.

1  Q.   Okay, but that is clearly visible, isn't it?

2  A.   Yes.

3  Q.   Okay.

4            On September 6th, these trees are in full

5       foliage, aren't they?

6  A.   Yes.

7  Q.   I mean, it's not like you know now where they're

8       baring, right?

9  A.   Correct.

10 Q.   These trees, the leaves of these trees extend down

11      to -- you know, the one tree extends basically to

12      the ground, correct?

13 A.   Yes, sir.

14 Q.   And on the other one, the one to the right still

15      appears to be coming down to like chest level or

16      belt level or something like that?

17 A.   Yes.

18 Q.   Do you think that's fair?

19 A.   Yes, sir.

20 Q.   Okay, thank you.

21            Okay, sir, Number Nine, that's northbound

22      from the field, I take it?

23 A.   Yes.

24 Q.   And you can see, again, you can see the debris pile

25      clearly, correct?

1    A.   Yes, sir.

2    Q.   On the left side, right?

3    A.   Yes, sir.

4    Q.   The pole clearly on the right side?

5    A.   Yes, sir.

6    Q.   The bike, at least to me, is entirely visible but

7         it would be between the two of those?

8    A.   Yes, sir.

9    Q.   And you're able to see certain buildings, right?

10   A.   Yes.

11   Q.   Older, what might be flat buildings?

12   A.   Yes, sir.

13   Q.   The one furthest to the left being 2648?

14   A.   2648.

15   Q.   Okay, and then one in the middle, 2638?

16   A.   Correct.

17   Q.   And then a gap, correct?

18   A.   Correct.

19   Q.   Then 2626, right?

20   A.   Correct.

21   Q.   And I'm sorry, and all these photos were, in fact,

22        taken on the day that you went out there initially,

23        right?

24   A.   Yes, sir.

25   Q.   All right.  Sir, seven is simply facing southeast,

1        correct?

2    A.    Yes.

3    Q.    Diagonally across what would be the path, right?

4    A.    Correct.

5    Q.    And you can see 2626 in that, right?

6    A.    Yes.

7    Q.    And in effect this photo does depict a marked

8        Detroit police squad car, right?

9    A.    Yes.

10    Q.    Number six, sir, is simply a limited amount of

11        blood drops, right?

12    A.    Yes.

13    Q.    We take it you were focused on that area as far as

14        your search for any casings or slugs?

15    A.    That was one of the areas I searched, yes.

16    Q.    Sure, that would be indicative of something had

17        been there shortly, right?

18    A.    Yes, sir.

19    Q.    And the blood in this is still red, correct?

20    A.    Yes.

21    Q.    As opposed to brown or anything like that?

22    A.    Correct.

23    Q.    This is a fair and accurate depiction of the ground

24        covered, sir?

25    A.    Yes.

1    Q.   Five is more less at a slightly different angle I

2          take it facing southeast?

3    A.   Yes.

4    Q.   Okay.

5          Again, four would basically be number

6          nine only a slightly different angle?

7    A.   Correct.

8    Q.   Now, I want you to take a look also at -- and

9          again, the debris pile is very prominent there,

10       very clear, isn't it, sir?

11   A.   Yes, sir.

12   Q.   And it appears that -- I mean, you come you out

13       there in the early morning hours, right?

14   A.   Yes.

15   Q.   That pile is already there when you come out?

16   A.   Yes, sir.

17   Q.   And last but not least with regards to the photos,

18       Officer Carpenter, Number Three, I take it you are

19       on the south street and the residences are looking

20       at you, right?

21   A.   I think I was standing right at the curb as you can

22       see the top half of the garbage can, so I was

23       standing -- and you can see the garbage can in some

24       of the other photos, so I was probably standing at

25       the curb line.

1    Q.   Okay.

2              So you are on the north side of Buena

3         Vista looking south into the field, right?

4    A.   Correct.

5    Q.   And again that depicts the two trees, right?

6    A.   Yes.

7    Q.   In close proximity of one another?

8    A.   Yes, sir.

9    Q.   Full foliage?

10   A.   Yes.

11   Q.   And when you look into that, can you see buildings

12        that would be on the south side of either the alley

13        or perhaps they would be facing the next street

14        south?

15   A.   Yes.

16   Q.   And there are clearly apartments, homes, whatever

17        type of things on either side of that tree,

18        correct?

19   A.   Yes, sir.

20   Q.   And whether or not -- does that show whether

21        there's one perhaps behind those trees, directly

22        behind those trees?

23   A.   It's hard to tell.

24   Q.   Okay, thank you.

25              Okay, and frankly I just want to follow

1       up on -- let me get the directions right, I'm

2       sorry. Okay.  The houses are on the north of Buena

3       Vista?

4   A.  Yes.

5   Q.  Let's say the one that seem to be most directly

6       across to the tree that would be on the western

7       side, correct, sir?

8   A.  Yes, it's to the western side.

9   Q.  Okay.

10          And that address would probably be 2638,

11      I take it, it would be the one most direct?

12  A.  It's pretty close between the two but according to

13      the sketch, the sketch is fairly accurate.

14  Q.  Okay.

15          And you indicated that from those porches

16      or that porch to the tree is where I take it when

17      you found the blood droplets that are depicted?

18  A.  Yes.

19  Q.  Would be somewhere in the neighborhood of 125 feet?

20  A.  Yes.

21  Q.  Roughly half the length of a football field?

22  A.  Yes.

23          MR. LANKFORD: Okay, thank you.  Nothing

24      else.

25          THE COURT: Any redirect?

1        MR. HASSINGER: No, your Honor.

2        THE COURT: We thank and excuse the

3    witness.  You're free to go.

4        THE WITNESS: Thank you, Your Honor.

5        THE COURT: Are you ready to call your

6    next witness?

7        MR. HASSINGER: Yes the People call

8    Lavero Crooks.

9        THE CLERK: Raise your right hand,

10   please.  Do you solemnly swear or affirm that the

11   testimony you're about to give in the matter now

12   pending before the court to be the truth under the

13   pains of penalty of perjury?

14       MR. CROOKS: Yes, ma'am.

15       THE CLERK: Thank you.

16       THE COURT: Please be seated there.

17   Counsel would you please identify yourself for the

18   record?

19       MR. COOK: For the record, Your Honor, my

20   name is Donald Crook.

21       THE COURT: Representing?

22       MR. COOK: Your Honor, representing the

23   witness in this matter.

24       THE COURT: Thank you. Go ahead, counsel.

25       MR. HASSINGER: Thank you, Your Honor.

LAVERO CROOKS

1                 

2  was thereupon called as a witness herein and having

3  been duly sworn, was examined and testified as

4  follows:

5  DIRECT EXAMINATION

6  BY MR. HASSINGER:

7  Q.   Good morning, sir, would you please state your

8  name?

9  A.   My name, Lavero Crooks.

10  Q.   How old are you, Mr. Crooks?

11  A.   I'm 25.

12  Q.   Mr. Crooks, I'd like to take you back to

13  September 6th of 2002?

14  A.   All right.

15  Q.   Back on that date around five in the morning, did

16  you happen to be in the area of Linwood and Buena

17  Vista in the city of Detroit?

18  A.   Yes, sir.

19  Q.   And can you tell us what you were doing at that

20  time in that area?

21  A.   I was hustling.

22  Q.   What do you mean by hustling?

23  A.   I was selling drugs.

24  Q.   Okay.

25        Where were you located, where were you

1      physically at?

2    A.   Buena Vista off Linwood like maybe three houses off

3      Linwood.

4    Q.   Were you actually on Buena Vista?

5    A.   Yes.

6    Q.   And were you standing on the street?

7    A.   No, I was sitting in my car.

8    Q.   What kind of car did you have then?

9    A.   '84 Cutlass.

10   Q.   Do you recall which way your car was pointed on

11     Buena Vista?

12   A.   Facing Linwood.

13   Q.   Facing Linwood.  Okay.

14        And do you recall were you on the side of

15     the vacant field or on the side of the houses?

16   A.   I was on the side of the vacant field.

17        MR. HASSINGER: Judge, may I have the

18     witness step down and look at the diagram that we

19     have here?

20        THE COURT: Yes.

21  BY MR. HASSINGER:

22   Q.   Mr. Crooks, I want you to step down from the

23     witness stand and look at this diagram that's been

24     admitted as an exhibit.  Okay. You can we got Buena

25     Vista running this way.  Okay. Here's Linwood.

1          Okay.  This is that vacant lot?

2    A.    I'm right here.

3    Q.    There's a street light --

4                THE COURT: I'm going to ask you have him

5          stand kind of over to the side because the jurors

6          who may be looking into his back and not see.

7                MR. HASSINGER: I'm sorry, Judge.

8                THE COURT: Go ahead.

9    BY MR. HASSINGER:

10   Q.    All these jurors need to be able to see where

11         you're pointing here.  Why don't you use my pen and

12         use it as a pointer.  Okay, point to where your car

13         was situated?

14   A.    This is Linwood and this is Buena Vista.  There's a

15         vacant lot, okay, well, first, it's like a parking

16         lot, then it's an alley, then it's a vacant lot,

17         then it's a house.  I'm right here. Then it's

18         another house, then it's another vacant lot.

19   Q.    Where were you parked?

20   A.    In front of the house after the vacant lot.

21   Q.    Okay, have a seat, please.

22               Can you recall at all how long you had

23         been parked in that area?

24   A.    The whole day.

25   Q.    The whole day you had been there?  When did you get

1           there?

2      A.   I spent the night over there that night.

3      Q.   In your car?

4      A.   No, in the house across from the field.

5      Q.   That's what I'm trying to get to though is how long

6           were you sitting there in your car?

7      A.   For the whole night.

8      Q.   Do you know the defendant in this case Mr. Michon

9           Houston?

10     A.   Yes, I do.

11     Q.   How do you know him?

12     A.   He used to be my friend.

13     Q.   Do you see him here in court today?

14     A.   Yes, I do.

15     Q.   Would you point to him and tell us what he's

16          wearing today, please?

17     A.   He's wearing a black shirt and tan slacks.

18               MR. HASSINGER: Judge, I'd like the record

19          to reflect he's pointed to and identified the

20          Defendant Mr. Michon Houston.

21               THE COURT: All right.

22     BY MR. HASSINGER:

23     Q.   How long have you known Mr. Houston?

24     A.   Since July last year.

25     Q.   July of 2002?

1    A.   Yes.

2    Q.   Did see him around five in the a.m. back on

3         September 6th of last year?

4    A.   Yes.

5    Q.   When was it you first saw Mr. Houston?

6    A.   I seen him from earlier that afternoon on to the

7         night.

8    Q.   Where was he around five in the a.m.?

9    A.   On the porch that I spent the night in on Buena

10        Vista.

11   Q.   The house that you spent the night in where is it

12        in relationship to that vacant field with the path

13        that cuts through it?

14   A.   Right across the street.

15   Q.   Was anyone with Mr. Houston when you first saw him

16        on that porch?

17   A.   His girl and his home-boy, JW.

18   Q.   Do you know what his girlfriend's name is?

19   A.   I just know her by Powder.

20   Q.   You know her as Powder?

21   A.   (No response)

22   Q.   You have to say yes or no?

23   A.   Yes.

24   Q.   Can you describe her for us?

25   A.   She's a short white girl.

1    Q.   The person you refer to is JW, you know him by any

2         other name?

3    A.   Not that I can remember, no.

4    Q.   You see the three of them on a porch across from

5         the vacant field that the path cuts across?

6    A.   Uh-huh.

7              THE COURT: Does that mean yes?

8              THE WITNESS: Yes.  That's the porch we

9         grind on.

10   BY MR. HASSINGER:

11   Q.   What do mean by grind?

12   A.   Do our hustling.

13   Q.   That's the house you guys been dealing drugs from?

14   A.   Yeah.

15   Q.   Did something unusual happen around that time?

16   A.   An argument started out in the field.  Sean went

17        into the house.  Sean came out of the house fired a

18        round.  Ran into the field.  The dude was laying in

19        the field.  He said,"Dude, I shot that nigga in his

20        face the first time."

21   Q.   Let me stop you for a minute. The person who got

22        shot, when do you first see that person?

23   A.   When he was coming through the field.

24   Q.   Now, you saw our diagram there when you stepped

25        down, right?  Did you see the diagram?

1    A.   I seen the board, yeah.

2    Q.   Okay.

3              And did you see on that diagram where the

4         victim who got shot was coming from?

5    A.   He came like towards off Glendale.

6    Q.   There's a dirt path in that field, right?

7    A.   It comes from Glendale, Linwood way.

8    Q.   Okay, is that where you first saw that person?

9    A.   Yeah.

10   Q.   Was that person on foot walking?

11   A.   Yeah.

12   Q.   Okay.

13             Do you hear anybody yell anything to that

14        person when you first noticed him?

15   A.   Normally people race up to them.

16             MR. LANKFORD: Objection, he was asked a

17        specific question.

18             THE COURT: Sustained.

19             MR. LANKFORD: Thank you.

20   BY MR. HASSINGER:

21   Q.   Specifically with regards to this situation, did

22        you hear any words spoken, if you can recall?

23   A.   Somewhat -- I mean, I don't know how to answer it

24        because I don't know everything that was said, but

25        I know bits and pieces of things that was said that

1       I could hear.

2   Q.  What could you hear?

3   A.  I know he hang and cops from JW.  And he didn't

4       want to deal with Sean.  His girl asked about a

5       coat and Sean thought that he was being the way he

6       was --

7               MR. LANKFORD: Objection, he can't read

8       his mind.

9               THE COURT: He's saying you can't tell

10      what was in someone else's mind.

11  BY MR. HASSINGER:

12  Q.  Let's back up for a minute.

13              THE WITNESS: Can I ask you something,

14      Judge?

15              THE COURT: No.

16  BY MR. HASSINGER:

17  Q.  Okay.

18              When you first observed Sean, he's on the

19      porch, right?

20  A.  Can I just reword it, how 'bout that?

21  Q.  You have to answer the question.

22  A.  I'm going to answer it, but I'm going to answer it

23      in a different way.

24  Q.  Okay.

25  A.  Okay.

1          MR. LANKFORD: Sorry, what was the

2     question again, Mr. Hassinger?

3               MR. HASSINGER: When he first saw Sean was

4     on the -- Mr. Houston who was on the porch.

5               THE WITNESS: Okay, you asked me what did

6     I hear?

7  BY MR. HASSINGER:

8  Q.    We moved on now though.

9  A.    Oh, okay.

10 Q.    When you first see Mr. Houston, he's on the porch;

11       is that correct?

12 A.    Yes, sir.

13 Q.    Okay, does Mr. Houston leave the porch?

14 A.    Yes, sir.

15 Q.    Where does he go?

16 A.    To the field.

17 Q.    Is he going in the direction of the victim who gets

18       shot?

19 A.    Yes, sir.

20 Q.    From where you're at in your car can you hear if

21       Mr. Houston say anything to the victim who gets

22       shot?

23 A.    Yes, sir.

24 Q.    What can you hear?

25 A.    I can you hear, "Oh, you ain't gonna deal with me,

1 this is my block."

2 Q. That's what Mr. Houston says to the victim?

3 A. Yes, sir.

4 Q. Okay.

5    Do you hear if the victim says anything

6 in return?

7 A. I can deal with who I want to.

8 Q. He says he can deal with who he wants to; is that

9 correct?

10 A. Yes, sir.

11 Q. Okay.

12    What does Mr. Houston do after that is

13 said to him by the victim?

14 A. Mr. Houston goes across to the house, goes in the

15 house and gets his gun and comes out and fires a

16 round.

17 Q. Let me stop you there for a minute.  Does Mr.

18 Houston go back in the house, the same house he's

19 been on the porch?

20 A. Yes, sir.

21 Q. When he comes out of the house, can you see a gun?

22 A. Yes, sir.

23 Q. And this a long gun; what type of gun is it, do you

24 know?

25 A. It was a 40 cal.

1    Q.    40 caliber?

2    A.    Yes, sir.

3    Q.    Now, you testify you see Mr. Houston fire a shot?

4    A.    Yes, sir.

5    Q.    Where is he when he fires the first shot?

6    A.    Coming off the porch.

7    Q.    What happens to the victim at that time?

8    A.    He falls in the grass.

9    Q.    Now, are there a couple of big trees there in that

10        field towards the back?

11    A.    There's two trees.

12    Q.    Can you tell us where the victim falls in

13        relationship to those trees?

14    A.    He falls on the outside on the first tree close to

15        the lot.  There's another lot it goes on Glendale.

16    Q.    And he falls by one of the trees?

17    A.    Near the first tree.

18    Q.    What does Mr. Houston do when the victim falls to

19        the ground?

20    A.    He goes over and he kicks him over on his back.

21    Q.    He has to move him over to get him on his back?

22    A.    Yeah, he had to roll him over.

23    Q.    So how did the victim land initially?

24    A.    On his stomach.  The victim went to run but the

25        bullet hit him, and he rolled him over.

1    Q.    So when Mr. Houston rolls the victim over, the

2          victim is now on his back?

3    A.    Yes, sir.

4    Q.    Do you hear Mr. Houston say anything at that time?

5    A.    He say,"Damn, dog, I shot that nigga in his face,

6          first shot."

7    Q.    What happens next?

8    A.    He searched his pockets.  I began to pull off.  He

9          started firing some more shots into him.  I left, I

10         left.

11   Q.    But before you leave you see more shots fired?

12   A.    Yes, sir.

13   Q.    And this was after Mr. Houston has flipped the

14         victim over on his back?

15   A.    Yes, sir.

16   Q.    Can you give the jury any idea of how many more

17         shots were fired once the victim is flipped over?

18   A.    The way I looked at it he fired the rest of the

19         shots.  He was looking at the gun because the gun

20         was shooting on him.

21   Q.    Was it more than one shot?

22   A.    Yes, sir.

23   Q.    Do you leave at that time?

24   A.    Yes, sir.

25   Q.    Where do you go?

1   A.   I had a young lady that was in the car with me.  I

2         had to take her to Taylor and then Linwood.  Then I

3         took her home because she had, you know, witnessed

4         it also, and she was ready to go.

5   Q.   Now, you've known Mr. Houston since July of 2002?

6   A.   Yep.

7   Q.   And you said at least at one point you were

8         friends?

9   A.   Yes, sir.

10   Q.   When did that all end?

11   A.   I don't remember exact, but one day I was smoking

12         on the block and I fell asleep.

13              MR. LANKFORD: Objection.

14              THE COURT: Basis of the objection?

15              MR. LANKFORD: This leads in an irrelevant

16         area, Your Honor.

17              THE COURT: Well, no, I thought it would

18         go for the reason for him to testify.  I'll

19         overrule the objection.

20  BY MR. HASSINGER:

21   Q.   First, sir, just to get a time frame.  I asked you

22         when did your friendship with Mr. Houston end?  On

23         the date of this shooting, on September 6th, 2002,

24         did you consider Mr. Houston your friend?

25   A.   Yes, sir.

1   Q.   Did there came a time in November of 2002 when your

2        friendship came to an end?

3   A.   Yes, sir.

4   Q.   Why did it come to an end?

5   A.   Sir, I woke up in my car about 10:30, eleven and I

6        had a pistol grip pumped to my head with Sean

7        telling me if pull off, try to pull off he'll kill

8        me, and you don't run this block.  This is my

9        block.  And the only thing I can ask him is why.  I

10       ain't done knowing to you.  What's wrong with you.

11       So his cousin grabbed the gun.  That's the only

12       reason he didn't shoot.

13            MR. LANKFORD: Objection, now we're

14       getting irrelevant, Judge.

15            THE COURT: Sustain, it's stricken.  The

16       jury's told to disregard it.

17 BY MR. HASSINGER:

18   Q.   So some time in November Mr. Houston comes at you

19       with some type of weapon?

20   A.   Yes, sir.

21   Q.   Are you able to get away from Mr. Houston at that

22       time?

23   A.   Yes, sir.

24   Q.   Do you report that to the police?

25   A.   Yes, sir.

1  Q.  I'd like to draw your attention to November 9th of

2      last year, 2002.  Back on that date did you meet

3      with Detroit Police Officers Moss and Adams?

4  A.  They came to my house, sir.

5  Q.  And did you talk with them?  Don't tell us what you

6      talked about, but did you talk with them?

7  A.  Yes, sir.

8  Q.  Did you indicate to them that you knew where Mr.

9      Houston was?

10 A.  Yes, sir.

11 Q.  And specifically did you formulate a plan with

12     those two officers to try get Mr. Houston under

13     arrest?

14 A.  Yes, sir.

15 Q.  What was the plan?

16 A.  I told them if I rode through there with my music

17     on he would run out with a gun shooting.

18 Q.  What area were you referring to?

19 A.  Buena Vista and Linwood.

20 Q.  Buena Vista and Linwood?

21 A.  Yes, sir.

22 Q.  How was it you knew Mr. Houston was in that area?

23 A.  Because we grind there every day.

24 Q.  So the plan is if you drive -- I'm sorry, strike

25     that.

1               What kind of car did you drive?

2    A.    An '84 Cutlass.

3    Q.    How long had you been driving that vehicle?

4    A.    Maybe two and a half, three months before that

5         happened.

6    Q.    Is it fair to say everybody knew that was your car?

7    A.    Yes, sir.

8    Q.    Okay.

9             So the plan was with Officer Adams and

10        Officer Moss that you drive your vehicle through

11        that area to see if you can bait Mr. Houston out of

12        an address on that street?

13    A.    Yes, sir.

14    Q.    What happened?

15    A.    When I pulled my car at a lot and parked it Sean

16        and his cousin came to the porch.

17    Q.    Do you know what address they were at?

18    A.    No, sir, the house before the field.  It's like the

19        field, the house, and then there's a four-family

20        flat.  He was at the four-family.

21    Q.    Do you know if this is on the north or the south

22        side of Buena Vista?

23    A.    I don't understand.  It's the same -- it's the one

24        from where the killing happened.

25    Q.    Is it on the same side of the road of the house

1    that you guys grind out of?

2 A. No, sir.

3 Q. It's on the opposite side?

4 A. Yes, sir.

5 Q. So it's farther from Linwood than the vacant field;

6    is that correct?

7 A. Yes, sir.

8 Q. Okay.

9       What do you do when you see Mr. Houston

10    come out of that house?

11 A. I point him out.  I say there he go there.

12 Q. Where are Officers Adams and Moss?

13 A. I don't know exactly, but it was a lot of police

14    every where. They just came out of every where.

15 Q. So you point out Mr. Houston to the police?

16 A. Yes, sir.

17 Q. What do you see Mr. Houston do?

18 A. He ran back in the house and barricaded himself.

19 Q. Do you stay at that location or do you leave?

20 A. I stay.

21 Q. What did the police do?

22 A. Search the house that they could go in.

23      MR. LANKFORD: Objection, what's his

24    personal knowledge, Your Honor?

25      THE COURT: I thought he said he was

1          there, so you mean what did you see the police do?

2                    MR. HASSINGER: Yes.

3                    THE COURT: Rephrase your question then.

4    BY MR. HASSINGER:

5    Q.    What do you see the police do?

6    A.    I see him search the houses because it's a

7          four-family flat.  Yet they wasn't available to

8          search and we waited for the landlord, then they

9          went in the other house and that's where they found

10         him.

11   Q.    So you're saying that the address that Mr. Houston

12         fled into is a four-family flat?

13   A.    Yes, sir.

14   Q.    They searched some of the units, but had to wait

15         for the landlord to search one of the others?

16   A.    Yes, sir.

17   Q.    Eventually do you see the police bring Mr. Houston

18         out of that four-family flat?

19   A.    Yes, sir.

20   Q.    Two days later on November 11th, do you end up over

21         at 1300 Beaubien Police Headquarters?

22   A.    Yes, sir.

23   Q.    And are you asked to give a statement about this

24         shooting?

25   A.    Yes, sir.

1    Q.   Do you cooperate with the police?

2    A.   Yes, sir.

3    Q.   Sir, what's the reason why you waited until

4          November to cooperate with the police about this

5          shooting that occurred in the vacant field?

6    A.   Because I had been confronted a couple of times by

7          investigators about it.  And then I thought there

8          was a point where I held myself for me trying to

9          kill him to putting a gun to my head.

10   Q.   Have you been promised anything to testify in this

11         particular case, sir?

12   A.   No, sir.

13   Q.   Did you ever meet myself before today?

14   A.   No, sir.

15   Q.   Are you testifying here today on your own free

16         will?

17   A.   Yes, sir.

18   Q.   In the last 10 years have you been convicted of any

19         crime involving theft or dishonesty?

20   A.   No, sir.

21   Q.   If the defendant hadn't put that gun to your

22         head --

23               THE COURT: Speculation.

24   BY MR. HASSINGER:

25   Q.   Is it fair to say you're here today because the

1       defendant put that gun to your head?

2  A.   No, sir.

3  Q.   Why not?

4  A.   Because I had left when he put the gun to my head,

5       I had charges for that, but I left it alone and

6       dropped the charges because I felt like I couldn't

7       take a man's freedom.  But then after I was being

8       questioned about the murder I felt bad because a

9       person life was taken and I knew what happened and

10      I was there even though I didn't have anything to

11      do with it.

12          So if it would make me rest easy because

13      I was put in that predicament I could have been him

14      for getting killed, you know, so I call myself

15      changing my life so I thought I'd just be honest

16      about it.

17          MR. HASSINGER: Thank you, Your Honor.

18          THE COURT: Counsel, we're going to have

19      to stop at 12:15 because I promised some lawyers

20      I'd handled some matters and I know your

21      cross-examination will not be short.  Therefore,

22      we're going to allow the jury for their luncheon

23      for recess.

24          I want to warn you about Greek Town.

25      They give you a lot of food.  It's very good.  Try

1      to eat lightly enough so when you come back this

2      afternoon you'll be able to keep awake and listen

3      to the testimony.

4              We'll start again in this matter at

5      1:30.  We'll rise for the jury to go to lunch.

6      Everyone rise. Jurors are free to get their things

7      to go to lunch.

8              (Jury exits courtroom)

9              THE COURT: You may be seated.  Counsel, I

10     saw somebody that I used to work over from your

11     office bring you a check for $250, right?

12             MR. LANKFORD: Whatever the amount,

13     Judge.

14             THE COURT: Okay.

15             MR. LANKFORD: We'd like to know just for

16     the record, I mean, this court had put us on notice

17     I do think for eight minutes and $250 is a little

18     high but it's not --

19             THE COURT: No, no, you know the reason

20     it's $250, that way people can't say well, if I'm

21     only two minutes late I only have to pay $100.  If

22     I'm five minutes late I have to pay -- it's $250

23     you got to be here on time.

24             MR. LANKFORD: And just for the record and

25     I do understand, and I think the reason that the

1    office is paying as opposed to me is that I also

2    had to cover a sentencing in the basement.  And I

3    ran a few minutes late and as I say I think the

4    amount is high for the length of infraction.

5              THE COURT: Let me explain to you why it's

6    not high.  You see, when I let you come back two,

7    three, four, five, six, seven, eight, minutes late,

8    those 14 people over there instead of coming back

9    when I tell them to, and then it's she doesn't

10   start on time, why in the world should I be there.

11   This morning they were all here at 9:00 o'clock

12   because I explain to them what I do.  They were all

13   here at 9:00 o'clock.

14             But because they had witness problems,

15   they didn't get to come out here, because I have it

16   in my notes, they didn't come out here until 9:15.

17   So that sets the first time.  The next time I let

18   them go for a coffee break and I don't start on

19   time, I'm eight minutes late.  The next time they

20   go to lunch, well, Judge Jones said come back at

21   1:30, but we don't have to do that.  So that's why

22   it's $250.

23             I wish I could make it more, then I could

24   give an increment.  You're ten minutes late, it's

25   $250.  You're 20 minutes late, it's $500, so I

1    think $250 is enough to get lawyers here on time,

2    don't you?

3         MR. LANKFORD: Well, and again, as the

4    court may or may not know, I was here before 9:00

5    and I'm not making excuses, a simple explanation, I

6    got tied up down the hall on a sentencing I was

7    assigned.

8         THE COURT: I'm very selfish.  I don't

9    care.  I got 14 citizens here, voters I hope, and

10   so I want them to see that we run this court

11   efficiently and your office is going to have to

12   assign other people to handle other matters when

13   you're in trial here.  Write your check for $250.

14   Thank you very much.

15        MR. LANKFORD: Judge, it's already

16   written.

17        THE COURT: Okay, and he can go back and

18   we'll start in this matter at 1:30.

19        MR. LANKFORD: Payable to who?

20        THE COURT: It's made to the court, isn't

21   it?  We'll have to call upstairs and find out.

22        MR. LANKFORD: Okay, well, Judge, I have

23   it, but it just doesn't have the payee.

24        THE COURT: Okay, you can give it to

25   Marylyn because it doesn't have the payee. She'll

1      have them put in the right payee.

2                     All rise for the jury.

3                     (Jury enters courtroom at 1:30 p.m.)

4                     THE COURT: Go ahead, counsel.

5                              CROSS-EXAMINATION

6      BY MR. LANKFORD:

7      Q.   Good afternoon, Mr. Crooks.

8                     THE COURT: I couldn't hear you.

9                     THE WITNESS: I said good afternoon.

10                    THE COURT: Thank you.

11     BY MR. LANKFORD:

12     Q.   Sir, you were -- sorry, do you know Jovan Johnson?

13     A.   Yes, sir.

14     Q.   J-W?

15     A.   Yes, sir.

16     Q.   You too have a nickname, don't you, sir?

17     A.   Yes, sir.

18     Q.   Country?

19     A.   Yes, sir.

20     Q.   Okay.

21                    And now, I think the last series of

22     questions that you were asked by Mr. Hassinger had

23     to do with how it came to be that you came forward

24     at some point in November, right?

25     A.   Yes, sir.

1   Q.   And it would be true that you came forward some two

2        months after this shooting that you say you

3        witnessed, right?

4   A.   Yes, sir.  I'm not for sure, but I'm just going to

5        say yes.

6   Q.   Let's say it was some time in the early part of

7        November, right?

8   A.   Yes, sir.

9   Q.   Because actually a statement this was at 1300

10       Beaubien, correct?

11  A.   Yes, sir.

12  Q.   To a Sergeant Paul Jones?

13  A.   Yes, sir.

14  Q.   Sometime just before noon on November 11th, 2002?

15  A.   Yes, sir.

16  Q.   And prior to that time, sir, and this all came to

17       pass, your conscious got the better of you; is that

18       right?

19  A.   Yes, sir.

20  Q.   You started feeling bad about this poor guy that

21       got shot to death, right?

22  A.   Yes, sir.

23  Q.   Okay.

24            And just coincidently when you came

25       forward was about the time that you had a beef with

1          Mr. Houston or Mr. Houston had a beef with you,

2          correct?

3     A.   Yes, sir.

4     Q.   Okay.

5               So what happens that you spent the night

6          at a house, a flat directly across from the field,

7          right?

8     A.   Yes, sir.

9     Q.   And you end up being in your car, correct, your

10         car?

11    A.   Yes, sir.

12    Q.   In the early morning hours, right?

13    A.   The next day after I spent the night over there,

14         yes, sir.

15    Q.   Before sun up, correct?

16    A.   Yes, sir.

17    Q.   And you're sitting in your car, it's nice weather,

18         I assume the windows are down?

19    A.   Almost all the way down, yes, sir.

20              MR. LANKFORD: And if I may ask the

21         witness to step down for a second to the chart,

22         Your Honor?

23              THE COURT: You may.

24    BY MR. LANKFORD:

25    Q.   Maybe I had directions wrong, but I want you to

1        assume that these numbers on bottom here are houses

2        on Buena Vista, okay?

3   A.   Okay.

4   Q.   And this is the field, all right?

5   A.   Okay.

6   Q.   Which side of the street were you parked on?

7   A.   I was on the same side of the field.

8   Q.   As the field?

9   A.   Yes, sir.

10   Q.   Pointed towards Linwood?

11   A.   Yes, sir.

12   Q.   Okay, do you see where it says, where it indicates

13       like a little sun glow?

14   A.   Yes, sir.

15   Q.   That's a street light, all right, and this pile of

16       debris marked pile of debris?

17   A.   Yes, sir.

18   Q.   And what looks to be a bike, correct?

19   A.   Yes, sir.

20   Q.   Where were you parked in relation to these items?

21   A.   On the other side of the debris towards -- yes.

22   Q.   Towards this way?

23   A.   Yes, sir.

24   Q.   Okay, thank you and you may be seated again.

25           You were with a young lady, correct?

1    A.    Yes, sir.

2    Q.    You drive that young lady home?

3    A.    Yes, sir.

4    Q.    I don't really need to know her name, but did you

5          ever tell the police in your statement that by the

6          way there is another person who witnessed this too?

7    A.    No, sir.

8    Q.    You didn't mention that?

9    A.    No, sir.

10   Q.    All right.

11            You indicated, speaking of things maybe

12    not mentioned, you indicated today that you saw Mr.

13    Thomas, Mr. Carlton Thomas let's assume that is the

14    death person's name, all right?

15   A.    Okay.

16   Q.    Did you see his pockets searched?

17   A.    Yes, sir.

18   Q.    By whom?

19   A.    By Sean.

20   Q.    Did you ever happen to mention that in your

21    statement?

22   A.    No, sir, I didn't.

23   Q.    Okay.

24            Now, so you don't come forward and you

25    got basically the whole month of September to come

1        forward, right?

2    A.   Yes, sir.

3    Q.   You don't do that?

4    A.   No, sir.

5    Q.   You got the entire month of October through

6        Halloween to come forward, right?

7    A.   Yes, sir.

8    Q.   You don't do that?

9    A.   No, sir.

10   Q.   And you don't do it until about a week or week in a

11       half in November, right, sir?

12   A.   Yes, sir.

13   Q.   More than two months later, correct?

14   A.   Yes, sir.

15   Q.   Now, I understand you know you're feeling bad, but

16       also at this time you indicated something about

17       you're being questioned by the police; is that

18       right?

19   A.   Yes, sir.

20   Q.   Between September and November?

21   A.   Yes, sir.

22   Q.   How many times are you being questioned by the

23       police?

24   A.   Three times, sir.

25   Q.   Three times.  Were those all out in the area of

1        Buena Vista and Linwood or were you ever talked to

2        in less pleasant surroundings?

3   A.   No, on Buena Vista and Linwood.

4   Q.   Always on Buena Vista.  Okay.  So I don't need to

5        know your address, but do you live on Buena Vista?

6   A.   No, sir.

7   Q.   But you hang there a lot, don't you?

8   A.   Yes, sir.

9   Q.   Okay, because the police are able to find you three

10       times out there to talk with you, right?

11  A.   Yes, sir.

12  Q.   Okay.

13          And, in fact, you're out there grinding,

14       isn't that your word, sir?

15  A.   Yes, sir.

16  Q.   On a regular basis, correct?

17  A.   Yes, sir.

18  Q.   All right.  In grinding, you indicated and I

19       appreciate your forthright, but grinding means

20       you're rolling, correct?

21  A.   Yes, sir.

22  Q.   That means you're selling dope, right?

23  A.   Yes, sir.

24  Q.   Sean Houston also appears to be selling dope,

25       right?

1    A.   Yes, sir.

2    Q.   And Jovan Johnson appears to be selling dope?

3    A.   Yes, sir.

4    Q.   The house that you spent the night in belongs to a

5         woman named Lisa?

6    A.   Yes, sir.

7    Q.   Okay, she's involved in this?

8    A.   No, sir.

9    Q.   Okay, she doesn't actively participate, would that

10        be fair?

11   A.   I don't understand your question.

12   Q.   You spend the night at Lisa's, correct?

13   A.   I stay the night upstairs.

14   Q.   Upstairs.  Does Lisa roll?

15   A.   No, sir.

16   Q.   The person that lives in the other unit?

17   A.   No, sir.

18   Q.   Do you know those persons names?

19   A.   I know Lisa stay downstairs and a girl name Kisha

20        stay upstairs.

21   Q.   What about a person by the name of Tenisha Watson,

22        are you familiar with her?  Probably live on

23        Glendale facing the opposite way, are you familiar

24        with her?

25   A.   I know a Tenisha, but I don't Tenisha Watson.   I

1          don't know her last name.  Probably so, yes.

2     Q.   Okay.

3               The person probably lives on Glendale a

4          house on Glendale?  I'm sorry, is Buena Vista and

5          Glendale one block apart?

6     A.   It's the next street, sir.

7     Q.   Does Tenisha live on Glendale?

8     A.   The Tenisha I know, no, she stayed on Tireman.

9     Q.   What about a Keith Lee?

10    A.   Excuse me?

11    Q.   Does that ring a bell ring Keith Lee?

12    A.   No, sir.

13    Q.   Somebody with a street name of PJ?

14    A.   Oh, yeah.

15    Q.   Okay.

16              And what happens, I mean, you are

17         specifically out there on September 6th at 5:00

18         o'clock in the morning?

19    A.   Yes, sir.

20    Q.   Looking to make a sale?

21    A.   Yes, sir.

22    Q.   If there are any crack heads they show up, it's a

23         24 hour service, right?

24    A.   Yes, sir.

25    Q.   And so why you're out there, instead of you making

1   a sale, apparently Mr. Houston attempts to make a

2   sale; is that right?

3 A. Yes, sir.

4 Q. Then you guys aren't selling together, are you?

5 A. No, sir.

6 Q. And so would it be fair to say you would rather

7   make the sale yourself?

8 A. No, sir.

9 Q. No, sir, okay.

10     So you're just sitting out there but you

11   don't mind the competitor, right?

12 A. No, sir.

13 Q. I see, okay.

14     Even after this shooting you continue to

15   go out grinding, don't you, sir?

16 A. Yes, sir.

17 Q. That's a regular area for you, isn't it?

18 A. Yes, sir.

19 Q. All right.

20     Now, I want to make sure I have something

21   clear.  You said Mr. Houston approaches the man and

22   you hear words, correct?

23 A. Yes, sir.

24 Q. And then you see Mr. Houston leave -- those words

25   take place in the field?

1    A.   Yes, sir.

2    Q.   Mr. Houston leaves the field, correct?

3    A.   Yes, sir.

4    Q.   Walks to some dwelling, right?

5    A.   Excuse me?

6    Q.   Walks to a dwelling?

7    A.   You mean the home, right?

8    Q.   A home, sure?

9    A.   Yes, sir.

10   Q.   What home is that; is that the same one that you

11        grind off the porch on?

12   A.   Yes, sir.

13   Q.   When did you see Mr. Houston show up that morning?

14   A.   He was there from the day before.  Okay, let me see

15        how can I explain it.  It seems like say it's about

16        almost 2:00 o'clock now, say if I come on the block

17        now, I might not leave 'til tomorrow afternoon,

18        early morning.

19   Q.   How does it happen that you see Mr. Houston

20        originally come out let's say 2638 Buena Vista or

21        do you see him arrive in a car shortly before 5:00

22        o'clock?

23   A.   I seen him sitting on the porch.

24   Q.   Sitting on the porch?

25   A.   Yeah.

```
 1    Q.   Okay, he's sitting on the porch when you first take

 2         up your location in your car?

 3    A.   Right.

 4    Q.   At which point you must have walked right by him,

 5         right, if you're coming out of that address?

 6    A.   No.

 7    Q.   Next address?

 8    A.   I went in the house at that time.  I was in my

 9         car.  I parked across the street.

10    Q.   Okay, but when you first saw -- you're in your car

11         when you first see Mr. Houston?

12    A.   Yes, sir.

13    Q.   And he's on the porch?

14    A.   Yes, sir.  That's why I parked across the street

15         instead of going to the house.

16    Q.   Okay, did you see where he came from?

17    A.   He came off the down flat.

18    Q.   But you hadn't seen him in that unit while you were

19         there overnight, right?

20    A.   No.

21    Q.   All right.

22                   And at that time what you indicated is

23         apparently that a shot is fired by Mr. Houston at

24         the man in the field, right?

25    A.   Yes, sir.
```

1    Q.   I mean, he is physically gone, traveled through the

2          field, across the curb, across the sidewalk, across

3          the street, back up on the other curb, into the

4          house to get a gun, right?

5    A.   Yes, sir.

6    Q.   Okay.

7               During that time Mr. Thomas apparently

8          doesn't make any attempt to leave, right?

9    A.   Not until he see the gun.

10   Q.   Okay, but we're talking a fair amount of time to

11         walk over from a field into a house, right?

12   A.   No, jog.

13   Q.   Jog, okay, but still we're still talking ten,

14         fifteen seconds, right?

15   A.   I don't know.

16   Q.   I want you to assume that the distance from that

17         field to the front porch to be approximately 125

18         feet, okay, I want you to assume that, all right,

19         take that as true, okay.  And then there's some

20         period of time inside the house before anybody

21         comes out with a gun, right?

22   A.   I'm listening.

23   Q.   Do you know?

24   A.   I don't understand what you asking.

25   Q.   Sure, a guy goes in the house, how long is Mr.

1    Houston supposedly in the house before he comes out

2    with the gun?

3    A.   I don't know, I wasn't timing him.

4    Q.   Okay.

5         All the time the man was trying to make a

6    buy, the guy ends getting shot, he's still out

7    there, isn't he?

8    A.   Yes, sir.

9    Q.   You're still out there?

10   A.   Yes, sir.

11   Q.   Jovan Johnson is still out there?

12   A.   Yes, sir.

13   Q.   Mr. Houston at least for the time being isn't out

14   there, correct?

15   A.   Yes, sir.

16   Q.   All right.

17        And then the first shot or series of

18   shots, could we distinguish them two different

19   shots or series of shots.  One at the victim and

20   then when they're both in the field, okay.  Now,

21   the first set of shots, where's that come from?

22   A.   It come from the sidewalk.

23   Q.   Okay, which sidewalk?

24   A.   From the front of the house I spent the night in.

25   Q.   Okay.  Fired by Mr. Houston?

1 A. Yes, sir.

2 Q. Okay.  That shot, how many shots then?

3 A. I think he fired two rounds.

4 Q. Okay, those shots do come from the side of the
5   street across from the field, right?

6 A. They come from the opposite side of the field.

7 Q. Right, okay.

8     So it's not like Mr. Houston is five feet
9   behind the guy chasing him at that time, is it?

10 A. No, sir.

11 Q. The man goes down, right?

12 A. Yes, sir.

13 Q. Now you say you see Mr. Houston jog back across to
14   where a field is, correct?

15 A. Yes, sir.

16 Q. And at that time you hear other rounds fired,
17   right?

18 A. After he rolled him over on his back.

19 Q. He used a racial epitaph said something about you
20   know, got him in the face, right?

21 A. Yeah.

22 Q. Okay.

23     And you're out there watching it.  Oh, do
24   you know where the young lady you were with is at
25   this point?  I don't need to know her name but, do

1           you know where she is?

2    A.    She probably still over on Taylor.

3    Q.    Okay, so now Mr. Houston rolls him over,

4           supposedly, right?

5    A.    Yes, sir.

6    Q.    Okay, continues to fire other rounds, right?

7    A.    I believe he went in his pockets, yes, sir.

8    Q.    Okay.

9                 Again, which you never mention to the

10          police about pockets, right, sir?

11   A.    No, sir.

12   Q.    Okay.

13                And he rolls him over and you seem to

14          have some familiarity with handguns, sir.  You

15          pretty much think this is a 40, right?

16   A.    Yes, sir.

17   Q.    Okay.  That being a semiautomatic weapon?

18   A.    I don't know, I never fired it.

19   Q.    Okay, but you've seen it before?

20   A.    Yes, sir.

21   Q.    You know it's kept in that residence, right, sir?

22   A.    It was my friends -- it was the dude's supposed to

23          be my friend's gun.  I seen him with it plenty

24          times.

25   Q.    The dude?

1 A. Sean.

2 Q. Okay.

3 A. I have seen him with it plenty times.

4 Q. Okay.

5     You didn't mention that to the police,

6   did you, sir?

7 A. I wasn't asked that, sir.

8 Q. Okay.

9     It would be fair, sir, the answer to that

10   I assume that you never bothered to tell the police

11   that, right?

12 A. Yes, sir.

13 Q. Okay.

14     And when the police questioned you, and

15   you know that they're questioning you about a

16   shooting, right?

17 A. Yes, sir.

18 Q. And I assume you've now given them information, the

19   police aren't rushing you, are they, sir?

20 A. What you mean by rushing me?

21 Q. They're not saying, okay, sit down.  We only got

22   five minutes to do this and we need to get this

23   stuff. They're not doing that, are they, sir?

24 A. No, sir.

25 Q. They're sitting there saying take your time.  Tell

1      us everything, correct?

2    A.   Yes, sir.

3    Q.   Right, in fact, the last question that they ask you

4      is specifically do you have anything else to add to

5      this statement, right, sir?

6    A.   Yes, sir.

7    Q.   And you say no, correct?

8    A.   Yes, sir.

9    Q.   All right.

10          Even when you first -- your first contact

11     with the police after the beef with Mr. Houston has

12     to do with your beef with Mr. Houston or his beef

13     with you, right, sir?

14    A.   Yes, sir.

15    Q.   Okay.

16          It is not at that point I want to tell

17     you -- even then, it's not I want to tell you about

18     something I saw that's been wearing on me for two

19     months, is it, sir?  It's not.  I mean, your thing

20     is a couple of days we had this problem, right, or

21     a day ago we had this problem.  That's how you

22     approach the police, right?

23    A.   Uh-huh.

24    Q.   Okay, that's a yes, sir?

25    A.   Yes, sir.

1   Q.   Okay.

2              So it's not that after two months I can't

3        take this anymore.  I have to tell the police

4        about what I saw that day on September 6th.  That's

5        not how you first approach the police with regards

6        to this case, is it?

7   A.   I don't know how to answer that question.

8   Q.   Okay, okay.  How many shots fired total, sir?

9   A.   I don't know.  I didn't count.

10  Q.   Do you know how many shots this Glock would hold?

11  A.   No, sir.

12  Q.   You are aware that the bullets would be in the

13       handle of the weapon, right?

14  A.   Yes, sir.

15  Q.   The whole length of the weapon, right?

16  A.   I guess so.

17  Q.   As far as you know.  Okay.

18             Now, you're talking about at some point

19       when you used to be with Mr. Michon Houston and

20       when Mr. Houston was arrested -- sorry, I lost my

21       train of thought.

22             THE COURT: Read that question for me,

23       please.  Do you remember?

24             THE WITNESS: It was the full length of

25       the gun.

BY MR. LANKFORD:

Q.   I think my last question was with regards to when
     you were with Officers Moss and Adams and Mr.
     Houston's arrested?

A.   Yes.

Q.   You were with Officer Moss and Adams when Mr. Houston
     was arrested, correct, sir?

A.   Yes, sir.

Q.   Okay, you seen them bring Mr. Houston out?

A.   Yes, sir.

Q.   2675 Buena Vista?

A.   I don't know that address.

Q.   The same side of the street of the field?

A.   Yes, sir.

Q.   All right.

          Do you see either of those two officers
     with any type of firearm other than their own
     department issued?

A.   No, sir.

Q.   All right.

          Now, do you recall in your statement
     saying specifically because you had testified today
     that Mr. Houston went and retrieved a gun from the
     flat where Lisa lives or that building, right?

A.   Yes, sir.

1    Q.    Do you recall telling the police that he left to

2          get a gun from a vacant house?

3    A.    I don't remember.

4    Q.    You don't remember?

5    A.    No, sir.

6                    MR. LANKFORD: May I approach, Your

7          Honor?

8                    THE COURT: Sure.

9                    MR. LANKFORD: Thank you.

10   BY MR. LANKFORD:

11   Q.    Sir, I'd like you to look basically about a third

12         of the way down in the yellow.  Read it to

13         yourself.

14   A.    On the right?

15   Q.    No, second set of yellows.  Okay.  Just read it to

16         yourself.  Don't say anything at this point,

17         please.

18                    Okay, have you had a chance to read the

19         highlighted area, sir?

20   A.    Yes, sir.

21   Q.    Does that refresh your memory as to whether or not

22         you told police that he went to a vacant house?

23   A.    I didn't say he went to a vacant house, sir.

24         That's what they wrote right there. That's not what

25         I said.

1    Q.    Okay.

2    A.    I said he went to the house across the street from

3          the field.

4    Q.    Take a look at People's Exhibit Number Four, sir.

5          Do you recognize that?

6    A.    Yes.

7    Q.    Okay.

8               That's from the field looking north

9          towards the houses, right?

10    A.    Uh-huh.

11    Q.    Is that a yes?

12    A.    Yes.

13    Q.    Okay, now, in that photograph your vehicle, and

14          it's a passenger car, isn't it, sir?

15    A.    Yes, sir.

16    Q.    It's not a van.  It's doesn't really sit that high

17          off the ground, right?

18    A.    Right.

19    Q.    Okay.

20               In that photograph there is a picture of

21          what appears to be a semi-marked Detroit police

22          car, right?

23    A.    Right.

24    Q.    You drive an '84 Olds Cutlass?

25    A.    Yes, I do.

1    Q.    Okay.

2                Basically the height of that vehicle

3          would be basically the same for a police car,

4          right?

5    A.    Maybe.

6    Q.    Maybe, okay.

7                And in that photo, sir, you can see a

8          debris pile, correct?

9    A.    Correct.

10   Q.    Pretty clearly, right?

11   A.    Yes, sir.

12   Q.    Okay.

13               Now to the left of that debris pile would

14         be where you are parked, right?

15   A.    Yes, sir.

16   Q.    And there's a little mound there, isn't there, sir?

17   A.    Yes, sir.

18   Q.    A dirt mound, correct?

19   A.    No, sir, just some weeds.

20   Q.    Some weeds, okay, that's not elevated?

21   A.    No.

22   Q.    Okay.

23               You may be right, but you would agree at

24         that point that would generally be where you were

25         parked, right, sir?

1   A.   Yes, sir.

2   Q.   And there are overgrown weeds, aren't there?

3   A.   There are weeds there, sir.

4   Q.   Fairly high weeds, correct?

5   A.   If that's what you want to call them.  They

6        wouldn't block no view if you look at it.

7   Q.   I didn't ask that.  Is that what the photo shows,

8        sir, overgrown weeds?

9   A.   It shows overgrown weeds on the fence.

10  Q.   Okay, right near where you would have been parked,

11       right?

12  A.   Uh-huh.

13  Q.   Uh-huh, that's a yes?

14  A.   Yes, sir.

15  Q.   Do you consider yourself friends with J-W?

16  A.   Yes.

17  Q.   Just about the time you come forward in any regards

18       regarding anything to do with Mr. Houston is about

19       the time that Mr. Johnson's managed to get himself

20       locked up on something, right, sir?

21            MR. HASSINGER: I'm going to object unless

22       there's a foundation.

23            THE COURT: I'll sustain the objection.

24  BY MR. LANKFORD:

25  Q.   Are you friends with Mr. Jovan Johnson?

1    A.    Yes.

2    Q.    Okay.

3              Were you aware that he had been arrested

4          on some charge the early part of November?

5    A.    No.

6    Q.    When did you learn -- are you aware of that now?

7    A.    Yes.

8    Q.    When did you learn it, sir?

9    A.    I learned after Thanksgiving.

10   Q.    All right. For a while you didn't see Mr. Johnson?

11   A.    No, sir.

12   Q.    You didn't hear anything about his whereabouts?

13   A.    No, sir.  I wasn't over Buena Vista and Linwood

14         area.  I was at home.

15   Q.    But you were at Buena Vista and Linwood from the

16         early part of September through the early part of

17         November, right, sir?

18   A.    Yes, sir.

19   Q.    Okay.

20             Now, even in the context of street deals,

21         a shooting of a person that you witness would be a

22         pretty dramatic event, wouldn't it?

23   A.    Yes.

24   Q.    Something that would stick with you, right?

25   A.    Yes, sir.

1    Q.   And after you drive this young woman home, you

2         return to that location in Buena Vista, don't you,

3         sir?

4    A.   Yes, sir.

5    Q.   And you must arrived there what 6:30 something like

6         that; is that about right?

7    A.   Yes, sir.

8    Q.   It's light outside at that time, correct?

9    A.   Yes, sir.

10   Q.   You do not see Mr. Houston at that time, do you,

11        sir?

12   A.   No, sir.

13   Q.   You do not see Mr. Johnson at that time, do you,

14        sir?

15   A.   No, sir.

16   Q.   Police officers are there, aren't they?

17   A.   Yes, sir.

18   Q.   Quite a few of them, right?

19   A.   Yes, sir.

20   Q.   Lots of law enforcement personnel, correct?

21   A.   Yes, sir.

22   Q.   An hour and a half after this shooting, when you

23        come back, did you manage or bother to ever go up

24        to any of the police and say I need to talk with

25        you?

1    A.   No, sir.

2    Q.   I know why you're here.  I got information.  Do you

3        say that?

4    A.   No, sir.  Can I say why?

5    Q.   No, question, sir.

6             Now, you were able to hear, apparently

7        you were close enough that you were able to hear

8        according to your testimony that Michon Houston

9        asked Mr. Thomas what you need, right?

10   A.   Yes, sir.

11   Q.   Did you ever hear Jovan Johnson ask or yell out

12       what you need?

13   A.   No, sir.

14   Q.   Mr. Johnson at the time of this?

15   A.   At first, let me see, Mr. Johnson, that's JW,

16       right?

17   Q.   Correct.

18   A.   At first both of them all rushed out to the field.

19   Q.   Say what?

20   A.   Both of them all went out towards the field.

21   Q.   Okay.

22   A.   JW went and got back on the porch.

23   Q.   Okay.

24            One second, please.  Okay, so you do see

25       JW go to the field initially?

1    A.    Towards the field.

2    Q.    Towards the field?

3    A.    Yes, sir.

4    Q.    That's true, you did see him do that, right?

5    A.    Yes, sir.

6    Q.    Did you ever hear him ask the guy what you need?

7    A.    No, sir.

8    Q.    Okay, only Mr. Houston asked that; is that right?

9    A.    Yes, sir.

10   Q.    All right.

11                 And you would agree that as between

12         yourself and Mr. Houston, that at the time of this

13         shooting that you had known Mr. Houston for maybe

14         two months; is that about right from July until

15         September?

16   A.    Yes, sir.

17   Q.    Excuse me a couple of seconds. Did you see a

18         bicycle at any point, sir?

19   A.    Not that I remember.

20   Q.    Did you see when Mr. Thomas showed up; were you

21         present in your car when Mr. Thomas arrived?

22   A.    Yes, sir.

23   Q.    Okay.

24                 Because you said that you saw him come

25         from the area of Glendale, right?

1    A.   Yes, sir.

2    Q.   Was he on a bicycle or was he on foot?

3    A.   All I remember is seeing him standing up there and

4         hearing him talking.   I don't exactly know, sir.

5    Q.   And it took place in the field, right?

6    A.   Yes, sir.

7    Q.   Would it be fair to say Mr. Thomas had not yet made

8         it to the curb where you were parked, right?

9    A.   Right, yes, sir.

10   Q.   Oh, I'm sorry. You have known Mr. Houston since

11        July, right?

12   A.   That's when I met him, sir.

13   Q.   Look at him a second. Do you see anything

14        distinctive on his face?

15   A.   Tear drops.

16   Q.   Tear drops, tattoo, right?

17   A.   Yes, sir.

18   Q.   Did he have that when you met him in July?

19   A.   Yes.

20   Q.   Okay.

21                 He's had it the whole time you've known

22        him?

23   A.   Yes, sir.

24   Q.   Sir, would it be fair that during the time that you

25        had been questioned three previous occasions by

1         police and you say you don't know anything, right?

2   A.   Yes, sir.

3   Q.   What you are saying here today is correct, that

4         would mean that you lied to them, right?

5   A.   Yes, sir.

6   Q.   All right.

7              Did you see a second guy with Mr. Thomas?

8   A.   No, sir.

9   Q.   All by himself, right?

10  A.   Yes.

11  Q.   What time did you go and get in your car from the

12        house?

13  A.   I've been around there that day.

14  Q.   The question is how long do you think you've been

15        sitting in your car?

16  A.   I had been in my car since about 12:30.

17  Q.   That afternoon or that night?

18  A.   That afternoon.

19  Q.   So you spent the night at or in the residence?

20  A.   I spent the night before the shooting in the

21        resident.  The night of the shooting I was on the

22        block grinding.

23  Q.   Maybe I'm thinking it's the same night.  Let's say

24        the 5th, you go over there sometime on the 5th,

25        right?

1    A.    Okay.

2    Q.    The shooting's on the 6th in the early morning

3          hours?

4    A.    Right, I spent the night on the 5th and I was there

5          all day to the next day.

6    Q.    My question is, when you saw the shooting, how long

7          had you been in your car?

8    A.    I had been in my car the whole day basically.

9    Q.    Okay.

10           And so obviously would it be fair to say

11         that you're not just sitting out there, you're

12         making sales, aren't you?

13    A.    Yes.

14    Q.    It's active, correct?

15    A.    Yes.

16    Q.    Are you using any narcotics or alcohol while you're

17         sitting out there?

18    A.    Smoking weed.

19    Q.    Smoking weed, okay.

20           According to your testimony you saw Mr.

21         Houston cross the street, go back into the field

22         with Mr. Thomas.  Where was Mr. Thomas at that

23         time?

24    A.    When I seen Mr. Houston go back in the field Mr.

25         Thomas was standing in the field close to the tree.

1   Q.   Close to, correct?

2   A.   Yes, sir.

3   Q.   But it would be on the side you could see, right,

4       sir?

5   A.   Yes, sir.

6   Q.   He never ran around to the back side, right?

7   A.   Not that I noticed, no.

8   Q.   And you were watching, weren't you?

9   A.   Yes.

10   Q.   And you didn't see that?

11   A.   No, sir.

12          MR. LANKFORD: Thank you.  No other cross.

13          THE COURT: Redirect?

14          MR. HASSINGER: Thank you, Judge.

15          REDIRECT EXAMINATION

16  BY MR. HASSINGER:

17   Q.   Mr. Crooks, when you came back to that location an

18       hour after the shooting, why didn't you immediately

19       approach the police and tell them what you had

20       seen?

21   A.   Because I felt again I would be a little bit viewed

22       wrong because I was at that present time dealing

23       drugs on that street, and I thought that I would be

24       viewed as a snitch.

25   Q.   Was Mr. Houston a friend of yours at that time?

1    A.   Yes, he was.

2    Q.   You had basically been dealing, was it crack?

3    A.   Yes, sir.

4    Q.   You'd be dealing crack all night up to 5:00 in the

5         morning; is that right?

6    A.   Yes, sir.

7    Q.   And had that girl been with you that whole time?

8    A.   No, sir.

9    Q.   Did you have to go get that girl at some point?

10   A.   Yes, sir.

11   Q.   So at least at some point you were not at that

12        location?

13   A.   For a couple of minutes, yes, sir.

14   Q.   Now, when you spent the night there the night

15        before, was Mr. Houston there?

16   A.   No, sir.

17   Q.   Sir, you've admitted a lot of things here today.

18        You're out there dealing dope, at least back in

19        September.  Sir, are you coming into court here

20        today committing perjury and lying to setup up Mr.

21        Houston on a murder case?

22   A.   No, sir.

23                  MR. HASSINGER: Thank you, Judge.

24                  THE COURT: Recross?

25                  MR. LANKFORD: Thank you.

1                              RECROSS-EXAMINATION

2       BY MR. LANKFORD:

3       Q.    Sir, you indicated the reason you didn't say

4             anything when you came back an hour and a half

5             later is because you would be viewed wrong, right?

6       A.    Yes, sir.

7       Q.    Members of the dope dealing committee --

8                        THE COURT: You're going so fast the court

9             reporter cannot take you down.

10                       MR. LANKFORD: Sorry.

11      BY MR. LANKFORD:

12      Q.    To members of the dope dealing community, you might

13            be viewed as a snitch, correct?

14      A.    Yes, sir.

15      Q.    Under the circumstances you been a drug dealer and

16            Mr. Thomas presumably being a possible buyer, you

17            might also be viewed as a suspect on this case,

18            correct, sir?

19      A.    No, sir?

20      Q.    You didn't think so?

21      A.    No, sir, because I haven't said a word to Mr.

22            Thomas.  I never went near him.

23      Q.    But my point is the police were there and you were

24            asked why didn't you say anything at 6:30, right?

25      A.    And I answered why I didn't say nothing at 6:30

```
 1        because I felt that I would be viewed by the people
 2        in the neighborhood and at that time he was not
 3        apprehended.  That mean I have to fear my life with
 4        him --
 5   Q.   You answered the question
 6   A.   I can't finish?
 7   Q.   You took care of it.
 8              THE COURT: Excuse me, counsel.  You do
 9        not have a right to cut him off.  You ask a
10        question, you must allow him to answer it.  Go
11        ahead.
12              THE WITNESS: If I feel I fear my life
13        because he's not apprehended, and if I tell on him
14        before you all get him, then I would have to kill
15        him or he'll kill me.  That's why I didn't say
16        nothing.
17   BY MR. LANKFORD:
18   Q.   So going back to it, sir, you felt it could be
19        viewed wrong, correct?
20   A.   If that's the way you put it, yes, sir.
21   Q.   The police asked you three times?
22   A.   And I denied.
23   Q.   And you didn't say anything, right?
24   A.   No, sir.
25   Q.   All right.
```

1          And, again, you indicated you feared for

2     your life, right, sir?

3   A.   Yes, sir.

4   Q.   All right.

5   A.   When I was first asked about what happened, they

6     said I didn't have to give my name I didn't have to

7     say nothing, I denied knowing anything.  I said I

8     didn't know anything at all.  So the detective came

9     back the next day him, a lady, and another officer.

10    They apprehend me and I denied.  And they told me

11    they were going to find out what happened because

12    they had to go home and tell this 30 year-old on

13    his father's birthday to his mom, on his father's

14    birthday that he was killed.

15          MR. LANKFORD: Your Honor, at this point

16    it's non-responsive.

17          THE COURT: It's non-responsive.  There's

18    no question before you. It's stricken.  The jury is

19    told to disregard it.

20  BY MR. LANKFORD:

21  Q.   Focus on this.  When you come at 6:30 on the 6th,

22    all right, Mr. Houston isn't out there, is he?

23  A.   No, sir.

24  Q.   There's multiple police officers out there?

25  A.   Yes, sir.

1    Q.   The next day when you talk with the detectives, Mr.

2         Houston isn't there, is he, sir?

3    A.   No, sir.

4    Q.   And you are with police detectives, aren't you?

5    A.   Yes, sir.

6              MR. LANKFORD: Nothing else.  Thank you.

7              THE COURT: All right, we're going to rise

8         and have our jury step in the jury room.   Jurors

9         are free to step in the jury room.

10             (Jury exits courtroom at 3:00 p.m.)

11             (Court is in recess)

12             (Court reconvenes)

13             THE COURT: You may be seated.  Do you

14        envision having to recall this witness for any

15        purpose?

16             MR. HASSINGER: The People do not.

17             MR. LANKFORD: Nor does defense.

18             THE COURT: Then I will discharge the

19        bench warrant at this time.

20             MR. HASSINGER: Thank you, Your Honor.

21             THE COURT: Okay, who's your next

22        witness?  Somebody else is in custody?

23             MR. HASSINGER: Yes, Judge.

24             THE COURT: Where is that person?

25             MR. HASSINGER: Out in the hallway with

1    the police officers.

2            THE COURT: Okay, this man can step down.

3    Let's rise for our jurors.

4            (Jury enters courtroom at 3:10 p.m.)

5            THE COURT: Let's rise for our jurors.

6            Go ahead, counsel.

7            MR. HASSINGER: The People call Jovan

8    Johnson.

9            THE CLERK: Raise your right hand to be

10   sworn, please.  Do you solemnly swear or affirm

11   that the testimony you're about to give before the

12   court to be the truth under the pains of penalty of

13   perjury?

14           MR. JOHNSON: Yes.

15           THE COURT: You can be seated right there

16   and we're going to ask you to speak right into that

17   microphone.

18           Counsel, your appearance for the record.

19           MR. NISKAR:  Joseph Niskar on behalf of

20   Mr. Johnson, Your Honor.

21           THE COURT: Counsel, whenever you're

22   ready.

23           MR. HASSINGER: Thank you, Judge.

24                   DIRECT EXAMINATION

25   BY MR. HASSINGER:

1   Q.   Good afternoon, sir, would you introduce yourself

2        for the jury.

3   A.   Jovan Johnson.

4   Q.   Mr. Johnson, I'm going to ask you to keep your

5        voice up nice and loud so everybody in the room can

6        hear you, okay?

7   A.   Yes, sir.

8   Q.   Mr. Johnson, do you have a nickname out on the

9        street?

10  A.   Yes, sir.

11  Q.   What is it?

12  A.   JW.

13  Q.   That's the letter "J" is it?

14  A.   Yeah.

15  Q.   And then "W," like short for "W"?

16  A.   Yeah.

17  Q.   Okay, how old are you, sir?

18  A.   Twenty-two.

19  Q.   Do you know the Defendant in this case, Mr. Michon

20       Houston?

21  A.   Yes, sir.

22  Q.   Do you see him here in the courtroom today?

23  A.   Yes, sir.

24  Q.   Would you point to him and tell us what he's

25       wearing today, please?

1    A.    Black with tan pants.

2              MR. HASSINGER: Judge, I'd like the record

3         to reflect he's pointed to and identified the

4         defendant, Mr. Michon Houston.

5              THE COURT: All right.

6    BY MR. HASSINGER:

7    Q.    How long have you known Michon Houston?

8    A.    Probably a year.

9    Q.    How is it you know him?

10   A.    In the neighborhood.

11   Q.    What neighborhood, sir?

12   A.    Buena Vista.

13   Q.    Does Mr. Houston have a nickname that you know him

14        by?

15   A.    Sean.

16   Q.    Sir, I'd like to take you back to September 6th of

17        last year 2002 around 5:00 a.m., do you recall who

18        you were with back on that date around that time?

19   A.    Yes, sir.

20   Q.    Pardon me?

21   A.    Yes, sir.

22   Q.    Who were you with?

23   A.    Sean.

24   Q.    The person you identified here in court today?

25   A.    Yes, sir.

1    Q.   Where were you at?

2    A.   We was on Buena Vista.

3    Q.   Do you recall you were on Buena Vista, you were?

4    A.   In the middle of the block.

5    Q.   Between what two streets?

6    A.   Between Linwood.

7    Q.   And what would be the other street?

8    A.   Linwood.

9    Q.   Is there a vacant field across from where you were

10        with Mr. Houston?

11   A.   Which block?

12   Q.   Who else was with you and Mr. Houston?

13   A.   Umm --

14   Q.   Powder?

15   A.   Yes, sir.

16   Q.   Okay.

17             Describe Powder for the jury, please?

18   A.   Short white girl.

19   Q.   And what was Powder's relationship with Mr. Houston,

20        if you know?

21   A.   I guess they was going together.

22   Q.   Now, what time had you gotten over on Buena Vista

23        with Mr. Houston and Powder?

24   A.   About four or five in the morning.

25   Q.   Were the three of you coming from somewhere?

1    A.   Yes, sir.

2    Q.   Where were the three of you coming from?

3    A.   Zodiac.

4    Q.   The Zodiac?

5    A.   (No response.)

6    Q.   You have to say yes or no?

7    A.   Yes, sir.

8    Q.   Tell the jury what the Zodiac is?

9    A.   A motorcycle club.

10   Q.   And after hours motorcycle club?

11   A.   Yes, sir.

12   Q.   And how long had you been at the Zodiac?

13   A.   For about two hours.

14   Q.   What were you doing there?

15   A.   Just drinking in there.

16   Q.   Drinking alcohol?

17   A.   Yes, sir.

18   Q.   All three of you?

19   A.   Yes, sir.

20   Q.   Back on that date, how would you consider your

21        relationship with Mr. Houston?

22   A.   He's an all right guy.

23   Q.   Pardon me?

24   A.   He's an all right guy.

25   Q.   He's an all right guy?

1    A.   Yeah.

2    Q.   Did you socialize a lot?

3    A.   Every now and then when we was on the block we did.

4    Q.   What did you do on the block?

5    A.   Sold drugs.

6    Q.   Do you know what Mr. Houston did on the block?

7    A.   I guess same thing.

8    Q.   Did you know someone by the name of Lavero Crooks

9         back then also known on the street as the Country?

10   A.   Yes, sir.

11   Q.   Do you know what he did on the block?

12   A.   Sold drugs.

13   Q.   How did all of you guys get along back on

14        September 6th?

15   A.   It wasn't like that.  It was each his own.

16   Q.   Okay.

17             Was there any bad blood between the three

18        of you?

19   A.   I wouldn't say that.

20   Q.   You would say it was to each their own?

21   A.   Yeah.

22   Q.   In the early morning hours then where are you and

23        Powder or Mr. Houston when you're on Buena Vista;

24        where exactly are you?

25   A.   Sitting on the porch.

1  Q.  Do you know how many houses off of the alley you

2      were from the alley closest to Linwood?

3  A.  About three houses.

4  Q.  Were you right across from that vacant lot?

5  A.  Yes, sir.

6  Q.  At some point did you see somebody cutting through

7      that vacant lot in the early morning hours?

8  A.  Yes, sir.

9  Q.  And what happened?

10 A.  We called him, then Sean went over there.

11 Q.  Okay, first you said we called him; what do you

12     mean by that?

13 A.  I called him too.

14 Q.  What did you say?

15 A.  I said, "What was up, man."

16 Q.  Did you yell out to the person you saw cutting

17     through the trees?

18 A.  Yeah.

19 Q.  Did you have any trouble seeing that person?

20 A.  I saw him clear coming through the field.

21 Q.  Describe the person for us to the jury?

22 A.  Brown-skinned guy, around 170 or 190.  I don't

23     really remember how he looked like that.

24 Q.  He was a black male?

25 A.  Yes, sir.

1    Q.    Do you recall if he had a coat or what he was

2           wearing?

3    A.    Yeah, he had a coat on.

4    Q.    Is anybody else with him or is he by himself?

5    A.    By himself.

6    Q.    A lot of us have never been over that area, is

7           there a lot traffic going through that area

8           typically?

9    A.    Yes, sir.

10    Q.    And was that narcotic sales?

11    A.    Yes, sir.

12    Q.    Is there enough business there to keep three drug

13           dealers busy?

14    A.    Yes, sir.

15    Q.    So in any event you call out to this person you see

16           cutting across the field; is that correct?

17    A.    Yes, sir.

18    Q.    And are you still on the porch when you do that?

19    A.    Yes, sir.

20    Q.    Do you leave the porch?

21    A.    No, sir.

22    Q.    What if anything does Mr. Houston do?

23    A.    He went over there and talked to him.

24    Q.    Could you hear the conversation between Mr. Houston

25           and that person?

1    A.    No, sir.

2    Q.    Who do you think is the owner of that house whose

3          porch you're sitting on?

4    A.    I don't know the landlord none, but I know the

5          people that stayed there.

6    Q.    Okay, what were the names of the people that stayed

7          there?

8    A.    Lisa.

9    Q.    Lisa?

10   A.    Yeah.

11   Q.    Is that a four-family flat?

12   A.    Two family flat.

13   Q.    Upper and lower?

14   A.    Yeah.

15   Q.    At some point can you hear any of the other

16         conversation between Mr. Houston and the person

17         he's talking to?

18   A.    No, sir.

19   Q.    Is there any yelling after a little bit of the

20         conversation?

21   A.    Yes, sir.

22   Q.    Okay, that's what I'm asking you.  At some point

23         could you hear something?

24   A.    Yes, sir.

25   Q.    What's the first thing that you could hear?

1    A.    Bitch.

2    Q.    Who's saying bitch?

3    A.    Sean.

4    Q.    That's Sean Houston?

5    A.    Yes, sir.

6    Q.    Okay, does he seem upset to you?

7    A.    Yes, sir.

8    Q.    Who he is talking to when he's saying those words?

9    A.    To the guy that was standing there.

10   Q.    What happened next?

11   A.    He chased him around the tree.

12   Q.    You saw Mr. Houston chasing the man?

13   A.    Yes, sir.

14   Q.    What happens next?

15   A.    He was shot.

16   Q.    Could you see a gun at that time?

17   A.    No, sir.

18   Q.    How did you know somebody got shot or there were

19         shooting going on?

20   A.    I heard it and saw it.

21   Q.    Who is shooting?

22   A.    Sean.

23   Q.    And that's the person you identified here in court?

24   A.    Yes, sir.

25   Q.    Do you see anything happen to the man he was

1          shooting at?

2    A.    The man fell.

3    Q.    Can you tell us how many shots were fired before

4          the man fell?

5    A.    About two or three.

6    Q.    Are you watching this whole time?

7    A.    Yes, sir.

8    Q.    What happens after the first couple of shots?

9    A.    The man fell.

10    Q.    Are there a couple of trees there in that field?

11    A.    There's one tree.

12    Q.    Where does the man fall in relationship to the

13          tree?

14    A.    He fell near it.  I don't know how far away he was

15          from it.

16    Q.    But close to the tree?

17    A.    Yeah.

18    Q.    From where you were on the porch, could you see how

19          the man fell?

20    A.    Yes.

21    Q.    How did he fall?

22    A.    He fell on his back.

23    Q.    What happens next?

24    A.    He stood over him and shot him about two, three

25          times.

1    Q.   Who stood over him and shot him?

2    A.   Sean.

3    Q.   Was Sean saying anything that you could hear during

4         that time?

5    A.   No, sir.

6    Q.   When the man's lying on his back, how many times

7         does Sean shoot at him?

8    A.   About two or three times.  I don't know it exact.

9    Q.   But to the best of your knowledge it was two or

10        three times?

11   A.   Yes, sir.

12   Q.   What happens next?

13   A.   He come across the street to where we was standing.

14   Q.   You're still on the porch?

15   A.   Yes, sir.

16   Q.   What if anything does Sean say when he comes back

17        to where you're at?

18   A.   He said now he want to grab the car.

19   Q.   Sir, we didn't understand what you said?

20   A.   He wanted to grab the car.  He went and hopped in

21        the car.

22   Q.   He didn't say anything to you?

23   A.   When he came back in the car, yeah.

24   Q.   What did he say to you then?

25   A.   He told me to get in.

1    Q.   Did you ever leave the porch and go over to that

2         field?

3    A.   Yeah, he told me to go see if he was dead.

4    Q.   Okay, wait a second now.  That's what I was driving

5         at?

6    A.   My mistake.

7    Q.   Okay, you made a mistake?

8    A.   Yeah.

9    Q.   When Mr. Houston comes back from by that tree where

10        the man fell, what happens?

11   A.   He told me to go look, go see if he dead.

12   Q.   What do you say?

13   A.   I told him no.

14   Q.   What happens next?

15   A.   He said, bitch, go look at him.

16   Q.   Mr. Houston told you bitch go look at him?

17   A.   Yes, sir.

18   Q.   Okay, what did you do?

19   A.   I went over there and looked at him.

20   Q.   Did you go over and look at the man then?

21   A.   Yes, sir.

22   Q.   Why did you do that?

23   A.   He had a gun in his hand at that point in time.

24   Q.   Do you go over to the man at that time?

25   A.   Yes, sir.

1    Q.    What do you see?

2    A.    He's bleeding, but he was still breathing.

3    Q.    Did you try and talk to him at all?

4    A.    I asked him if he was all right.

5    Q.    You asked him if was all right?

6    A.    Yes, sir.

7    Q.    Was he able to talk back to you?

8    A.    He nod his head.

9    Q.    What did you do?

10   A.    I went back across the street and said he was dead.

11   Q.    And who did you tell that the man was dead to?

12   A.    Sean.

13   Q.    Where is Sean at that time?

14   A.    Standing in front of the house that we was sitting

15         on the porch on.

16   Q.    Can you still see the gun at that time?

17   A.    Yeah.

18   Q.    Have you ever seen that gun before that day?

19   A.    No, sir.

20   Q.    So you go back and tell Mr. Houston that the man

21         dead?

22   A.    Yes, sir.

23   Q.    What happens next?

24   A.    Then he said get in the car.

25   Q.    Does Mr. Houston get in the car?

1    A.   Who?

2    Q.   Mr. Houston?

3    A.   Yes, sir.

4    Q.   What kind of car does he get into?

5    A.   It's like a Tempo.  I don't know what kind of car

6         it was.

7    Q.   Okay, had you ever seen that car before?

8    A.   No, sir.

9    Q.   Did you now whose car that was?

10   A.   No, sir.

11   Q.   Do you get in the vehicle with Mr. Houston?

12   A.   Yes, sir.

13   Q.   What happens?

14   A.   He pulled off. He was telling Powder to get in but

15        she wouldn't get in and he dropped me off after

16        that.

17   Q.   Okay, his girlfriend refused to get in the car?

18   A.   Yes, sir.

19   Q.   Mr. Houston takes you somewhere?

20   A.   Yes, sir.

21   Q.   Where does he take you?

22   A.   To Dexter.

23   Q.   And why do you want to go there?

24   A.   So I can go to the house.

25   Q.   That's your neighborhood where you live?

1   A.   Yes, sir.

2   Q.   How long does it take him to get you over there?

3   A.   About two or three minute.

4   Q.   The house where you were on the porch there, how

5        many times have you been to that house, Lisa's

6        house?

7   A.   A lot.

8   Q.   Is that where you regularly deal drugs from?

9   A.   Yes, sir.

10  Q.   So that's one of the local drug houses?

11  A.   Yes, sir.

12  Q.   Do you know if Lavero Crooks, the guy you know as

13       Country, does he deal out of that house also?

14  A.   No, sir.

15  Q.   How was it, sir, that you came to give a statement

16       to the police about what you knew in this case?

17  A.   I caught a drug case.

18  Q.   I'm sorry?

19  A.   I was in jail.

20            THE COURT: He said he caught a drug

21       case.

22  BY MR. HASSINGER:

23  Q.   Thank you, Judge, I got bad hearing.

24            Okay, so you caught a drug case and you

25       were locked up; is that right?

1    A.    Yes, sir.

2    Q.    So the police came to talk to you?

3    A.    Yes, sir.

4    Q.    Did they promise you anything if you cooperated in

5          this case?

6    A.    I wouldn't go to jail for accessory.

7    Q.    Okay, at first did you --

8                    THE COURT: Excuse me, I'm not sure if the

9          jury was able to hear.  He wouldn't go to jail for

10         what?

11                   THE WITNESS: Accessory.

12                   THE COURT: Go ahead.

13   BY MR. HASSINGER:

14   Q.    For accessory?

15   A.    Yes, sir.

16   Q.    At first did you intend to cooperate with the

17         police?

18   A.    No, sir.

19   Q.    And when you did sit down with the police, did you

20         tell them the truth when you finally did give a

21         statement?

22   A.    Yes, sir.

23   Q.    Did the police in your opinion sort of tricked you

24         into giving a statement?

25   A.    No, sir.

1   Q.   Did they accuse you of anything in order for you to

2        give a statement?

3   A.   No, sir.

4   Q.   Did the police tell you what they wanted to talk to

5        you about?

6   A.   Yes, sir.

7   Q.   What did they say they wanted to talk to you about?

8   A.   A homicide that happened on Buena Vista and

9        Linwood.

10  Q.   So you then gave the police a statement on November

11       17th of last year?

12  A.   Yes, sir.

13  Q.   And then at some point you had to testify over in

14       36 District Court about this particular case?

15  A.   Yes, sir.

16  Q.   Did you tell the truth?

17  A.   Yes, sir.

18  Q.   Is it fair to say that even at five in the morning,

19       six in the morning out there on Buena Vista there's

20       a fair amount of drug trafficking going on?

21  A.   Yes, sir.

22  Q.   Besides yourself and Powder and Mr. Houston, did

23       you actually see any other people out there that

24       morning?

25  A.   No, sir.

1    Q.   Can you give us any idea of how many drug

2         transactions you would have made in that hour

3         between five and six a.m.

4    A.   I can't tell you that.

5                   MR. HASSINGER: One second, Judge.

6                   Thank you, Judge.

7                   THE COURT: All right, counsel, this is a

8         good time for us to take our coffee break.  Once

9         again I promised the lawyers that I would take care

10        of some matters, and so we're going to run just a

11        little bit longer for our coffee break than we

12        would usually take.

13                   If you go out the property, be outside

14        that door at five minutes to three by that clock.

15        It you go into the jury room you'll have to remain

16        in there until we knock for you and tell you to

17        come out.  We'll rise for you to take your coffee

18        break.

19                   (Jury exits courtroom)

20                   (Court is in recess)

21                   THE COURT: You may be seated.

22                   (Jury enters courtroom)

23                   THE COURT: You may proceed, counsel.

24                        CROSS-EXAMINATION

25   BY MR. LANKFORD:

1    Q.   Mr. Johnson, I want to show you a couple of

2         photographs.  I want you to look at People's

3         Number 9, what's that a photograph of, sir?

4    A.   This is the field and the house we were sitting on

5         the porch.

6    Q.   And that's just showing a portion of the house that

7         you're sitting on; is that correct?

8    A.   Yes, sir.

9    Q.   I'm trying to think if any of these are better.

10        Okay, yes, just the portion of the house that you

11        say you were sitting on, sir?

12   A.   Yes, sir.

13   Q.   Did that appear to have windows in it?

14   A.   This is the house right here.

15   Q.   Right, that one there?

16   A.   This one.

17   Q.   Does that appear to have windows in it?

18   A.   Yes, sir.

19   Q.   It does.  It doesn't look it's an opening at the

20        top?

21   A.   Here's the door, top door and the bottom door.

22   Q.   And does that particular porch have columns?

23   A.   What'd you just say?

24   Q.   Columns, brick columns running from top to bottom,

25        correct?

1    A.   Yes, sir.

2    Q.   And the porch also has a brick, basically an area

3         that's bricked in maybe up to where this bench

4         would be on me, correct?

5    A.   Yes, sir.

6    Q.   All right, in fact there was a column on the corner

7         of that house, isn't there, sir?

8    A.   Yes, sir.

9    Q.   Okay.

10           Sir, I want to take your attention back

11       to, and we'll come back on September 6th shortly,

12       but I want to take your attention first to

13       November 17th, 2002; do you remember that day?

14    A.   Yes, sir.

15    Q.   Okay.

16           You had been charged with some drug

17       offense, right, sir?

18    A.   Yes, sir.

19    Q.   And you are in police custody, correct?

20    A.   Yes, sir.

21    Q.   At some point homicide detectives come over to see

22       you at county jail, right?

23    A.   Yes, sir.

24    Q.   You do not initiate contact with them, right?

25    A.   Yes, sir.

1    Q.   And you don't ask to talk with them, correct?

2    A.   Yes, sir.

3    Q.   They come over, right?

4    A.   Yes, sir.

5    Q.   They say they want to talk to you about a situation,

6         right?

7    A.   Yes, sir.

8    Q.   They do that, they talk to you about a situation,

9         don't they?

10   A.   Yes, sir.

11   Q.   They tell you you're looking at a shooting on Buena

12        Vista and Linwood, right?

13   A.   Yes, sir.

14   Q.   We have an unsolved case?

15   A.   Yes, sir.

16   Q.   That we know you hang there?

17   A.   Yes, sir.

18   Q.   That it was a Saturday.  Did they tell you what day

19        it was?

20   A.   Yes, sir.

21   Q.   Okay.

22             They tell you all kinds of things about

23        this case, don't they, sir?

24   A.   Yes, sir.

25   Q.   All right.

```
 1              You're in custody at that time, I take

 2         it, you've been physically arrested?

 3    A.   Could you repeat that?

 4    Q.   You'd been physically arrested?

 5    A.   Yes, sir.

 6    Q.   Some officers come put you in handcuffs?

 7    A.   Yes, sir.

 8    Q.   Transports you down to a station house?

 9    A.   Yes, sir.

10    Q.   You are held there for a few days?

11    A.   Yes, sir.

12    Q.   You were probably in a bull pen area?

13    A.   Yes, sir.

14    Q.   With some other guys, right?

15    A.   No, I was in a single cell.

16    Q.   Single cell, okay, that's at the precinct?

17    A.   Yes, sir.

18    Q.   You're basically looking at bars and concrete,

19         aren't you?

20    A.   Yes, sir.

21    Q.   They got those tin toilets, don't even have a lid

22         on them?

23    A.   Yes, sir.

24    Q.   And you sit there at the precinct I imagine

25         probably three days, two days something like that?
```

1    A.    Yeah, something like that.

2    Q.    Okay, you're then arraigned, aren't you?

3    A.    Yes, sir.

4    Q.    At that time they set a certain bond that you are

5          unable to post, correct?

6    A.    Yes, sir.

7    Q.    You were then taken from the precinct to county

8          jail, right?

9    A.    Yes, sir.

10   Q.    You continue to sit there in the area with bars and

11         concrete, right?

12   A.    Yes, sir.

13   Q.    Everybody in uniform, right?

14   A.    Yes, sir.

15   Q.    Everybody's got badges?

16   A.    Yes, sir.

17   Q.    Weapons, or they might not have them in jail,

18         right?

19   A.    What did you saw, sir?

20   Q.    Strike that.

21                Your movement is controlled, isn't it?

22   A.    Yes, sir.

23   Q.    You eat when they tell you to?

24   A.    Yes, sir.

25   Q.    You eat what they tell you to?

1  A.  Yes, sir.

2  Q.  And at that time on November 17th, would it be fair

3      to say, you don't know when you're going to get

4      out, right?

5  A.  Yes, sir.

6  Q.  Is it fair to say that this was not fun being in

7      the precinct lock up or county jail, it's not very

8      fun, is it?

9  A.  No, sir.

10 Q.  And now when they come and talk with you, they give

11     you this information.  They tell you that you know

12     you might just have some involvement in this case,

13     isn't that correct?

14 A.  Yes, sir.

15 Q.  They tell you, threaten you, whatever again warn

16     you that if you didn't give a statement they would

17     charge you with this murder, right?

18 A.  Yes, sir.

19 Q.  First degree murder?

20 A.  Yes, sir.

21 Q.  Okay.

22          This is now some two and a half months

23     after -- yeah, basically two and half months after

24     the shooting, right?

25 A.  Yes, sir.

1    Q.    At no time in that previous ten weeks do you bother

2          to tell anyone what you have told us here in court,

3          do you?

4    A.    No, sir.

5    Q.    Okay.

6                And it's not until the police threaten

7          you, tell you they think you're involved in this

8          and threaten you being charged with a first degree

9          murder that you make any kind of statement, right?

10   A.    Yes, sir.

11   Q.    Pardon?

12   A.    Yes, sir.

13   Q.    Okay.

14               And, in fact, sometime probably somebody

15         named Keith Bleach?

16   A.    I don't know who that is.

17   Q.    PJ?

18   A.    Yes, sir.

19   Q.    Do you know that person?

20   A.    Yes, sir.

21   Q.    Sometime within the first week after this homicide

22         you and Mr. Bleach are questioned in the hallway at

23         PJ's apartment, aren't you?

24   A.    Yes, sir.

25   Q.    Pardon?

```
1    A.   Yes, sir.

2    Q.   About this homicide?

3    A.   Yes, sir.

4    Q.   Within the first week, right?

5    A.   Yes, sir.

6    Q.   Out there on Buena Vista?

7    A.   Yes, sir.

8    Q.   Not two hundred feet from where this occurred,

9         right?

10   A.   Yes, sir.

11   Q.   And you say I don't know anything, right?

12   A.   Yes, sir.

13   Q.   And, in fact, you don't just tell them I don't know

14        anything and my name is Jovan Johnson, do you, sir?

15   A.   No, sir.

16   Q.   You say I don't know anything and my name is what?

17   A.   What?

18   Q.   You tell them I don't know anything and my name is

19        what?

20   A.   I told them Jovan Johnson.

21   Q.   You told them your name?

22   A.   Yes, sir.

23   Q.   Did the police ever follow up with you until you

24        got arrested?

25   A.   No, sir.
```

1    Q.    Are you still hanging out on Buena Vista?

2    A.    No, sir.

3    Q.    I mean, at the time in that two month period, sir.

4          That wasn't clear.

5    A.    Probably once or twice.

6    Q.    Okay.

7                    And you do have a street name of JW?

8    A.    Yes, sir.

9    Q.    And you're well aware of Lavero Crooks name being

10         Country?

11   A.    Yes, sir.

12   Q.    Do you consider Lavero Crooks a friend of yours?

13   A.    He all right.

14   Q.    He's all right, okay, same way that Mr. Houston's

15         all right, right?

16   A.    We talk when we see each other.  That's about it.

17   Q.    Okay.

18                   So you have nothing and Lavero Crooks is

19         an okay guy as far as you're concerned?

20   A.    Yeah, he okay guy.

21   Q.    And you see him on Buena Vista when you're out

22         there rolling, would that be fair?

23   A.    What you say now?

24   Q.    You see Mr. Crooks when you're out there rolling on

25         Buena Vista, right, sir?

1 A. When I was, yeah.

2 Q. On a regular basis, right?

3 A. Yes, sir.

4 Q. Okay.

5     Now, you indicated at some point during

6 the course of this night and I apologize if I jump

7 around.  Bear with me.  But in a couple of

8 occasions Mr. Houston used swore words, right,

9 swear words?

10 A. Yes, sir.

11 Q. Apparently according to your testimony he calls Mr.

12 Thomas a bitch, correct?

13 A. Yes, sir.

14 Q. At some point later on he calls you a bitch, right?

15 A. Yes, sir.

16 Q. You don't ever hear Mr. Houston use any racial

17 remarks, do you?

18 A. No, sir.

19 Q. Okay, just swear words, right?

20 A. Yes, sir.

21 Q. You indicated that you had never seen the gun that

22 you saw that morning?  You had never previously

23 seen that gun, right?

24 A. Yes, sir.

25 Q. Did you see where Mr. Houston got that gun from?

1    A.   No, sir.

2    Q.   When he goes into the field I assume he does go

3         into the field at some point?

4    A.   Yes, sir.

5    Q.   Does it appear that he has that gun out at the

6         time?

7    A.   No, sir.  I didn't know.

8    Q.   Pardon me?

9    A.   I said I didn't know until I heard the shots.

10   Q.   Okay, okay.  So you don't see it but you hear it,

11        right?

12   A.   Yes, sir.

13   Q.   Would it be fair to say at that time do you see Mr.

14        Houston talk with the man and leave the field to

15        get a gun, right?

16   A.   No, sir.

17   Q.   So in other words whatever happened in the field,

18        stayed in the field, right?

19   A.   Yes, sir.

20   Q.   You indicated that you and Mr. Crooks do sell drugs

21        out there, right?

22   A.   Yes, sir.

23   Q.   And that probably Mr. Houston too, right?

24   A.   Yes, sir.

25   Q.   You consider yourselves competitors with Mr.

1           Houston?

2    A.     No, sir.

3    Q.     But it would be true, sir, that on that particular

4           evening a guy calls out or you call out, I'm sorry,

5           to a guy that you recognize as some crack cocaine

6           user, right?

7    A.     Yes, sir.

8    Q.     You've seen the man a few times before?

9    A.     Yes, sir.

10   Q.     And you've dealt with him a few times before?

11   A.     Yes, sir.

12   Q.     Okay.  He's been your customer?

13   A.     Yes, sir.

14   Q.     Okay.

15               And you see him, you recognize this man,

16          and I don't mean to be offensive, but this crack-

17          head, right?

18   A.     Yes, sir.

19   Q.     You call out to him what you need, right?

20   A.     Yes, sir.

21   Q.     Nothing unusual about that in that context, right?

22   A.     No, sir.

23   Q.     You might even do that to a strange passing

24          through, correct?

25   A.     No, sir.

1    Q.   No, all right, but you are out there rolling,

2         correct?

3    A.   Yes, sir.

4    Q.   And this guy you recognize as a potential repeat

5         customer?

6    A.   Yes, sir.

7    Q.   You try to induce him to buy from you?

8    A.   Yes, sir.

9    Q.   You'd rather make a sale than have somebody else

10        make it, right?

11   A.   Yes, sir.

12   Q.   That's why you, in fact, are sitting on that porch

13        so if anybody comes looking needy, you're there to

14        serve, right?

15   A.   Yes, sir.

16   Q.   All right.

17             Now, so Mr. Houston goes over, leaves you

18        and Powder, Christina Eshelman --

19   A.   Yes, sir.

20   Q.   -- on the porch.

21             Goes over to the field, correct?

22   A.   Yes, sir.

23   Q.   You don't follow, I take it, do you follow in order

24        to maybe make the sale or say hey this guy's mine

25        or something like that?

```
 1    A.   No, sir.

 2    Q.   You just stay on the porch, right?

 3    A.   Yes, sir.

 4    Q.   And then you start hearing words, right?

 5    A.   Yes, sir.

 6    Q.   Loud words?

 7    A.   Yes, sir.

 8    Q.   Aggressive words?

 9    A.   Yes, sir.

10    Q.   And then you see, you then see Mr. Houston start

11         chasing this man; is that what you testified to?

12    A.   Yes, sir.

13    Q.   Around a tree, right?

14    A.   Yes, sir.

15    Q.   And you're way on the other side of the street on

16         the porch, correct, sir?

17    A.   Yes, sir.

18    Q.   And you hear first a shot or maybe two or three,

19         right?

20    A.   Yes, sir.

21    Q.   That person, Mr. Thomas falls, correct?

22    A.   Yes, sir.

23    Q.   And he falls onto his back, right?

24    A.   Yes, sir.

25    Q.   You don't ever see Mr. Houston turn him over, do
```

1      you?

2    A.   No, sir.

3    Q.   You don't ever see Mr. Houston riffling through the

4      man's pockets, do you?

5    A.   No, sir.

6              MR. LANKFORD: May I approach the witness,

7    Your Honor?

8              THE COURT: Yes, you may.

9  BY MR. LANKFORD:

10   Q.   I'm showing you People's Exhibits, Number 3 and 8.

11      Can you look first at three, sir.  What is that a

12      photograph of?

13   A.   The field.

14   Q.   Is that looking basically from the porch area?

15   A.   Yes, sir.

16   Q.   It appears to be, okay.

17            Number 8, what is that, sir?

18   A.   The same field.

19   Q.   The same field, okay.  And that's from a little

20      closer distance?

21   A.   Yes, sir.

22   Q.   Now these photographs -- and is the tree to the

23      right where you say you saw Mr. Houston chasing Mr.

24      Thomas, correct?

25   A.   Yes, sir.

```
 1    Q.   And there are buildings depicted in the background,

 2         right?

 3    A.   Yes, sir.

 4    Q.   All right, other apartment buildings, flats, that

 5         kind of thing, correct?

 6    A.   Yes, sir.

 7    Q.   And do you see a bicycle in the foreground?

 8    A.   Yes, sir.

 9    Q.   Did you ever see Mr. Thomas actually drive that

10         bicycle up to where that photograph shows it?

11    A.   No, sir.

12    Q.   Do you ever see Mr. Thomas riding a bicycle at all?

13    A.   No, sir.

14    Q.   Did you ever see a second civilian with Mr. Thomas?

15    A.   No, sir.

16    Q.   With regards to these trees, sir, they pretty much

17         look the way they did the day in question, right,

18         other than there's daylight in these?

19    A.   Yes, sir.

20    Q.   These are pretty full trees, aren't they?

21    A.   Yes, sir.

22    Q.   And they come down, at least the one on the right

23         comes down, there is leaves on that almost to the

24         ground level, isn't there?

25    A.   Yes, sir.
```

1    Q.    Okay.

2                      Including leaves that would be on the

3          side that you're looking from, right?

4    A.    Yes, sir.

5    Q.    They appear to be branches, okay.  All right.

6                      Now, the house that you're sitting in, is

7          that an abandoned house?

8    A.    No, not at that point of time it wasn't.

9    Q.    It may be now?

10   A.    Yes, sir.

11   Q.    Was that Lisa's porch?

12   A.    Yes, sir.

13   Q.    And you would come from the Zodiac?

14   A.    Yes, sir.

15   Q.    Motorcycle club?

16   A.    Yes, sir.

17   Q.    And I take it that -- how did you get to the

18         Zodiac?

19   A.    Drove.

20   Q.    You drove?

21   A.    He drove.

22   Q.    Michon drove.  What did he drive?

23   A.    The same car like a Tempo.  I can't remember

24         exactly the kind of car it was.

25   Q.    Some type of smaller Ford product?

1    A.    Yes, sir.

2    Q.    Did you see Mr. Houston driving that vehicle

3          before?

4    A.    No, sir.

5    Q.    Okay, the first time in that vehicle?

6    A.    Yes, sir.

7    Q.    Was Christina with you, Ms. Eshelman?

8    A.    Yes, sir.

9    Q.    What time did you get to the Zodiac?

10   A.    About two.

11   Q.    About two?

12   A.    Yes, sir.

13   Q.    What time did you leave the Zodiac?

14   A.    About four or five, I'm not too sure.

15   Q.    Okay, so you're there for two, three hours?

16   A.    Yes, sir.

17   Q.    During that period of time I assume that this

18         establishment sales alcohol?

19   A.    Yes, sir.

20   Q.    You drink it?

21   A.    Yes, sir.

22   Q.    How much did you have to drink?

23   A.    Two Heinkens.

24   Q.    Pardon me?

25   A.    Two Heinkens.

1    Q.   Two Heinkens?

2    A.   Yes, sir.

3    Q.   That's it?

4    A.   Yes, sir.

5    Q.   No shots?

6    A.   No, sir.

7    Q.   Do any drugs why you were there?

8    A.   No, sir.

9    Q.   Do any drugs on the way there or back with Mr.

10        Houston and Ms. Eshelman?

11   A.   No, sir.

12   Q.   Now, when you're out there to your knowledge, the

13        best of your knowledge, the only persons out there

14        other than Mr. Thomas are you, Mr. Houston and Ms.

15        Eshelman, correct?

16   A.   Yes, sir.

17   Q.   You don't ever see Lavero Crooks out there in a

18        parked vehicle, do you?

19   A.   No, sir.

20   Q.   And, again, this guy you said he's all right with

21        you.  Sometimes acquaintances will sit there and

22        say hey how you doing --

23             THE COURT: Excuse me, I didn't get an

24        answer.  You said this guy is all right with you.

25        I didn't hear a verbal answer.

```
 1    BY MR. LANKFORD:

 2    Q.   And Lavero Crooks is all right with you?

 3    A.   Yes, sir.

 4    Q.   Okay, positive acquaintance?

 5    A.   It's not like that.

 6    Q.   You guys don't have any problems, right?

 7    A.   We don't have no problems.

 8    Q.   And you don't see him or any car out there that you

 9         recognize is his, correct?

10    A.   No, sir.

11    Q.   Because had you recognized it, had you seen a car,

12         do you know what kind of car Lavero Crooks drove?

13    A.   A Cutlass.

14    Q.   An '84 Olds Cutlass, does that sound about right?

15    A.   Yes, sir.

16    Q.   What color?

17    A.   Blue.

18    Q.   Blue, okay.

19              Anything distinctive as far as wheels go?

20    A.   He has some Ralley.

21    Q.   What's a Ralley?

22    A.   Deep dish hub caps.

23    Q.   Okay, fancy wheel covers?

24    A.   You can say that.

25    Q.   Big rims.
```

```
1    A.   Yes, sir.

2    Q.   Mr. Houston is taller than you, right, sir?

3    A.   Yes, sir.

4    Q.   He's probably six two, maybe something like that?

5    A.   Yes, sir.

6    Q.   And fairly slim built, right?

7    A.   Yes, sir.

8    Q.   Lavero Crooks, the man that drives the blue car,

9         he's a big man, isn't he?

10   A.   Yes, sir.

11   Q.   And he's got to go at least 250, 280 something like

12        that, right?

13   A.   Yes, sir.

14   Q.   At any rate, nobody ever signals you from a car or

15        honks a horn or yells out the window, hey, you

16        know, Jovan how you doing; JW, how you doing.

17        Nobody ever does that, right?

18   A.   No, sir.

19   Q.   Okay.

20             Did Ms. Eshelman ever go and get in

21        anybody's car?

22   A.   Who?

23   Q.   Christina, Powder?

24   A.   No, sir.

25   Q.   Okay, she stayed on the porch with you the whole
```

1            time?

2   A.      Yes, sir.

3   Q.      You're not for sure what caused this swearing to

4           begin, right?

5   A.      No, sir.

6   Q.      Because you couldn't really hear it, right?

7   A.      Yes, sir.

8   Q.      You were far enough away that hearing is difficult,

9           would that be fair?

10  A.      Yes, sir.

11  Q.      And your testimony is that Mr. Houston is chasing

12          Mr. Thomas.  I assume he would be behind Mr.

13          Thomas, would that be fair?

14  A.      Yes, sir.

15  Q.      Now, you've hung out there for a while.  You know

16          many of the people, would that be true?

17  A.      Yes, sir.

18  Q.      Do you happen to know a person by the name of

19          Tenisha Watson that probably lives on Glendale?

20  A.      No, sir.

21  Q.      The other side of the field?

22  A.      No, sir.

23  Q.      While you were out there, you only saw the one guy

24          coming through the field?

25  A.      Yes, sir.

1    Q.   You never saw seven different guys coming through

2         the field all with black shirts and pants?

3    A.   No, sir.

4    Q.   You never head any guy say we got that, whatever

5         word you want to fill in?

6    A.   No, sir.

7    Q.   Do you know a guy by the name of Donte who went to

8         McKenzie High School who lives on Buena Vista?

9    A.   No, sir.

10   Q.   You don't know him?

11   A.   No, sir.

12   Q.   This is a clean shaven guy with a fade haircut and

13        gemmed glasses; do you know that man?

14   A.   Would you repeat that; I can't hear you.

15   Q.   He would be clean shaven with a fade haircut and

16        kind of gemmed, you know, fancy glasses; do you

17        know that?

18   A.   No, sir.

19   Q.   Are you familiar with anybody that drives a yellow

20        and possibly a black Thunderbird marked with some

21        decal that says Tweety Bird on it?

22   A.   No, sir.

23   Q.   You don't know anybody by that?

24   A.   No, sir.

25   Q.   All right.

1          You didn't see anybody out there, meaning

2    any vehicles or persons meeting that description

3    while you were observing this, right?

4    A.  No, sir.

5    Q.  By the way, you've known Mr. Houston for a while,

6        distinctive tatoo on the left eye?

7    A.  Yes, sir.

8    Q.  He's had that before September?

9    A.  Yes, sir.

10   Q.  All right.

11         Now, did you ever go over to that field

12   before or after the shooting to talk with Mr.

13   Thomas, I'm sorry, before the shooting let me

14   break that up?

15   A.  No, sir.

16   Q.  You did go over afterwards?

17   A.  Yes, sir.

18   Q.  You knew that a man was injured, correct?

19   A.  Yes, sir.

20   Q.  He's moving but he's clearly injured, isn't he?

21   A.  Yes, sir.

22   Q.  You come back you say he's dead, forget about it,

23   right?

24   A.  I said he's dead.

25   Q.  You said he's dead.  Okay.

1               You don't say let's get out of here,

2       Christina, there may be trouble, you don't say

3       anything like that, sir?

4  A.   No.

5  Q.   Now, you indicated that Ms. Eshelman refused to

6       leave with you; is that true?

7  A.   Leave with Sean.

8  Q.   Well, you left with Sean, didn't you?

9  A.   Sean told me to get in the car with a gun.

10  Q.   Okay, and did you do so?

11  A.   Yes, sir.

12  Q.   Did Ms. Eshelman do so?

13  A.   No, sir.

14  Q.   Was she asked or told to get in the car?

15  A.   She was asked.

16  Q.   Pardon?

17  A.   She was asked.

18  Q.   By whom?

19  A.   Sean.

20  Q.   Did you ever say to her let's go also?

21  A.   No, sir.

22  Q.   Okay.

23           Do you know what -- could you identify

24       the type of weapon that you -- well, a weapon, did

25       you ever actually see one?

```
1    A.   I didn't see it.
2    Q.   So you wouldn't know what kind or anything like
3         that, right?
4    A.   No, sir.
5    Q.   So you leave with Mr. Houston and you're taken to
6         an address at Tuxedo and Dexter?
7    A.   Yes, sir.
8    Q.   Are you dropped off there?
9    A.   Yes, sir.
10   Q.   Does Mr. Houston come in with you?
11   A.   He dropped me off at the bus stop on Dexter, not a
12        house.
13   Q.   You go home?
14   A.   Yes, sir.
15   Q.   Do you ever return back to Buena Vista and meet up
16        with Ms. Eshelman an hour later?
17   A.   No, sir.
18   Q.   Did Ms. Eshelman ever come over to your residence
19        about an hour later?
20   A.   No, sir.
21   Q.   All right.
22             Now, how long do you figure you had been
23        on the porch before you first seen Mr. Thomas?
24   A.   About a half an hour or so.
25   Q.   About a half an hour.  And with regards to -- how
```

1        long do you figure Mr. Thomas was out there from

2        the time you first saw him until the time that you

3        left?

4    A.   I don't know.

5    Q.   Was he out there when you would ride back from the

6        Zodiac?

7    A.   No, sir.

8    Q.   And it would be fair, and I ask this specific

9        question, you felt that you might well be charged

10       with a first degree murder, right, sir?

11   A.   No, sir.

12   Q.   You didn't feel that?

13   A.   No, sir.

14   Q.   Okay, it's probably what the police said, right?

15   A.   Telling me it was for a witness.

16   Q.   Pardon?

17   A.   Telling me it was for a witness.

18   Q.   I still didn't catch what he said.

19            THE COURT: They told me it was for a

20        witness.

21            MR. LANKFORD: Okay.

22  BY MR. LANKFORD:

23   Q.   Now, we'll do this again then. Do you recall

24        testifying across the street on January the 29th of

25        this year?

1    A.   Yes, sir.

2    Q.   At that time there was a judge, correct?

3    A.   Yes, sir.

4    Q.   Somebody other than this judge, right?

5    A.   Yes, sir.

6    Q.   There were two lawyers, correct?

7    A.   Yes, sir.

8    Q.   Different than Mr. Hassinger and myself, correct?

9    A.   Yes.

10    Q.   A white woman and a black male, right?

11    A.   Yes, sir.

12    Q.   Okay, page 32, oh, I'm sorry.  You were sworn to

13        tell the truth the whole truth and nothing but the

14        truth just like today?

15    A.   Yes, sir.

16    Q.   Both lawyers got to ask you questions?

17    A.   Yes, sir.

18    Q.   Do you recall this on page 32, lines 14 through

19        seventeen;

20            "Question: And did they threaten you if

21          you didn't give a statement that they would

22          charge you with this murder?

23          Answer:  Yes, sir."

24          Do you recall that question and answer?

25    A.   Yes, sir.

1    Q.   Okay.

2             But at any rate I'm going to do the

3    digression.  You did feel that you might be charged

4    in connection with this homicide in some capacity,

5    didn't you?

6    A.   Yes, sir.

7    Q.   And you took them seriously about that, right?

8    A.   Yes, sir.

9    Q.   You met Ms. Eshelman probably last summer also?

10   A.   Who?

11   Q.   Powder, Christina?

12   A.   Yes, sir.

13   Q.   Sir, today you said that at the Zodiac you had two

14   beers, two Heinkens, correct?

15   A.   Yes, sir.

16   Q.   You order beer, right?

17   A.   Yes, sir.

18   Q.   Good tasting stuff, correct?

19   A.   Yes, sir.

20   Q.   Okay.

21             Would you describe two beers in two hours

22   as fairly heavily?

23   A.   Pardon me?

24   Q.   Would you describe that as a fair amount of

25   drinking, sir?

1   A.   Yes, sir.

2   Q.   Okay, all right.

3             So you say that you drank a fair amount

4        and that would be two beers?

5   A.   Yes, sir.

6   Q.   All right. I might have asked that, sorry, it's

7        late in the day, but you have been to that

8        particular place that you pointed out on the

9        photographs a number of times, haven't you, sir?

10  A.   Yes, sir.

11  Q.   You're very familiar with the area?

12  A.   Yes, sir.

13  Q.   And people tend to frequent it?

14  A.   Yes, sir.

15  Q.   Many of the people tend to live there?

16  A.   Yes, sir.

17  Q.   All right, one moment please.

18             There's been a person here today earlier

19        that testified regarding this chart. But this

20        number 3 that you described, the one that was fully

21        grown, branches down almost to the ground.  That's

22        in a vacant lot, right, sir?

23  A.   Yes, sir.

24  Q.   And let's say just for a moment that there had been

25        houses on the south side once upon a time on Buena

1   Vista just like the ones on the north side, okay?

2 A. Yes, sir.

3 Q. That tree would in the back would have been in the

4   backyard of that house, right?

5 A. Yes, sir.

6 Q. Because it would be pretty close to the alley on

7   that side, isn't it?

8 A. Yes, sir.

9 Q. You indicated that you don't have any commissions

10   for fraud, theft, or dishonesty in the last ten

11   years punishable by more than a year?

12 A. No, sir.

13 Q. You're used to working outside obviously at five

14   o'clock, right?

15 A. Yes, sir.

16 Q. And there are some street lights, correct?

17 A. Yes, sir.

18 Q. And there may even be a street light directly,

19   right on the street, correct, sir?

20 A. Yes, sir.

21 Q. Did the incident that you described has taken place

22   would have occurred on the other side of that light

23   away from where you are, right?

24 A. Yes, sir.

25 Q. You've described what, five or six shots altogether

1        is that basically correct?

2   A.   Yes, sir.

3   Q.   Okay.

4            And now from the time Sean comes, Mr.

5        Houston, excuse me, comes back and says get in the

6        car, from the time of the shooting until you get

7        into the get car and actually leave the area, how

8        long is that?

9   A.   After the shoot?

10   Q.   Yes.

11   A.   About five seconds, five, ten seconds.  About five,

12        ten seconds.

13   Q.   I mean from the time of the shooting, what you're

14        saying is Mr. Houston has to come out of the field,

15        onto the porch, right?

16   A.   Yes, sir.

17   Q.   Has to yell at you, correct?

18   A.   I would say probably five minutes.

19   Q.   Five minutes, okay, as opposed to five seconds,

20        right?

21   A.   Yeah.

22   Q.   During that five minute period of time after shots

23        you start seeing house lights go on and people

24        looking out their windows and dogs barking and that

25        kind of thing?

1    A.    No, sir.

2    Q.    No, sir, okay.

3                At some point that you've described as

4          the shootings, once the man had fallen on his back,

5          you indicated that Mr. Houston fired some more

6          rounds, right?

7    A.    Yes, sir.

8    Q.    Do you think the way you described it is he's

9          standing right over the guy, correct?

10   A.    Yes, sir.

11   Q.    Right over him, right?

12   A.    Yes, sir.

13   Q.    Okay, what I want you to do --

14               MR. LANKFORD: May I approach, Your

15         Honor?

16               THE COURT: Yes, go ahead.

17   BY MR. LANKFORD:

18   Q.    I'd like you to tell me when to stop when you

19         figure the barrel of the gun was to Mr. Thomas?

20   A.    Right there.

21   Q.    Right here?

22   A.    Yeah.

23   Q.    My foot is on this first step, right?

24   A.    Yes, sir.

25   Q.    You're on the second step, right?

1    A.    Yes, sir.

2    Q.    You were probably about that far apart, right,

3          sir?

4    A.    Yes, sir.

5    Q.    Indicating 12 to 15 inches more or less?

6                    THE COURT: Mr. Prosecutor, do you agree?

7          Did you see his hands?  He was hard to see. Try it

8          again, counsel.

9    BY MR. LANKFORD:

10   Q.    It's hard to keep them exact as I walk forward.

11         You indicate right here, that's this close, right?

12   A.    Yes, sir.

13   Q.    Now, the distance between my knee and your knee was

14         approximately 15 -- about a couple inches back, 15,

15         eighteen inches?

16   A.    Right there.

17   Q.    Couple feet.

18                    THE COURT: Okay, thank you.

19   BY MR. LANKFORD:

20   Q.    All right.  When you went over to see Mr. Thomas

21         and observed his condition, did you go in his

22         pocket?

23   A.    No, sir.

24   Q.    You didn't search his pockets for any money?

25   A.    No, sir.

1    Q.    Did you see Mr. Houston search for any money

2          either, did you?

3    A.    No, sir.

4    Q.    But this man indicated that he wanted to make a

5          buy, correct?

6    A.    Yes, sir.

7    Q.    Powder is a regular in the neighborhood, sir?

8    A.    What?

9    Q.    And you said Powder, she's a regular in the

10         neighborhood?

11   A.    Yes.

12   Q.    You always see her on Buena Vista?

13   A.    Yes, sir.

14   Q.    Do you have any relatives that live over there on

15         Buena Vista?

16   A.    Yes, sir.

17              MR. HASSINGER: Could I find out what why

18         counsel -- relevance.

19              MR. LANKFORD: I'll withdraw the

20         question.  He's established familiarity with the

21         area.  Thank you.

22              MR. LANKFORD: One second, I think that's

23         about it.

24   BY MR. LANKFORD:

25   Q.    The statement that you-- the man that you made a

1        statement to, that man over there?

2    A.   Yes, sir.

3    Q.   Do you know his name?

4    A.   Sergeant Danny Marshall.

5               MR. LANKFORD: Nothing further.

6               THE COURT: Go ahead, counsel.

7               MR. HASSINGER: Thank you, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. HASSINGER:

10   Q.   Mr. Johnson, are you coming into court today and

11        lying on Mr. Houston and want to set him up on a

12        gun case?

13   A.   No, sir.

14   Q.   Did you actually see who murdered that man on

15        September 6th?

16   A.   Yes, sir.

17   Q.   And who would that be?

18   A.   Sean.

19   Q.   He was your friend back on that date?

20   A.   Yes, sir.

21               MR. HASSINGER: Thank you.

22               THE COURT: Recross-Examination of what

23        has been pointed out on redirect only.

24               MR. LANKFORD: No, thank you, Your Honor.

25               THE COURT: Go ahead, counsel.

1          MR. HASSINGER: The People call Officer

2     Bastianelli.

3          THE CLERK: Do you solemnly swear or

4     affirm that the testimony you're about to give

5     before the court to be the truth under the pains of

6     penalty of perjury?

7          MR. BASTIANELLI: Yes, I do.

8          THE CLERK: Thank you.

9          THE COURT: Please be seated right there

10    and we're going to ask you to pull the microphone

11    around to your mouth and speak right into it.

12          Counsel, whenever you're ready.

13          MR. HASSINGER: Thank you, Your Honor.

14               MICHAEL BASTIANELLI

15    was thereupon called by the People as a witness

16    herein, and having been duly sworn, was examined

17    and testified as follows:

18                  DIRECT EXAMINATION

19   BY MR. HASSINGER:

20   Q.   Good afternoon, sir, would you please introduce

21        yourself to our jury?

22   A.   My name is Officer Michael Bastianelli.

23   Q.   How are you employed, sir?

24   A.   I'm employed with the City of Detroit as a police

25        officer.

1    Q.    I'd like to take you back to September 6th of last

2          year 2002 somewhere around six, seven in the a.m.,

3          were you working, sir, back on that date around

4          that time?

5    A.    Yes, I was.

6    Q.    And did you get some type of assignment that

7          concerned going to a hospital?

8    A.    Yes, I did.

9    Q.    What was your assignment?

10   A.    I was working on a patrol unit.  I was backing up a

11         primary unit on the shooting run.

12   Q.    And who requested you to go to the hospital?

13   A.    We pretty much volunteered for that.

14   Q.    Okay, and which hospital did you go to, sir?

15   A.    We went to Henry Ford Hospital.

16   Q.    And were you aware at the time that a victim by the

17         name of Carlton Thomas have been conveyed to Henry

18         Ford Hospital?

19   A.    Yes, I had.

20   Q.    You personally went there?

21   A.    To the hospital?

22   Q.    Yes.

23   A.    Yes, I did.

24   Q.    Did you have a partner?

25   A.    Yes, I did.

1    Q.   What is your partner's name?

2    A.   Daniel Sitarski.

3    Q.   While you were at the hospital, did you collect

4          clothing that was taken from the victim in this

5          particular case?

6    A.   Yes, we did.

7    Q.   And can you tell us what clothing were collected

8          from the victim Carlton Thomas?

9    A.   For accuracy I'd have to refer to my PCR.

10   Q.   Would that help refresh your memory?

11   A.   Yes, it would.

12   Q.   Please tell us.

13   A.   We placed on evidence -- do you want me to say the

14         evidence tag number?

15   Q.   Please.

16   A.   On evidence tag number 738872 one blue coat, one

17         black pair of underwear, one pair of black shorts

18         with a brown belt, two white socks, one green shirt

19         and two black shoes.

20              On evidence tag 738873, we put one set of

21         miscellaneous keys, one brush, one cigarette

22         lighter, and one half pint of Gilbey's gin.

23   Q.   And to best of your knowledge that's the things

24         that were on the complainant when he was conveyed

25         to the hospital?

1    A.    That's correct.

2    Q.    And all that was placed on evidence?

3    A.    Yes, sir.

4                  MR. HASSINGER: I have no further

5          questions of the witness.

6                  THE COURT: Cross-examination.

7                  MR. LANKFORD: Thank you, Your Honor.

8                       CROSS-EXAMINATION

9    BY MR. LANKFORD:

10   Q.    Good afternoon Officer?

11   A.    Good afternoon.

12   Q.    You simply go and retrieve these clothes that might

13         be of some value later on, that's basically the

14         idea?

15   A.    Pretty much, sir.

16   Q.    You found a number of items such as clothing?

17   A.    I'm sorry?

18   Q.    You found a number of items, clothing, keys?

19   A.    Yeah, they were turned over to us by the hospital

20         staff.

21   Q.    Was any currency turned over to you?

22   A.    No.

23   Q.    Any form of identification from Mr. Thomas?

24   A.    No, sir.

25                  MR. LANKFORD: Nothing else.  Thank you.

1          THE COURT: Redirect?

2          MR. HASSINGER: None, Your Honor.

3          THE COURT: We thank and excuse the

4    witness.  You're free to go.

5          Are you ready to call your next witness?

6          MR. HASSINGER: Yes, we'd like to call

7    Officer Melvin Williams.

8          THE CLERK: Raise your right hand,

9    please.  Do you solemnly swear or affirm that the

10   testimony you're about to give in the matter now

11   pending before the court to be the truth under the

12   pains of penalty of perjury?

13         MR. WILLIAMS: Yes, ma'am.

14         THE COURT: Please be seated right there

15   and we're going to ask you to pull that microphone

16   back around to your mouth and speak right into it.

17   Counsel, whenever you're ready.

18         MR. HASSINGER: Thank you, Your Honor

19              MELVIN WILLIAMS

20   was thereupon called as a witness by the People

21   herein and having been duly sworn, was examined and

22   testified as follows:

23              DIRECT EXAMINATION

24   BY MR. HASSINGER:

25   Q.   Good afternoon, sir, would you please state your

1        name?

2    A.   Melvin Williams.

3    Q.   How are you employed, sir?

4    A.   Through the City of Detroit Police Department.

5    Q.   How long have you been a police officer?

6    A.   Three and a half years.

7    Q.   Sir, I'd like to take you back to September 6th,

8        2002, an early Friday morning some where around

9        5:30 or six 50 in a.m., sir, did you get some type

10       of run back on that day around that time?

11   A.   Yes, sir, I got a police run on a shots fired in

12       the area of Buena Vista and Linwood.

13   Q.   Do you know what precinct that is, sir?

14   A.   The Tenth Precinct.

15   Q.   Is the Tenth Precinct where you normally work?

16   A.   Yes.

17   Q.   How long have you been assigned to the Tenth

18       Precinct?

19   A.   Two and a half years.

20   Q.   Did you go over to Linwood, west Buena Vista area?

21   A.   Yes, I did.

22   Q.   And are you the first officer that arrives at

23       scene.

24   A.   Yes, sir.

25   Q.   Can you tell us approximately what time it was when

1    you got there?

2  A.  I believe it was just before six a.m., maybe

3    between 5:50 and six a.m., maybe 5:55.

4  Q.  Can you tell us what the lighting conditions were

5    at that time?

6  A.  It was dawn just breaking through so.

7  Q.  And when you get over there where do you direct

8    your attention to?

9  A.  I was coming eastbound on Buena Vista Street, and I

10    looked to my right which would be the south corner

11    of Buena Vista and Linwood and that's where my

12    direction of sight was at, sir.

13  Q.  Did you have a partner?

14  A.  Yes, I did.

15  Q.  What was your partner's name?

16  A.  He was driving at the time so.

17      THE COURT: No, he said what was his name.

18      THE WITNESS: I'm sorry, what's his name?

19  BY MR. HASSINGER:

20  Q.  Yes.

21  A.  Fred Mcintyre.

22  Q.  So you're coming eastbound on Buena Vista; is that

23    correct?

24  A.  Yes, sir.

25  Q.  At some point do you stop; does your vehicle come

1       to a stop?

2   A.   Yes, sir.

3   Q.   Where do you stop at?

4   A.   At the corner of Buena Vista and Linwood prior to.

5   Q.   And what do you do?

6   A.   I noticed lying in the field what appeared to be a

7       body.  I noticed clothing. I commanded my partner

8       to bring the vehicle as I jumped out of the car and

9       ran over to the scene.

10   Q.   Now, you're saying from sitting in your police

11       vehicle out on Buena Vista, you were able to see a

12       body laying in that field there south of Buena

13       Vista?

14   A.   Yes, sir.

15   Q.   Okay.

16            Do you recall there being a couple of

17       trees in that area?

18   A.   Well, yeah, yeah, I do recall that toward the alley

19       which the tree would actually have been behind the

20       body.

21   Q.   Okay.

22            But the tree, is it fair to say the trees

23       are towards the back of that lot?

24   A.   Yes, directly toward the back of that lot.

25   Q.   Okay.

1                  But you didn't have any trouble seeing

2    that body that was laying back there in the front

3    of the tree?

4  A.   There was no obstruction of my view to that body.

5  Q.   Okay.

6                  That's what I made clear that you were

7    easily able to make that observation?

8  A.   Yeah, there was no obstruction at all.  The tree

9    was to the back of that body.

10  Q.   Okay.

11                And, in fact, you saw that and you asked

12    your partner to stop the vehicle so you could go

13    investigate?

14  A.   Yes, sir.

15  Q.   What do you do?

16  A.   I immediately jump out of my squad car.  I grabbed

17    my radio.  Run over toward the body and I confirmed

18    there was a body first.

19  Q.   Okay.

20               Was there anybody else out there around

21    that body?  Were there any civilians out there in

22    that lot?

23  A.   No.

24  Q.   Were there any other civilians in that general

25    area along Buena Vista in front of that lot?

1    A.    No.

2    Q.    So you run over to check the body; is that correct?

3    A.    Yes, sir.

4    Q.    Tell the jury what observations you make?

5    A.    Well, I immediately notice what appeared to be a

6          gun shot wound to the mouth or some type of wound

7          to the mouth.  It was almost a perfect hole in the

8          middle of his mouth.  His eyes were rolled to the

9          back of his head.

10                There was a gun shot wound or what

11         appeared to be a gun shot wound to the temple.  He

12         was laying there and I believe he had his left leg

13         up and it was still slightly swaying back and forth

14         back.  He tried to talk to me and tell me what his

15         name was.

16   Q.    Was he having trouble talking?

17   A.    Very much.

18   Q.    Were you able to communicate with him?

19   A.    Just for a second. I got a name out of him.  And he

20         just said, you know, he shot me, he shot me.

21   Q.    Do you recall what name -- did he give you his name

22         or the name of the shooter, what was this?

23   A.    Well, I couldn't decipher it.  I asked him what his

24         name was, but I couldn't decipher whether or not he

25         was talking about the shooter or anything.  When I

1    asked him he said his name was -- he just said

2    Carlton Thomas.

3  Q.  And you said there was a shot it looked like to the

4    temple.  Was his mouth area also injured?

5  A.  Yes.

6  Q.  Did it appear to be?

7  A.  Yes, it did.

8  Q.  Okay.

9    At some time do you call EMS or does your

10   partner call EMS?

11 A.  Upon me standing over a body is when I radioed for

12   my dispatch to make sure that the EMS was rolling.

13   Subsequently the EMS appeared.  You know, they were

14   just right there, so I guess they got the run at

15   the same time we got the run and they were pulling

16   up.

17 Q.  Is it fair to say they're pulling up seconds after

18   you pulled up?

19 A.  Seconds later.

20 Q.  Okay.

21 A.  Seconds later after I was standing over the body.

22 Q.  And at that point do you turn Mr. Thomas over to

23   the EMS people so they can do whatever they need to

24   do?

25 A.  Yes.

1     Q.    To the best of your recollection, was Mr. Thomas

2          fully clothed?

3     A.    At the time, yes.

4     Q.    Was there anything covering his face?

5     A.    No.

6     Q.    Do you know where EMS took Mr. Thomas to?

7     A.    I'm sorry at that point I conducted a canvas of the

8          area looking for a perpetrator or a witness.

9     Q.    So you start looking around the neighborhood trying

10         to find witnesses or gain information about the

11         case?

12    A.    Yes, we had a supervisor who instructed another

13         unit to convey the EMS to the hospital.

14    Q.    So basically at this point is it fair to say you're

15         looking for anybody out there who was might have

16         information about what happened?

17    A.    Yes, sir.

18    Q.    Do you recall anybody you talked to?

19    A.    Not by name.  I radioed, I called radio again to

20         dispatch and we got an ID of the address where the

21         call came from, and I made that location with a

22         supervisor, a location with a supervisor to ask

23         exactly what did they see or hear.

24    Q.    Do you know what location that was where the call

25         came from?

1   A.   Not offhand, sir.

2   Q.   If I showed you a report that appears to be made by

3        on that day would that refresh your memory?

4   A.   Yes, sir.

5               MR. HASSINGER: May I approach the

6        witness, Your Honor?

7               THE COURT: You may.

8   BY MR. HASSINGER:

9   Q.   And who did you talk to?

10  A.   It was Sherita Johnson.  She didn't live at the

11       address but she was at the address where the call

12       came from.  She was the caller.

13  Q.   Can you tell us the names of people that you would

14       have talked to back on that date trying to gain

15       information about this case?

16  A.   All I can say is Sherita Johnson, Derrick McGee who

17       was a resident of that building and John Watson.

18  Q.   Can you tell us the address of the building where

19       the call came from?

20  A.   2663 West Buena Vista.

21  Q.   Now, I don't want to go into whatever these people

22       told you.  I just want to know did any of these

23       people claim to you that they witnessed this crime?

24  A.   No.

25  Q.   You got all these people's names and information;

1       is that correct?

2   A.   Yes, sir.

3   Q.   What did you do next?

4   A.   We continued our search of the area looking for

5       evidence.  At some point we had to wait for the

6       homicide investigator to get over there and we

7       turned the investigation over to the homicide

8       detective.

9   Q.   Were you in charge protecting the scene until the

10      homicide officers got there?

11  A.   I'm sorry, yes, sir.  We preserved the scene, the

12      area where he was found laying in.  So we kept that

13      area free of contamination before I turned it over

14      to the homicide investigator.

15  Q.   And you've been working the Tenth Precinct at this

16      point for about two and a half years; is that what

17      you told us?

18  A.   Yes, sir.

19  Q.   Can you tell the jury in general about this area on

20      Buena Vista near Linwood; is this a high priority

21      area for anything?

22  A.   There's a lot of drugs over in that area, and so

23      over in that area the officers and myself dealing

24      with that area, you know, most the time when you

25      come in contact with somebody over that area, it's

1     not unlikely that a priority is called out, as far

2     as somebody producing a weapon or some other type

3     of dangerous object where an officer feels he need

4     assistance from someone else.

5            But the answer to your question, it's a

6     high drug trafficking area.

7   Q.  Do you have your guard up when you go through that

8     area?

9   A.  All the time.

10           MR. HASSINGER: Judge, I'd like to ask the

11     witness to have permission to take a look at the

12     exhibit.

13           THE COURT: All right.

14  BY MR. HASSINGER:

15   Q.  Officer, can you please step down for a second.

16     I'd like you to look at what's already been

17     introduced as People's Number 2 here. It's shows

18     Buena Vista running this way.  We have Linwood over

19     here.  North is this way on this, okay?

20   A.  Okay.

21   Q.  So just to get your bearings.  There's been an area

22     where the evidence technician has testified that

23     there was there blood in front of a tree. Can you

24     indicate for the jury, and you can use my pen to

25     point, where Mr. Thomas was when you found him on

```
1          this map.
2                    THE COURT: And kindly stand to the side
3          so that the jurors can see where you're pointing.
4                    THE WITNESS: I remember finding Mr.
5          Thomas right here.
6     BY MR. HASSINGER:
7     Q.   Are you were talking about -- now, you said you
8          were going down Buena Vista and you could see his
9          body in front of the tree, correct?
10    A.   Yes, our scout car was riding up Buena Vista this
11         way. And you could see his body laying in this area
12         here.  And like I said, the tree was toward the
13         back next to the alley.
14    Q.   Okay.
15                   Now the evidence technician has marked
16         the trees.  See where it sees right there, tree
17         right here?
18    A.   Okay.
19    Q.   See this circle represents the trunk.  Now, does
20         that help you position where the body was?
21    A.   Yes.
22    Q.   And where was Mr. Thomas?
23    A.   Laying right here.
24    Q.   Thank you, sir, why don't you resume your seat.
25                   Did you yourself recover it?
```

1          THE COURT: You know what, fix it.  You

2      don't know how to fix it but my officer does.

3      After it's been moved enough times it gets loose

4      and it tries to assault whoever's sitting in the

5      chair.  Okay, go ahead.

6          MR. HASSINGER: Thank you, Judge.

7   BY MR. HASSINGER:

8   Q.   Did you personally recover any other evidence at

9        that location?

10  A.   No, I didn't.

11         MR. HASSINGER: Thank you, Your Honor.

12         THE COURT: Cross-examination.

13         MR. LANKFORD: Thank you.

14              CROSS-EXAMINATION

15  BY MR. LANKFORD:

16  Q.   Good afternoon, Officer Williams?

17  A.   Good afternoon.

18  Q.   Sir, you had changed your eastbound Buena Vista,

19       correct?

20  A.   Yes, sir.

21  Q.   And approaching heading towards Linwood?

22  A.   Yes, sir.

23  Q.   And you're the passenger, right?

24  A.   Yes, sir.

25  Q.   Your side is facing south?

1  A.   Yes, sir.

2  Q.   So you're on the curb side facing south?

3  A.   Yes, sir, I was facing south.  I would have been

4       looking south.

5  Q.   Correct, okay.

6            And at some point you indicated that you

7       didn't have any trouble seeing, you saw something

8       out there that got your attention, right?

9  A.   Yes, sir.

10 Q.   You don't have any trouble seeing that, right?

11 A.   No, I didn't.

12 Q.   Okay.

13           Because whatever, say disrepair the

14      things were, certainly you were able to from

15      probably 60 feet away see an object out there,

16      correct?

17 A.   Correct.

18 Q.   So it wasn't like weeds were up to your waist or

19      your groin or anything, right?

20 A.   Correct.

21 Q.   Okay.  Now, also you pulled down --

22           MR. LANKFORD: I ask permission to have

23      him step down if he needs to.

24           THE COURT: Step down again if you'd like.

25 BY MR. LANKFORD:

1    Q.   I'm going to direct a couple of questions, Officer,

2         would you look towards the lower right where it

3         says pile of debris?

4    A.   Right.

5    Q.   And, in fact, would that be -- I'm showing you a

6         couple of photographs, sir.  Is that pile of debris

7         shown in these photographs People's Exhibits Number

8         4, 5 and 9?

9    A.   Yes, this is the pile debris that was out there.

10   Q.   A pretty nice little pile, right?

11   A.   Right.

12   Q.   And this photograph Number 3, that shows a bicycle,

13        sir?

14   A.   Yes.

15   Q.   And as you were going down Buena Vista eastbound

16        you would have passed the pile of debris first and

17        then come up to where this bike is depicted,

18        correct?

19   A.   Right.

20   Q.   So it's fair to say that you would pass the pile of

21        debris when you noticed it?

22   A.   Right.

23   Q.   Heading east on that you would look where the

24        little light, maybe sunshine which is actually a

25        light pole?

1   A.   Right.

2   Q.   You must have been about there, right, when you

3       first notice things?

4   A.   To be honest, I didn't actually remember the light

5       pole being there, so maybe I was a little bit

6       further than it.

7   Q.   Okay.

8             My point though is certainly you were

9       passed the pile of debris, correct?

10   A.   I was definitely passed the pile of debris, but I

11       was no where even close to the alley.

12   Q.   Okay.

13             And one moment, please.  Okay.  You may

14       resume your seat if you would please, Officer.

15       Thank you.

16             MR. LANKFORD: May I approach the

17       witness?

18             THE COURT: Yes.

19   BY MR. LANKFORD:

20   Q.   I'm showing you People's Exhibit Number 4 which I

21       may have shown you. Does that look like the area

22       looking from the field to the houses?

23   A.   Yes.

24   Q.   And there appears to be a semi-marked or supposedly

25       unmarked police car?

1    A.    Yes.

2    Q.    Now, that however is pointed west as opposed to the

3          direction you were traveling, correct?

4    A.    Correct.

5    Q.    And that pile of debris is depicted in there,

6          correct?

7    A.    Correct.

8    Q.    Now, east of the location -- you were east of the

9          debris when you saw the body, right, or something

10         that caught your attention?

11   A.    Correct.

12   Q.    In that photograph if you are looking north to the

13         west or the left of the pile of debris, it appears

14         to be some fairly heavy weeds, correct, just at the

15         curb?

16   A.    Next to the fence?

17   Q.    Yes.

18   A.    Okay.

19   Q.    Is that right?

20   A.    Yes.

21   Q.    And that is not the location from which you were

22         able to see the body as you came down Buena Vista?

23   A.    Correct.

24   Q.    All right, thank you.

25                Sir, you did indicate he had damage to

1         his mouth?

2    A.    Yes.

3    Q.    So you're not even able to say or really determine

4         what he was saying, would that be fair?

5    A.    I made his name out.

6    Q.    Okay, and that was pretty much it?

7    A.    Yes.

8    Q.    So certainly he was incapable, appeared to be

9         incapable of giving you any description, right,

10        sir?

11    A.    I didn't get a description from him.

12    Q.    And then clearly he's been shot and he's in bad

13        shape, right?

14    A.    Yes.

15    Q.    Okay.

16            Now at any time though, I mean, the

17        person was still swaying back and forth kind of

18        thing?

19    A.    His left leg, I believe it was his left leg.

20    Q.    Right.

21    A.    But he was laying down and it was swaying back and

22        forth, so it was obvious to me he was still alive.

23    Q.    Conscious, correct, sir?

24    A.    Yes.

25    Q.    Did he make any attempt to put his hands to point

1          to his eyes, the area of his eyes?

2     A.   Not to my recollection, no.

3     Q.   And you did obviously, you've testified that you

4          canvased the area and talked to Sherita Johnson,

5          Derrick McGee, and John Watson, correct?

6     A.   Yes, sir.

7     Q.   Can I see --

8               THE COURT: Counsel, we're going to have

9          to stop. It's almost 4:00 o'clock.

10              MR. LANKFORD: Judge, I can wrap up in two

11         minutes.

12              THE COURT: Okay, go ahead.

13              MR. LANKFORD: May I approach?

14              THE COURT: Yes.

15    BY MR. LANKFORD:

16    Q.   John Watson, is one of the names, John Watson?

17    A.   Yes, sir.

18    Q.   What is the address on that, they blacked mine out?

19    A.   2638 Glendale.

20    Q.   2638 Glendale, okay.

21              And you seen a building here 2638 Buena

22         Vista, correct, on this diagram, sir?

23    A.   Do you mind if I step over here?

24              THE COURT: Please do. Now remember,

25         counsel, you said you were going to wrap it up.

1      We're going to have to go through redirect anyway.

2      Go ahead.

3              THE WITNESS: It's not noted on here.

4  BY MR. LANKFORD:

5  Q.   No, no, no, I'm saying it shows 2638 Buena Vista,

6       correct?

7  A.   Yes.

8  Q.   Glendale's the next street south?

9  A.   Yes.

10 Q.   2638, if I continued through that alley onto

11      Glendale, 2638 Glendale would be an address that--

12              THE COURT: Think about it for tomorrow.

13              MR. LANKFORD: Okay, no problem.

14              THE COURT: I'm going to caution jurors

15      you may not discuss this matter among yourselves

16      nor with anyone else.  I'm going to ask you to go

17      home and have a good dinner. Be back here tomorrow

18      morning promptly at 9:00.

19              Now, I'm going to be here at 9:00 and I

20      know defense counsel's going to be here at 9:00

21      since he's already given us one check.

22              I know the prosecutor doesn't want to

23      have to give us a check, so if you all can be here

24      on time we'll get this case concluded as

25      efficiently as possible.  We'll rise for the day.

1    Everyone rise.   The jurors are free to be back at

2    9:00 o'clock tomorrow.

3              (Jury exits courtroom 4:10 p.m.)

4              THE COURT: You may be seated.   Okay, see

5    you tomorrow morning at 9:00 o'clock unless you

6    have something else you want to bring up.   Was

7    there something you wanted to bring up?

8              MR. LANKFORD: Yes.

9              THE COURT: We got to go quickly.

10             MR. LANKFORD: I did, yes.

11             THE COURT: We got a security problem

12   after 4:00 o'clock, so let's do it.

13             MR. LANKFORD: Judge, this is real brief.

14   Basically I've asked for assistance regarding a

15   witness who I had no information on other than she

16   had a statement taken by the police.   That order

17   was signed.   The police had gone out I understand

18   that they have attempted to serve her.

19             THE COURT: That's the same witness that I

20   served; isn't that somebody I issued a warrant

21   for?

22             MR. LANKFORD: You didn't issue a warrant,

23   just a subpoena, a subpoena.

24             THE COURT: Okay, well, if they can find

25   her -- you want a bench warrant?

1           MR. LANKFORD: I want a warrant for her.

2           THE COURT: Have they been able to find

3 her at all?

4           MR. HASSINGER: They have found her,

5 Judge, but she refuses to come to the door.

6           THE COURT: Well, you know what you have

7 to do, right?

8           MR. HASSINGER: We need a warrant first.

9           THE COURT: You got a warrant so give my

10 clerk the information.  Take him back, get to my

11 clerk and give her the information so I can sign it

12 before we leave here.  Talk to my clerk.

13           MR. LANKFORD: Okay.

14           THE COURT: Give her the information so

15 she can get the warrant and I can get out of here.

16           Please be back tomorrow at 9:00.

17           THE WITNESS: Yes, ma'am, promptly.

18           THE COURT: Okay.

19           MR. HASSINGER: Judge, may I leave my

20 materials in the courtroom?

21           THE COURT: I don't have a problem with it

22 but I don't know what the other people do. I don't

23 know if they move things around.  Ask the clerk.

24           MR. HASSINGER: But I have your permission

25 to do that?

1          THE COURT: You have my permission.

2          MR. HASSINGER: Okay, you're the boss.

3          THE COURT: I'm just concerned about we

4     can't be responsible for it.

5          MR. HASSINGER: I understand.

6          THE COURT: Okay.

7          (Proceedings concluded.)

240

R E P O R T E R ' S     C E R T I F I C A T E

        I do hereby certify that I have recorded stenographically the proceedings had and testimony taken in the above-entitled matter at the time and place hereinbefore set forth, and that the foregoing is a full, true and correct transcript of the proceedings had in the above-entitled matter; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

Debra L.   Finch
Certified Shorthand Reporter - 5702

Dated:   August 9 , 2003