*248742*

```
 1                    STATE OF MICHIGAN

 2         IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

 3

 4     THE PEOPLE OF THE STATE OF MICHIGAN

 5

 6     .vs                           Case No. 03-001609

 7     MICHON DESMOND HOUSTON,

 8             Defendant.
                                              /
 9     _____

10                      JURY TRIAL

11          PROCEEDINGS HAD in the above-entitled cause before

12     the HONORABLE VERA MASSEY JONES, Circuit Judge, Detroit,

13     Michigan on Monday, April 7th, 2003.

14

15     APPEARANCES:

16

17     For the People:      RODNEY P. HASSINGER (P-40573)
                            Wayne County Assistant Prosecutor
18                          1441 St. Antoine Street
                            Detroit, MI 48226
19                          (313) 224-5777

20

21     For the Defendant:   DAVID E. LANKFORD (P-43536)
                            645 Griswold Street, Suite 2350
22                          Detroit, MI 48226
                            (313) 965-4834

23

24

25
```

RECEIVED
MAY 17 2004
MICHIGAN COURT OF APPEALS
FIRST DISTRICT

APPROVED
8-18-03
CLERK

1

1

TABLE OF CONTENTS

                                                        PAGE

2

WITNESSES:   PEOPLE

3

4    OFFICER MELVIN WILLIAMS
          Cross-Examination continuing by Mr. Lankford     4
5         Redirect Examination by Mr. Hassinger            7

6

7    OFFICER CHARLES ADAMS
          Direct Examination by  Mr. Hassinger             9
          Cross-Examination by Mr. Lankford               26
8         Redirect Examination by Mr. Hassinger           30
          Recross-Examination by Mr. Lankford             30
9         Redirect Examination by Mr. Hassinger           31
          Recross-Examination by Mr. Lankford             31

10

11

12   The People Rests                                     35
     The Defense Rests                                    46
     Closing argument by Mr. Hassinger                    47
13   Closing argument by Mr. Lankford                     62
     Rebuttal argument by Mr. Hassinger                   86
14   Court charges the jury                               97
     Jury renders a verdict                              122

15

16

17

18   EXHIBITS:                          IDENTIFIED    RECEIVED
     None

19

20

21

22

23

24

25

1                    Detroit, Michigan

2                    Monday, April 7, 2003

3                    Morning session

4          -  -  -

5          THE CLERK: All rise for the jury.

6          (Jury enters courtroom)

7          THE COURT: Do I have the stipulation that

8     all of our jurors are here and in their proper

9     places?

10          MR. HASSINGER: People so stipulate.

11          MR. LANKFORD: Defense also.

12          THE COURT: Ladies and gentlemen, I

13     apologize to you, but you know when you make real

14     good plans I'm supposed to take two weeks off in

15     May to help my daughter with the new baby that's

16     going to be born May 22nd.  Well, the baby decided

17     to come Friday and at 10:40 we were on our way to

18     the hospital at 3:00 o'clock in the morning, and I

19     have a new granddaughter, a baby girl.

20          (Audience clapped)

21          THE COURT: Thank you.  But that's why I

22     wasn't here.  Now, I'll remind the witness you're

23     still under.  Sir, would you please resume the

24     witness stand.

25          You may proceed, counsel.

1           MR. LANKFORD: Thank you.

2                OFFICER MELVIN WILLIAMS

3      was thereupon called as a witness by the People

4      herein and having been previously duly sworn, was

5      examined and testified as follows:

6                     CROSS-EXAMINATION, continuing

7   BY MR. LANKFORD:

8   Q.   Officer Williams, good morning?

9   A.   Good morning.

10           MR. LANKFORD: May I set this briefly up,

11      Your Honor?

12           THE COURT: Go right ahead.

13           MR. LANKFORD: I think where we left off,

14      Your Honor, is Officer Williams is at the diagram.

15      If you could please, sir.

16   BY MR. LANKFORD:

17   Q.   I want to ask you a couple of things. I think we

18      had gone through your position when you first saw

19      something in the alley you had come past a clump of

20      weeds and then a pile of debris and near where that

21      light pole is, sir, here?

22   A.   No, no, on Buena Vista.

23   Q.   I'm going to get your bearings, correct.

24   A.   Okay.

25   Q.   Is that right, sir, you had come by a clump of

1           weeds and a pile of debris near where that light

2           pole is?

3      A.   You mean my vehicle?

4      Q.   Your vehicle, yes, sir.

5      A.   Correct.

6      Q.   And also you had been talking about 2638 Glendale,

7           right?

8      A.   Correct.

9      Q.   And you can see a 2638 Buena Vista on that diagram,

10          sir?

11     A.   Right here is the area.

12     Q.   And Glendale would be the next block south?

13     A.   Correct.

14     Q.   And the number there is sequential in the same

15          pattern as what's depicted there?

16     A.   On Glendale?

17     Q.   Yes, sir.

18     A.   Well, it's not showing here but --

19     Q.   Okay, you're familiar with the area from patrol?

20     A.   Yeah.

21     Q.   That area west of Linwood is the 2600 block over on

22          Buena Vista and on Glendale?

23     A.   Correct.

24     Q.   Okay, thank you, if you would please, sir, you may

25          resume your seat if you would, officer.  Thank you.

1                And at the time that you arrived you were

2      talking about doing some canvasing then you stay in

3      the area for a while, sir, would that be fair?

4  A.   Yes, sir.

5  Q.   And set up some type of preliminary security?

6  A.   Yes, sir.

7  Q.   And do you remain until the Investigator Jackson or

8      the evidence tech arrive?

9  A.   Yes, sir.

10  Q.   Okay, so you were the one that found Mr. Thomas?

11  A.   Yes, I was.

12  Q.   And you were there when the evidence tech did

13      arrive, correct, sir?

14  A.   Yes, I was.

15  Q.   And you point out the area where you had seen the

16      things, correct?

17  A.   Yes, I did.

18  Q.   All right.

19               At any time while you were there did you

20      remove or recover any shell casings?

21  A.   No, I didn't.

22  Q.   At any time while you were there, did a person by

23      the name of Lavero Crooks approach you in any way?

24  A.   No.

25  Q.   One moment, please.

```
 1              So you did indicate though the time that
 2        you were coming down Buena Vista dawn was breaking?
 3        In other words, it was getting light as you made
 4        that?
 5   A.   Yes, sir.
 6   Q.   You get no weeds in the field impeded your vision
 7        of the body?
 8   A.   No, sir.
 9              MR. LANKFORD: Thank you, nothing else.
10              THE COURT: Any redirect?
11              MR. HASSINGER: Briefly, Judge.
12                    REDIRECT EXAMINATION
13   BY MR. HASSINGER:
14   Q.   Okay, Officer Williams, I wanted to clear up one
15        thing that was confusing myself, at least over the
16        weekend, why don't you come back down to the
17        diagram for me for one second, please.
18              Now, when you found Mr. Thomas there in
19        the field, did you yourself personally observe any
20        blood in the field?
21   A.   Yes, I did.
22   Q.   Okay.
23              And you see where on our diagram there is
24        some blood indicated with a round circle in front
25        of a tree, correct?
```

```
 1    A.    Right here?

 2    Q.    Yes.

 3    A.    Yes.

 4    Q.    Okay.

 5               Now in relation to that blood did you

 6          find Mr. Thomas?

 7    A.    Mr. Thomas sat maybe right here and then there was

 8          blood here.

 9    Q.    Can you give us any idea the distance between the

10          blood indicated on our chart and how far Mr. Thomas

11          was from it?

12    A.    Foot and a half, maybe two feet.

13    Q.    I know you didn't actually measure that, right?

14    A.    No, I didn't.

15    Q.    But that's your best estimate today a foot and a

16          half to two feet?

17    A.    Correct.

18               MR. HASSINGER: Thank you, Judge.  I have

19          nothing further.

20               MR. LANKFORD: No re-cross.  Thank you.

21               THE COURT: We thank and excuse the

22          witness.  You're free to go.

23               THE WITNESS: Thank you, ma'am.

24               THE COURT: Are you ready to call your

25          next witness?
```

1          MR. HASSINGER: Yes, we'd like to call

2     Officer Adams.

3          THE CLERK: Please raise your right hand.

4     Do you solemnly swear or affirm that the testimony

5     you're about to give before the court to be the

6     truth under the pains of penalty of perjury?

7          MR. ADAMS: I do.

8          MR. HASSINGER: Thank you, Judge.

9          THE COURT: Please be seated right there,

10    and we're going to ask you to speak right into the

11    microphone.  Counsel, whenever you're ready.

12          MR. HASSINGER: Thank you, Your Honor.

13                    CHARLES ADAMS

14    was thereupon called as a witness herein and having

15    been duly sworn, was examined and testified as

16    follows:

17                  DIRECT EXAMINATION

18    BY MR. HASSINGER:

19    Q.   Good morning, sir, would you please introduce yourself

20         to our jury?

21    A.   Hello, my name is Officer Charles Adams.

22    Q.   And how are you employed, sir?

23    A.   With the Detroit Police Department.

24    Q.   Sir, I'd like to take you back to November 9th of

25         last year, 2002 at Saturday 1:15 in the p.m.  Do

1      you recall if you were working back on that date

2      around that time?

3    A.   Yes, I was.

4    Q.   Can you tell us how long you've been a police

5      officer?

6    A.   Approximately eight years.

7    Q.   Back on that date around that time, what was your

8      assignment?

9    A.   I was working 36, I don't specifically know what

10     particular car I was working.

11   Q.   Okay.

12          Around that time did you come into

13     contact with somebody by the name of Lavero Crooks?

14   A.   Yes, I did.

15   Q.   How was it you came in contact with Mr. Crooks back

16     on that date?

17   A.   Prior to that particular time at our roll call at

18     the beginning of the shift what we were doing we

19     were looking at some of the prior PCR's, which are

20     preliminary complaint reports, different crimes

21     that had happened. And we put together a description

22     of a particular individual and a particular area

23     where things were happening and that's what we were

24     interviewing Mr. Crooks about.

25   Q.   Okay.

```
 1                   And where did you first meet up with
 2       Mr. Crooks?
 3   A.  We went to his home. I don't remember the address.
 4       I need my PCR to recollect.
 5                   MR. HASSINGER: May I approach the
 6       witness, Your Honor?
 7                   THE COURT: Yes, you may.
 8   BY MR. HASSINGER:
 9   Q.  Sir, I'm going to hand you a piece of paper and ask
10       you if you can identify this for me, please?
11   A.  This is the PCR that I made earlier in the day
12       during the arrest.
13   Q.  So you met up with Mr. Crooks at his home?
14   A.  Yes.
15   Q.  Okay, and how was it you knew where Mr. Crooks
16       lived?
17   A.  One of the reports that were made earlier from the
18       felonious assault that happened to Mr. Crooks.  He
19       was the complainant.
20   Q.  Was Mr. Crook at his home when you arrived there?
21   A.  Yes, he was.
22   Q.  Was anybody else with you?
23   A.  Yes, my partner was, my scout car partner.
24   Q.  What's that's person's name?
25   A.  That's going to be Olivia Moss, Police Officer
```

1        Olivia Moss.

2   Q.   And when you went to Mr. Crooks' house, did you

3        develop any type of plan to try and get a suspect

4        in custody?

5   A.   Yes, we did.

6   Q.   What was the plan you developed?

7   A.   After talking to Mr. Crooks, after interviewing him

8        he said that --

9             MR. LANKFORD: Objection, hearsay.

10             MR. HASSINGER: This is going to explain

11        what actually --

12             THE COURT: It goes to the reasons for the

13        actions, not for the truth of the matter stated.

14        I'll overrule the objection.

15             MR. HASSINGER: Thank you, Your Honor.

16   BY MR. HASSINGER:

17   Q.   Go ahead.

18   A.   After receiving the information, we're talking to

19        Mr. Crooks and he explained to me that Mr. Houston

20        would come out after when Mr. Crooks got in that

21        area.

22   Q.   What area are we talking about?

23   A.   We're talking about Buena Vista and Linwood.

24   Q.   Is that an area you're personally familiar with?

25   A.   Yes.

1    Q.    How is it you're familiar with that area?

2    A.    It's a high crime area.  Heavy drug infestation.

3          I've made several arrests in that location.

4    Q.    Okay.

5                Did Mr. Crooks have an address where he

6          believed you could find Michon Houston?

7    A.    Yes, he did.

8    Q.    And do you know what that address is?

9    A.    Going back to my PCR.

10   Q.    Would that help refresh your memory?

11   A.    Yes, it would.

12   Q.    Please do.

13   A.    2675 West Buena Vista.

14   Q.    What specifically is your plan about how you're

15         going to get Mr. Houston in custody?

16   A.    Me and my partner were working plain clothes or

17         semi-marked where we don't have police uniforms or

18         anything like that.  Basically we have our badge

19         around our neck.  You know, if you cover up your

20         badge you can look like anybody else.

21                We parked away from the location and we

22         walked -- we were like east of this particular

23         address, this 2675.  And we pretty much just sat up

24         on the porch.

25   Q.    How far away from the house where Mr. Houston was

1    supposed to be?

2    A.    Approximately about 100 feet, I'd say.

3    Q.    Now, after you and your partner setup, what's Mr.

4          Crooks supposed to do?

5    A.    Mr. Crooks is supposed to do his normal.  He's

6          supposed to come back over in that area, park his

7          car and hopefully Mr. Houston would show up.

8    Q.    Now, what did you know about Mr. Crooks prior to

9          setting up this arrangement with him?

10   A.    Well, I knew that he did frequent the area.  He was

11         suspected for selling drugs over in that area too.

12   Q.    So you knew -- go ahead.

13   A.    Suspected for selling drugs in that area. I'm going

14         to say based on my information and my knowledge as

15         a police officer that he was selling drugs in that

16         area.

17   Q.    Okay.

18                   And even though you knew that he was a

19         guy who sold narcotics over there, you were still

20         willing to setup this system with him to try to get

21         Mr. Houston into custody?

22   A.    Yes, because basically I was -- we were

23         investigating the crime that happened to him, even

24         though what he was doing over there was illegal, a

25         crime that happened and that's what we were

1    investigating.

2  Q.   Okay.

3          So after you and your partner get setup,

4       do you see Mr. Crooks driving on Buena Vista?

5  A.   Yes, he was coming westbound.   He crossed Linwood

6       and came up Buena Vista westbound. He pulled up

7       parked his car and see if he can get him out.

8  Q.   Where did Mr. Crooks park his car in relationship

9       to this house that Mr. Houston was supposed to be

10       in?

11  A.   I want to say approximately maybe not directly

12       across the street from it, but maybe about a house

13       before that on the opposite side of the street.   He

14       exited his vehicle.   You know, as he exited his

15       vehicle, you know, people in the neighborhood

16       because they knew that he was into it with Mr.

17       Houston, the neighborhood kind of --

18          MR. LANKFORD: I'm going to object, Your

19       Honor.

20          THE COURT: Sustained. You can't tell what

21       was in other people's mind.

22  BY MR. HASSINGER:

23  Q.   Right.   Just tell you what you observed?

24  A.   I observed the neighborhood got kind of quiet.

25       People got aroused at the fact that he showed up.

1        You can see people starting to notice.  They

2        stopped and looked at him because they knew

3        something was about to happen or that's what I

4        assumed that they felt that something was about to

5        happen.

6    Q.  Did you make any observations about that house

7        where Mr. Houston was supposed to be?

8    A.  Yes.  Mr. Houston came out of the front door onto

9        the porch.

10   Q.  For the record do you see Mr. Houston here in the

11       courtroom today?

12   A.  Yes, I do.

13   Q.  Could you point to him and tell us what he's

14       wearing today, please?

15   A.  He's wearing a black shirt with beige pants and

16       black shoes with his hair braided to the back with

17       the two tear drops.

18              MR. HASSINGER: Judge, I'd like the record

19       to reflect he's identified the defendant in this

20       case Mr. Michon Houston.

21              THE COURT: All right.

22   BY MR. HASSINGER:

23   Q.  Okay, you see Mr. Houston come out on the porch?

24   A.  Yes.

25   Q.  What happens next?

1   A.   He yelled something towards Mr. Crooks.  Mr. Crooks

2        started yelling back at him.  Well, actually Mr.

3        Houston stayed on the porch.  And as Mr. Crooks was

4        crossing the street, he wasn't going to him, he

5        was going to another house. I guess he didn't see

6        where me and my partner --

7             MR. LANKFORD: Judge, speculation, Your

8        Honor.

9             THE COURT: Sustained. Officer don't tell

10       us what you think was in their minds.  Just tell us

11       what you actually saw.  Go ahead.

12            MR. HASSINGER: Thank you, Judge.

13            THE WITNESS: As he walked across the

14       street they kept yelling back and forth.  They kept

15       yelling back and forth and then Mr. Crooks yelled

16       out there's that mother-fucker right there.

17  BY MR. HASSINGER:

18  Q.   Was he pointed at anybody when he said that?

19  A.   Yes, he pointed toward Mr. Houston.

20  Q.   Where are you at that time when Mr. Crooks says

21       those words?

22  A.   Me and my partner are located northeast.  We were

23       on opposite side of the street.  But east of there

24       at that particular time because we were trying to

25       move up, we didn't want to make ourself

1      conspicuous, but after he yelled out and he looked

2      in our direction we just went on and started

3      closing.  We ran towards the house closing the gap.

4   Q.   You said he looked in your direction, who are you

5      referring to?

6   A.   Mr. Houston.

7   Q.   You have badges around your neck; is that what you

8      testified to?

9   A.   At that particular time after we were starting we'd

10     be running up identifying ourselves as the police

11     and we pulled out our badges.

12  Q.   Okay.

13           So you're actually running towards Mr.

14     Houston at this time?

15  A.   Yes.

16  Q.   And what words were you saying?

17  A.   Detroit Police.

18  Q.   What does Mr. Houston do when you're running up

19     towards him saying Detroit Police with your badge

20     out?

21  A.   He runs back into the location.

22  Q.   Now, tell the jury what's at that location?

23  A.   That's a location that is a fenced in four-family

24     flat. It's two up.  I guess you would say two up

25     north and south.

1   Q.   So there's two flats on the upper level and two

2        flats on the lower level?

3   A.   Yes.

4   Q.   Once Mr. Houston runs into the front door of that

5        four-family flat, what do you do?

6   A.   We didn't get a chance to actually see his hands

7        and because the previous count was FA, we didn't

8        know whether he had a pistol or anything like

9        that.  I ran to the rear to secure the location.

10       My partner stayed in front to secure the location.

11       And at that particular time we called for a

12       supervisor.

13  Q.   Does a supervisor come to the scene?

14  A.   Yes.

15  Q.   Did any other police officers come to the scene?

16  A.   Yes, several other cars came.

17  Q.   Okay.

18            And once you had a supervisor there and

19       other officers there, did you take any further

20       action?

21  A.   Yes, we did.  First we secured -- we talked to the

22       supervisor and we let her know exactly what we

23       had.  The supervisor saw the people that lived in

24       the building, came out of the building, and the

25       landlord of the building, I guess one of the

1    tenants showed up -- I mean had to call him, but he

2    showed up and as we talked to them, they gave us

3    permission to check their particular flat.

4  Q. So did you check the two upper flats at that

5    location?

6  A. Yes, we did.

7  Q. And you did that with the permission of owners of

8    those flats?

9  A. Yes, we did.

10  Q. Okay.

11      Did you find anything in those two upper

12    flats?

13  A. No, we did not.

14  Q. Then there are two lower flats; is that correct?

15  A. Yes, the lower right was unoccupied.  The landlord

16    had the keys.  He gave us permission to go into

17    there.  We checked that too.

18  Q. One of the lower flats, the one to the right was

19    unoccupied?  No one was renting that flat?

20  A. Yes.

21  Q. Okay, did you go in that flat?

22  A. Yes, we did.

23  Q. Did you find anything in that flat?

24  A. No, we did not.

25  Q. Okay, so that leaves one lower flat on the left?

1    A.    Yes.

2    Q.    Okay.

3                Was the person who resided in that flat

4          at the location?

5    A.    Yes, he was.

6    Q.    Did you talk to that person?

7    A.    Yes, after we talked to him he stated that he did

8          not have a key to his door and usually he leaves it

9          unlocked.  At that particular time when we checked

10         the door, the door was locked.

11   Q.    Okay.

12               So the owner of that location told you he

13         had left the door unlocked?

14   A.    Yes.

15   Q.    But at this time when you're checking that lower

16         flat, the door is locked?

17   A.    Yes, it is.

18   Q.    Now, during the course of this are you saying

19         anything to try and find Mr. Houston?

20   A.    Yes.  We are all the way through.  We stating our

21         name and our purpose that we're the Detroit Police

22         and that we were looking for Mr. Houston.  You

23         know, asking him to come out and show his hands.

24   Q.    Okay.

25               So I just want to be clear to the jury.

```
 1        The whole time you're doing this search of the

 2        building in these flats, you are making it loud

 3        enough if Mr. Houston wants to he's going to come

 4        out?

 5   A.   Yes.

 6   Q.   Okay.

 7             Did Mr. Houston ever voluntarily come out

 8        of any of these flats?

 9   A.   No, he did not.

10   Q.   Okay.

11             So this last flat were the doors locked?

12        Are you able to get in that flat?

13   A.   Yes, the doors were locked, but the landlord, he's

14        got the key to the door.

15   Q.   Did he have like a master key or something like

16        that?

17   A.   Yes.

18   Q.   Okay.

19             And does he give you the key or does he

20        personally unlock that flat?

21   A.   No, he gives us the key. After we talk to the

22        tenant he gave him permission to give us the key to

23        go into it.

24   Q.   Okay, and do you personally unlocked the door?

25   A.   Yes, I do.
```

1    Q.   Once you unlock the door, are you able to open the

2          door?

3    A.   No, not directly because it had resistance.  There

4          was resistance behind the door like somebody was

5          trying to keep the door closed.

6    Q.   And again, are you saying stuff at this time?

7    A.   Detroit Police.

8    Q.   Is there any response?

9    A.   No, there is not.

10    Q.   What do you do?

11    A.   I still yell Detroit Police, turn the key, and then

12          I'm pushing the door feeling the resistance.  Then

13          I pushed the door a little bit harder and I stated

14          again, Detroit Police, get back away from the door.

15    Q.   What happens then?

16    A.   Maybe for a half a second or so, he stayed on the

17          door and then he let the door go and then at that

18          time we went in, put him to the ground and frisked

19          him and handcuffed him.

20    Q.   Now, who are you referring to?

21    A.   Mr. Houston.

22    Q.   The person you identified here in court today?

23    A.   Yes.

24    Q.   He was placed under arrest at that time?

25    A.   Yes, he was.

1    Q.    Was anybody else in that particular flat besides

2          Mr. Houston?

3    A.    No, there was not.

4    Q.    Did Mr. Houston claim he lived in that flat?

5    A.    No, he did not.

6    Q.    In fact, at some point he gives you an address

7          where he lives; is that correct?

8    A.    Yeah.

9    Q.    Can you tell us what address Mr. Houston gave you?

10   A.    Referring back to my PCR.

11   Q.    If that would help refresh your memory.

12   A.    12142 Plainview.

13   Q.    So that's obviously not an address on Buena Vista

14         there, correct?

15   A.    No, it is not.

16   Q.    Mr. Houston is then placed in custody?

17   A.    Yes, he is.

18   Q.    Do you do any other searching in or around the

19         front of that four-family flat?

20   A.    Yes, we do because it was reported that he possibly

21         had had a -- the particular complaint that we were

22         following up on stated that or the information we

23         received that he had a shot gun, a sawed off shot

24         gun and we searched for that particular weapon.

25   Q.    Did you recover any weapons?

1    A.    No, we did not.

2    Q.    Did you recover anything else?

3    A.    No, I did not.

4    Q.    Did you see anything, other evidence that was

5          recovered from that location?

6    A.    I need to refer back to my PCR to make sure I

7          didn't.

8    Q.    Would that help refresh your memory?

9    A.    Yes, it would.

10                I did not recover anything else.  One of

11         the other scout cars recovered some narcotics.

12   Q.    Did you see that being recovered?

13                MR. LANKFORD: Objection, relevance, Your

14         Honor.

15                THE COURT: Did he see it being recovered

16         is relevant, so I'll have to overrule the

17         objection.

18                THE WITNESS: No, I did not.

19                THE COURT: If any information is

20         stricken, the jury's totally to disregard it. It's

21         hearsay.

22                MR. HASSINGER: Thank you, Your Honor.

23   BY MR. HASSINGER:

24   Q.    Sir, I'd like to then take you to November 13th,

25         2002.  I believe that would be a Wednesday around

```
1        9:15 in the a.m.  Sir, do you recall if you had

2        contact again that day with Lavero Crooks?

3   A.   Yes.

4   Q.   And why did you have contact with Mr. Crooks on

5        that day?

6   A.   After this particular arrest, we had received some

7        information that there had been a shooting done at

8        that particular area.  A homicide had taken place

9        and that possibly --

10              MR. LANKFORD: Objection, speculation,

11       plus, I don't see any relevance after Mr. Houston's

12       arrest, Your Honor.

13              THE COURT: I'm going to have to sustain

14       the objection unless the Prosecutor can come over

15       and give me an offer of proof.

16              MR. HASSINGER: Judge, I just wanted to

17       establish basically that he had contact with Mr.

18       Crooks.

19              THE COURT: Well, you got that.

20              MR. HASSINGER: Thank you, Judge.

21              THE COURT: All right. Anything else?

22              MR. HASSINGER: Not on behalf of the

23       People, Judge.

24              THE COURT: Cross-examination.

25                  CROSS-EXAMINATION
```

BY MR. LANKFORD:

Q.   Sir, you go out there -- officer Adams, good
     morning?

A.   Good morning.

Q.   You go out there following up on the allegation
     made by Mr. Crooks, correct?

A.   No, actually what we went, the original was that it
     was -- are you talking about the original arrest?

Q.   Well, when you go out -- I'm sorry, let me back
     up.  On the date that you go out and meet with Mr.
     Crooks?

A.   Yes.

Q.   That's in response to a complaint that has been
     filed by Mr. Crooks?

A.   Yes.

Q.   Okay.

          And as part of that you were leery or at
     least observant regarding the presence of any
     firearm, correct, sir?

A.   Yes.

Q.   Okay.

          Now what happened then you found no
     firearm, did you, sir?

A.   No, we did not.

Q.   Okay.

```
 1              No shot gun, no 40 caliber semi anything
 2       like that, right, sir?
 3   A.  No.
 4   Q.  Okay.
 5              When you go out there, I mean this a high
 6       crime area, correct, sir?
 7   A.  Very much so.
 8   Q.  Mr. Crooks appears to live in that neighborhood,
 9       right?
10   A.  Well, yeah, he frequents that area.  I've seen him
11       there before.
12   Q.  Okay, sure you said, yeah, right as part of an
13       officer you've seen him there before.  Okay.
14              Were you aware that Mr. Crooks had been
15       questioned three times by detectives with regard to
16       the homicide in September, were you aware of that
17       at the time you went out?
18   A.  No, I was not.
19   Q.  Okay.
20              And it would be obvious here that -- I
21       mean, you're in plain clothes, right, sir?
22   A.  Yes.
23   Q.  You and your partner. And I assume that means not
24       only would you have a blue uniform with a badge on,
25       but you wouldn't be dressed the way you and I are
```

1      today either, correct?

2   A.   No.

3   Q.   You're wearing more blue jeans, a sweat shirt a

4        jacket, that type of thing?

5   A.   Yes.

6   Q.   You want to mix in, right?

7   A.   Yes.

8   Q.   You want to be inconspicuous, correct?

9   A.   Yes.

10  Q.   Okay.

11            And Mr. Houston you indicated fled into

12       that location, okay, once you and your partner

13       Officer Oliva Moss attempt to approach him, right?

14  A.   Yes.

15  Q.   And what happens when this all occurs, your attempt

16       to approach Mr. Houston occurs after Mr. Crooks and

17       Mr. Houston have exchanged words, right?

18  A.   Yes.

19  Q.   Okay, fairly loud aggressive words, right?

20  A.   Yes.

21  Q.   Including Mr. Crooks saying basically there's that

22       MF right there, right?

23  A.   Yes.

24  Q.   And at that point would it be fair to say that you

25       and your partner start moving over rapidly,

1          correct?

2     A.    Correct.

3                    MR. LANKFORD: Okay, nothing else.

4                    THE COURT: Redirect?

5                        REDIRECT EXAMINATION

6     BY MR. HASSINGER:

7     Q.    And when you're approaching Mr. Houston rapidly

8           because you're in plain clothes, what are you

9           doing?

10    A.    Pull my badge so that he could see it, and also I

11          stated that I was the Detroit Police.

12    Q.    And did you say it just like you said it here in

13          court today I'm Detroit Police?

14    A.    No, I did not.  I said it very loud so that he

15          would hear me very clearly.

16    Q.    And that was being said during the course of this

17          entire search?

18    A.    Very much so.

19                    MR. HASSINGER: Thank you.  Thank you,

20          Judge.

21                    THE COURT: Re-cross, limit to what was

22          brought out on redirect only.

23                    MR. LANKFORD: Sure.

24                        RECROSS-EXAMINATION

25    BY MR. LANKFORD:

1    Q.    But the badge is just, I mean, it's just hanging

2           down from your neck on a cord, right?

3    A.    Yes.

4    Q.    And you have -- I mean, you are aware of a some

5           things such as false identifications, I'm a police

6           officer when I'm not, right, sir?

7    A.    Correct.

8                 MR. LANKFORD: Okay, thank you, nothing

9           else.

10            THE COURT: One last question, Your Honor.

11            THE COURT: Well, all right, then I have

12    to give him another opportunity.

13            MR. HASSINGER: I understand, Judge, I'm

14    sorry.

15                REDIRECT EXAMINATION

16  BY MR. HASSINGER:

17    Q.    Other officers come to this scene?

18    A.    Yes.

19    Q.    Are they in full uniform?

20    A.    Yes, they are.

21    Q.    Are there marked scout cars out there on the

22           street?

23    A.    Yes, there is.

24            MR. HASSINGER: Thank you, Judge.

25            THE COURT: Okay, go ahead, counsel

RECROSS-EXAMINATION

BY MR. LANKFORD:

Q.   All of that happens after Mr. Houston has gone
     inside of that location, right, sir?

A.   Yes.

          MR. LANKFORD: Okay, nothing else.  Thank
     you.

          THE COURT: We thank and excuse the
     witness.  You're free to go.  Are you ready to call
     your next witness?

          MR. HASSINGER: Yes, Judge. Actually,
     Judge, defense counsel and I would like to do with
     the court's permission is to enter into a stipulation
     at this time.

          THE COURT: All right.

          MR. HASSINGER: Judge, that stipulation
     would be that on September 6th of last year, 2002
     the Defendant, Michon Houston was ineligible to
     possess or use or carry a firearm because he had
     been convicted of a specified felony punishable by
     imprisonment for four more years and the requirements
     for gaining eligibility had not been met.

          MR. LANKFORD: Agreed, Your Honor.

          THE COURT: All right.

          MR. HASSINGER: Judge, and at this time

1    the People would move to waive several endorsed

2    witnesses from the People's witness list.

3              THE COURT: Go ahead.

4              MR. HASSINGER: Thank you, Judge.  We'd

5    like to waive and thank and excuse police officer

6    Fred Mcintyre.

7              THE COURT: Do you agree to that waiver?

8              MR. LANKFORD: I do, Your Honor.

9              THE COURT: Okay.  Accumulative testimony,

10   is that it?

11             MR. LANKFORD: Absolutely.

12             MR. HASSINGER: Exactly, Judge.  He was

13   the partner of Officer Williams who testified this

14   morning.

15             We'd like to thank, waive and excuse

16   police Officer Daniel Sitarski.  He was the partner

17   of the officer who conveyed the clothing.

18             MR. LANKFORD: Bastianelli.

19             MR. HASSINGER: Bastianelli, correct, so

20   he would accumulative.

21             THE COURT: All right.

22             MR. LANKFORD: Agreed.

23             MR. HASSINGER: We'd like to waive

24   Investigator Olson from Detroit Homicide.  He

25   simply would say he took statements from certain

1    witnesses.

2              MR. LANKFORD: Agreed.

3              THE COURT: All right.

4              MR. HASSINGER: We'd like to waive

5    Christina Eshelman who's endorsed on the witness

6    list, Judge.

7              MR. LANKFORD: Agreed, Your Honor.

8              THE COURT: She was the partner of someone

9    or you're just waiving?

10             MR. HASSINGER: No, she's a civilian,

11   Judge.

12             THE COURT: Oh, that's a civilian and

13   you've agreed to that?

14             MR. LANKFORD: Yes, Your Honor.

15             THE COURT: Accumulative testimony, all

16   right.

17             MR. HASSINGER: And finally, Judge, we've

18   endorsed a representative of Third Circuit Court

19   and also Lisa Westwood, but the stipulation that we

20   just entered into negates the need to call those

21   witnesses, Judge.

22             THE COURT: Okay.

23             MR. LANKFORD: I'd agree, Your Honor.

24             MR. HASSINGER: And then finally, Your

25   Honor, we just heard from Officer Charles Adams.

```
1    His partner is Oliva Moss.  She's present, but
2    again I believe the testimony you would hear from
3    her would be identical to what Officer Adams just
4    testified to.  The People would move to waive
5    Officer Moss.
6              MR. LANKFORD: No objection.  I agree with
7    that statement.
8              THE COURT: All right.
9              MR. HASSINGER: Finally, Judge, the
10   officer in charge is endorsed.  He's present.  The
11   People would move to waive him from the People's
12   case.
13             THE COURT: Because he'd have nothing to
14   add?
15             MR. HASSINGER: Basically, Judge, that's
16   correct.
17             THE COURT: Okay, all right, and there's
18   no objection.
19             MR. LANKFORD: Correct.
20             MR. HASSINGER: Judge, unless I missed
21   anybody on the witness list, I do not believe I
22   have -- the People have exhausted their witnesses
23   that are endorsed and the People would rest.
24             THE COURT: Okay, and because I also have
25   Exhibits Number One through have been admitted into
```

1    evidence, right?

2         MR. HASSINGER: That was my understanding,

3    Judge.  I did want to make sure that the Court was

4    agreeing with me on that.

5         THE COURT: Right. Okay.  At this time we

6    will let our jurors because there some people who

7    were able to get here at 9:00.  Why don't we let

8    them take a coffee break because there's some

9    matters we can take care of and then I think we'll

10   be hearing the conclusion of this case.

11        We'll rise for you to take a 20 minute

12   coffee break.  Please, be outside to the courtroom

13   door at ten minutes to the hour by that clock.

14        THE CLERK: All rise.

15        (Jury exits courtroom)

16        THE COURT: I can't see any motion to make

17   at this point either.

18        MR. LANKFORD: Right, you know, I would

19   however like to make a record.  Two quick things.

20        THE COURT: Go ahead.

21        MR. LANKFORD: The first one is --

22        THE COURT: And that's right, you better

23   get your officer in charge back here. Go ahead,

24   counsel.  You're not going to need him for this?  I

25   thought it was about the witness that you asked

1    them to get.

2              MR. LANKFORD: I'll make a record with

3    regards to that.  And I'd like to voir dire

4    Mr. Houston, if I may.

5              THE COURT: Okay, we'll wait until he gets

6    the officer because you're going to need him.

7              MR. LANKFORD: Okay.

8              THE COURT: All right, counsel, go ahead

9    first of all and voir dire your client if that's

10   what you wanted to do.

11             MR. LANKFORD: Thank you.

12             Mr. Houston, if you stand please, sir.

13   Sir, do you understand that the People now have

14   rested; in other words their case is done in its

15   entirety as far as any production of witnesses or

16   evidence?

17             DEFENDANT HOUSTON: Yes.

18             MR. LANKFORD: And I explained to you that

19   at this point we would have the opportunity to call

20   any witnesses on our behalf if we wanted too,

21   right?

22             DEFENDANT HOUSTON: Yes.

23             MR. LANKFORD: And I explained to you

24   specifically that you have the right to take the

25   stand and testify on your own behalf, correct?

1          DEFENDANT HOUSTON: Right.

2          MR. LANKFORD: The absolute right to do

3    that?

4          DEFENDANT HOUSTON: Right.

5          MR. LANKFORD: And in addition, you have

6    the absolute right not to take the stand if you so

7    desire, right?

8          DEFENDANT HOUSTON: Right.

9          MR. LANKFORD: If you take the stand, sir,

10   you'd be subject to cross-examination on the same

11   standards regarding credibility as any other

12   witness?

13         DEFENDANT HOUSTON: Right.

14         MR. LANKFORD: If, however, you elected

15   not to take the stand, this Judge would specifically

16   inform the jury that they may not hold that against

17   you in any way; do you understand all of that?

18         DEFENDANT HOUSTON: Yes.

19         MR. LANKFORD: In addition, we have

20   discussed some of the proofs that have come out

21   during the course of this testimony?

22         DEFENDANT HOUSTON: Yes.

23         MR. LANKFORD: And you've been satisfied

24   with the discussion that we've had?

25         DEFENDANT HOUSTON: Right.

1    MR. LANKFORD: And you have indicated to

2    me earlier today that your choice was not to take

3    the stand; is that correct?

4    DEFENDANT HOUSTON: Right.

5    MR. LANKFORD: Okay.

6    THE COURT: And that is still your choice

7    not to testify?

8    DEFENDANT HOUSTON: Yes, yes.

9    THE COURT: Okay, very good. He may be

10   seated.

11   MR. LANKFORD: Thank you.

12   THE COURT: All right, now, you did have a

13   witness you tried to get -- go ahead.

14   MR. LANKFORD: Yes, just briefly as the

15   court's well aware of, there had been an order for

16   assistance beyond a subpoena subsequent to actually

17   they were going to get a bench warrant.  That was

18   issued on Thursday.  I know we were here Friday.  I

19   did talk with Sergeant Marshall, they've been

20   unable to procure that witness.  They have as I

21   understand that they continued to look over the

22   weekend.

23   Still have not procured her.  I do think

24   she is valuable to the defense.  I guess I'm not

25   sure -- I guess, I don't know whether additional

1    time would assist in procuring that person or not,

2    and I have no reason to believe that there hasn't

3    been a diligent effort, but I would ask that those

4    efforts continue.

5            THE COURT: Well, counsel, I will say that

6    the one thing that I thought about on Friday as I

7    stood in the hospital calling back here to find out

8    was whether they got the witness and I was informed

9    they didn't.  I said, well, great tell them they

10   got the whole weekend.

11           So it was really like you had the

12   adjournment to get the witness.  I don't think any

13   additional time is going to be -- because

14   as I understand it as an officer of the court, I

15   heard from the prosecutor that she gave a false

16   name.

17           MR. HASSINGER: Judge, that's absolutely

18   correct.  Sergeant Marshall, in fact, called me at

19   my home last night.  They've been making efforts

20   all weekend, but what they did find out from going

21   back to that location is that from talking to other

22   witnesses there that, in fact, the witness gave a

23   false name when she gave a statement to the police.

24   And we have no way to even determining what her

25   true identity is.

1        Sergeant Marshall is here if we need take

2    testimony to that fact, but that is what he has

3    conveyed to me. And I know they were out there all

4    weekend trying to find that witness.

5        THE COURT: I will also say this because

6    I had to issue a detainer, witness detainer for two

7    of the main witnesses in this case.  And I think I

8    did that one day and the very next day you had all

9    of those persons here, so I know that they have

10   been trying very hard to get all of the witnesses

11   here.

12       Unless counsel is going to demand, I'm

13   going to take your word as an officer of the court

14   that they have determined this woman gave a false

15   name and we have no place to go with it.

16       MR. LANKFORD: And I will, I mean I feel

17   I had to make the request on behalf of Mr. Houston

18   as his attorney. But I also am aware of the fact

19   that I have no reason to disbelieve that they tried

20   their best.  I also do note that they weren't able

21   to find Ms. Watson who may have been helpful.

22       Apparently, they were making the same

23   type of efforts with regards to Ms. Eshelman who

24   could have been helpful to the prosecution.

25       THE COURT: And they didn't find her

1   either.

2              MR. LANKFORD: And they didn't find her.

3              MR. HASSINGER: That's correct, Judge.

4              THE COURT: All right, okay.   Then are you

5   going to put in any evidence?

6              MR. LANKFORD: No.   Defense will rest

7   formally.

8              THE COURT: I pulled the following

9   instructions. Have seats.   I intend to give these

10  and, of course, if you make proper objections I'll

11  omit any.   If you make a proper request, I'll

12  include any others.

13             We're going to give Judge and Jury,

14  Presumption of Innocence, Burden of Proof,

15  Reasonable Doubt, Defendant Not Testifying,

16  Evidence, Weighing Conflicting Evidence, Number of

17  Witnesses, Circumstantial Evidence, Motive,

18  Stipulation, Flight, Witness Credibility, Witness

19  Who Has Been Interviewed By a Lawyer, Expert

20  Witness, Police Witness, Impeachment Brought By

21  Prior Inconsistent Statements.   And that was both

22  Mr. -- well, wait a minute, I got to go back.

23             I remember you're asking him about things

24  that they did not say which you can argue in their

25  statements, they didn't put in their statement.

1    But I'm going back, I don't see any actual

2    impeachment of either Jovan Johnson and Lavero

3    Crooks.   Let me get to their testimony.

4              Lavero Crooks, I don't have anything.

5              MR. LANKFORD: I'd agree with Mr. Crooks.

6              THE COURT: I don't have anything on Jovan

7    Johnson.

8              MR. LANKFORD: Your Honor, Mr. Johnson

9    did -- there was one off a preliminary exam

10   transcript with regards to what he felt he may have

11   been charged with.

12             THE COURT: Oh, okay, Jovan Johnson.

13             MR. LANKFORD: So I agree with regards to

14   Crooks that there some things that weren't included,

15   but Johnson was different at least as to that.

16             THE COURT: Okay, let me put that down.

17   And that was from the preliminary examination, so,

18   I will however if the witness testified that the

19   earlier statement was true or if the earlier

20   inconsistent was given under oath subject to the

21   penalty of perjury at a trial or hearing it may be

22   considered as proof of the facts in this case.

23             MR. LANKFORD: Thank you.

24             THE COURT: First Degree Premeditated

25   Murder, Specific Intent, Felon Possessing a

1    Firearm, Possession of a Firearm at the Commission

2    or Attempt to Commit a Felony, Deliberations and

3    Verdict, Communications with the Court, Penalty,

4    Exhibits.

5              Now, I assume that you're also going to

6    want something more on Inferring and Intent.

7              MR. HASSINGER: Yes, Judge.

8              THE COURT: Other than Inferring, State of

9    Mind, is there anything else?

10             MR. HASSINGER: No, that's the one that

11   the People request, Your Honor.

12             MR. LANKFORD: Your Honor, with regards

13   to --

14             THE COURT: Hold on one moment.

15             MR. LANKFORD: Okay.

16             THE COURT: I keep telling you I can only

17   do one thing at a time.  All right.

18             MR. LANKFORD: Judge, one last thing not

19   that I would be arguing second degree murder.  I

20   know that for years that had to be given even if I

21   objected.  Last year they came up with a case, it's

22   just muddied the water to say the least.  I read

23   and reread it and quite frankly still can't make

24   heads or tails.

25             THE COURT: I can't figure it out either.

1    But I want to hear what the People have to say.

2    Are you going to object to my giving Second Degree

3    Murder?

4            MR. HASSINGER: No.

5            THE COURT: Then I'm going to give it

6    because I still don't understand about that opinion

7    and it seems to me that I'm seeing weirder and

8    weirder opinions coming out of the Court of Appeals

9    because I've gotten a slue of unpublished opinions

10   that say that probation violations are not subject

11   to the guidelines.

12           And I have a lawyer who did an appeal and

13   he has an opinion from the Court of Appeals that

14   says that they are subject to the guidelines.

15           Now, apparently nobody up there at the

16   Court of Appeals has recognized that there is at

17   least a conflict among the panel because nobody

18   certified it, so I don't know what's going on with

19   them anymore.  So I'm going to give second degree

20   murder.

21           MR. LANKFORD: If I can I guess it's just

22   a little editorializing.  They took what appeared

23   to have been a perfectly workable rule for years on

24   lessors, I got no idea what they're doing.

25           THE COURT: I agree.  Okay, anything

1    else?

2              MR. LANKFORD: No, I think the court has

3    covered it from defense prospective.  Thank you.

4              MR. HASSINGER: And also from the

5    People's, Judge.

6              THE COURT: Okay.  We'll start again in

7    ten minutes -- well, we're going to give court

8    reporter and I a couple minutes more than that, so

9    let's make it and you be ready at 11:00 to do your

10   openings.  Okay, 11:00 o'clock.

11              (Court is in recess.)

12              (Court reconvenes.)

13              (Jury enters courtroom.)

14              THE COURT: You may be seated.  May I have

15   a stipulation that all of our jurors are here

16   and in their proper places?

17              MR. HASSINGER: So stipulate, Your Honor.

18              MR. LANKFORD: Yes, we do.

19              THE COURT: Ladies and gentlemen, I'm

20   going to remind you may not discuss this case among

21   yourselves nor with anyone until I send you to the

22   jury room after you've had your final instructions

23   and tell you to begin discussing this case.  Don't

24   discuss this case at all until that time.

25              Does the defense wish to put in any

1    evidence?

2              MR. LANKFORD: No, Your Honor, defense

3    rests.

4              THE COURT: Are the People ready to

5    proceed with closing?

6              MR. HASSINGER: Ready, Judge.

7              THE COURT: You may.

8              MR. HASSINGER: Good morning, ladies and

9    gentlemen of the jury.  As the Judge just indicated

10   to you, this is my opportunity to give my closing

11   statement to you.  Before I do that I'd like to

12   thank each and every one of you for being down

13   here, being prompt in this horrible weather to try

14   and get down here today.  You're all here.  You're

15   ready to go.  You've been paying attention to this

16   case.  I've been watching you.  I know you have

17   been trying your best to listen to the evidence and

18   understand what's going on here and I appreciate

19   that.  I appreciate that on behalf of the People of

20   the State of Michigan, who I represent. I appreciate

21   that on behalf of the family of Carlton Thomas.

22   They appreciate the fact that you're all here.  And

23   even Mr. Houston appreciates it, so we all thank

24   you for being here.  For taking the time out your

25   lives to be jurors in this case.

1   Like I told you in my opening statement,

2   we all have things we'd rather be doing these last

3   three days we've been together so, and on behalf of

4   the officer in charge Sergeant Marshall, he thanks

5   you also.  A lot of work and effort had gone into

6   this case. So thank you very much for being here.

7   Again, I want to talk to you a little bit

8   about evidence and charges, and then get into the

9   actual facts of the case. The evidence in this case

10  is the testimony you heard from witnesses. The

11  Judge is going to tell you that attorney's

12  questions are not evidence.  Our statements to you

13  are not evidence.  The evidence is the testimony

14  you heard from the witness.

15  The other evidence you have that's been

16  introduced is our diagram that the medical examiner

17  testified to.  Our sketch of scene.  And then we

18  have seven pictures that were admitted into

19  evidence. So you got nine pieces of evidence along

20  with the testimony you heard from witness stand.

21  And your job is to put all of that

22  together and then to tell us with your verdict what

23  happened back on September 6th of last year.

24  Carlton Thomas was shot four times and

25  died as a result of those gun shots wounds.

1   Somebody committed a cold blooded first degree

2   murder. There's no doubt about it. No doubt about

3   the fact that Mr. Thomas is now dead. Somebody shot

4   him four times for no reason.   There was no reason

5   to kill Mr. Thomas. What was his big crime.

6          Well, okay, he was going over there

7   to buy some cocaine. But that doesn't give anyone

8   the right to be his judge, jury, and executioner

9   like Mr. Houston that day.

10          This man was his judge, jury, and

11   executioner. Why. Because Mr. Thomas didn't want to

12   buy his cocaine from Mr. Houston.   That's why he

13   lost his life back on that day.   Laying in that

14   field.

15          Ladies and gentlemen of the jury, I told

16   you right from the beginning I said this case is

17   about drugs, it's about drug dealers, its about

18   guns, it's about violence, and it's about that

19   whole underworld that unfortunately is going on, on

20   a daily basis over there on west Buena Vista and

21   Linwood. Okay.

22          You heard from the officers who patrol

23   that scene regularly. This is life in that

24   neighborhood.   This is what the people who live in

25   that neighborhood have to put up with on a daily

1   basis. And I told you right from the get go when a

2   crime like this occurs, the witnesses to this crime

3   are going to be the same type of people who are

4   caught up in that environment.

5          Who did we have in this particular case.

6   JW, Jovan Johnson, County, Lavero Crooks.  And they

7   both got up on the stand and they admitted to you,

8   they didn't lie about it.  They admitted to you,

9   yeah, they're over there grinding on a daily

10  basis.  What does grinding mean, they're out there

11  dealing drugs.

12         They get up there and they admit that

13  they're doing that on a daily basis.  And all the

14  grinders out there know each other.  They've got a

15  code of honor basically.  You heard it from these

16  witnesses.  You know, they got a code.  They don't

17  tell on each other.  They look out for each other.

18         In fact, Jovan Johnson told you, hey,

19  there's enough business for all of us.  We can all

20  make a living out here grinding.  There's no reason

21  to be going after one another.  There's plenty of

22  business for all of us out here.

23         They don't fight over customers. They

24  tell you there were customers coming up and down

25  that street all the morning of September 6th,

1    2002.  They're all businessmen basically.  They're

2    businessmen conducting their business over there on

3    west Buena Vista.  They all know each other.  And

4    they all know if you start talking to other people

5    and telling on people that you're not going to be

6    able to conduct your business over there on west

7    Buena Vista.

8             So you got to sort of get in that type of

9    mind set.  You have to sort of put yourself in the

10   shoes of these people who are out there conducting

11   their business and how they go about it.  And why

12   they do what they do.

13            You have to use your common sense and

14   your reasoning.  Okay.  And I know none of you are

15   caught up in this life-style or this type of circle

16   of violence, but you have to think a moment like

17   people do when they are out there.

18            So let's go back to September 6th.  Let's

19   talk a little bit about what happened.  Carlton

20   Thomas comes walking through the field. And again,

21   everybody knows anyone who comes to that

22   neighborhood is there to buy drugs.  Both Jovan

23   Johnson and Mr. Houston yelled to him from the

24   porch they're up on.  Say, what's up.  What do you

25   need.  What do you want.  Mr. Houston runs over to

1    him and he has a conversation with Mr. Thomas.

2         And Mr. Thomas tells him, I don't want to

3    deal with you.  I'll spend my money the way I want

4    to spend my money. And that enrages Mr. Houston.

5    This is his neighborhood.  He doesn't want to be

6    turned down.  And what does he do, he goes and gets

7    his gun.  And he fires one shot from a distance at

8    Mr. Thomas.

9         And I put forward all the evidence in

10   this case especially what you heard from the

11   medical examiner that first shot from a distance is

12   the shot that hit Mr. Thomas in the head. Mr.

13   Thomas was perhaps running towards these trees from

14   this trail.

15        Okay.  He's running perhaps in this

16   direction. A shot is fired from this direction.  It

17   hits him here. Exits.  Then has another entrance

18   right here.  The medical examiner told you that was

19   consistent with what he saw on Mr. Thomas when he

20   examined him.

21        Mr. Thomas falls.  And, in fact, he falls

22   where that blood is on the map, on our diagram. You

23   know that because Mr. Crooks tells you he falls

24   face first.  And that's going to be important.

25   Okay.  All these little things are going to be

1    important.  They're all going to add up.

2         He falls face forward, and that's how we

3    get this blood out there that the evidence tech

4    takes a picture of, and it's admitted into

5    evidence.

6         Mr. Crooks then tells you that Mr.

7    Houston goes up to him, flips the body over, okay,

8    so the body's going to be a foot, foot and a half

9    away from the blood now.  Stands over him and

10   shoots him at least three more times.

11        And the medical examiner told you that

12   those other three shots, the shot to the leg below

13   the knee, and gun shot wounds two and three were

14   consistent with somebody standing above you and

15   shooting.  It all fits together.  It all makes

16   sense.

17        Mr. Houston comes up after he shot him

18   the first time, turns him over, and shoots him

19   three more times. Standing above.

20        (Disruption in courtroom)

21        THE COURT: You'll have to leave the

22   courtroom.

23        MR. HASSINGER: Mr. Houston goes back

24   across the street to JW, Jovan Johnson.  Tells him

25   go back over and see if he's dead.  Jovan Johnson

1    doesn't want to do it.   Some words are exchanged.

2    Jovan Johnson does it.   He goes back over there Mr.

3    Thomas is still alive at that point but Mr. Johnson

4    goes back and says he's dead, he's dead, and that's

5    when they leave the scene.

6         Mr. Crooks who's seated in a car about

7    this location.   He's on the other side of the

8    debris pile.   He's sitting out rolling too.   He

9    observes all this from right here in this

10   location.   You can see the porch over here.

11   There's a street light here.   He can see what's

12   going on right here.   And, in fact, there's a very

13   good picture of exactly what his line-of-sight

14   would be.

15        Just for the record and for you people,

16   that picture is Exhibit Number 4, because Exhibit

17   Number four shows the debris pile.   You can see a

18   police car that's parked a little bit west of

19   debris pile.   You can see what Mr. Crooks'

20   line-of-sight would have been.

21        That's exactly his view. He can see

22   everything that's happening.   He can hear the words

23   that are being spoken because he's out there

24   rolling too.

25        In fact, Mr. Crooks sees that when the

1  defendant gets -- excuse me, when Mr. Thomas gets

2  rolled over that Mr. Houston goes through his

3  pockets and takes his money.  That's important too.

4  Okay. Mr. Houston takes his money.

5         That's what happened back on September 6

6  of last year when Mr. Thomas lost his life. This is

7  the man responsible. Right here.  And I'm asking

8  you to hold him accountable for what he did.  None

9  of us made him do anything.  Hold him accountable

10  for his actions.  That's what I'm asking you to do.

11  I'm asking you to come back and find him guilty of

12  first degree murder.

13         This is premeditated, deliberate killing

14  of another human being.  He shot him not once.  He

15  reflects about what he wants to do. He goes over to

16  Mr. Thomas, he turns him over, he stands over him

17  thinks about what he wants to do and he puts three

18  more rounds in him.  That's first degree premeditated

19  deliberate willful killing of another human being

20  without justification or excuse. No good reason.

21  Senseless. It's ridiculous.

22         The evidence in this case from all the

23  witnesses is that Mr. Houston is the man who pulled

24  the trigger.

25         Now, I'm not asking you to like Lavero

1    Crooks and Jovan Johnson.   But I'm asking you to

2    believe them based on their testimony and all the

3    evidence in this case.   Just because they're drug

4    dealers doesn't mean they're liars.   If they wanted

5    to lie are they going to get up on the stand and

6    admit their drug dealers.   Doesn't make any sense.

7              Why would they lie to set up Mr.

8    Houston.   I guess that's the real issue in this

9    case because Mr. Lankford's going to get up and

10   address you.   And he's basically going to imply to

11   you that these witnesses that are coming in here

12   and perjuring themselves to setup Mr. Houston on

13   something he didn't do.   Okay.   Now, why would they

14   do this.   What's the argument.

15             Well, Mr. Crooks waits two months before

16   he reports this.   Okay. And why does he report it.

17   He told you why he reported it.   Because Mr.

18   Houston started to come after him.   And he told you

19   from the witness stand that he realized that when

20   Mr. Houston started to come after him, it was

21   either going to be him or Mr. Houston.   One of them

22   was going to have to die.

23             He chose a third option.   He decided,

24   well, at this point I'll get the police involved

25   because he didn't want to have to kill Mr. Houston,

and he certainly didn't want Mr. Houston killing him.

Now, does that make sense.  Is that enough reason to break the code of west Buena Vista and Linwood.  I put forward it's probably about the only reason for breaking the code, because you're going to lose your life unless you break the code.  They're all making good money over there.  They're all conducting their business over there.  The only reason you break the code is if you're going to lose your life.

Mr. Johnson is slightly different though because Mr. Johnson gets locked up in the county and at this time when he's in the County locked up on his dope case, on his drug case, the police have already talked to Lavero Crooks.  And Lavero Crooks have already told the police who else was out there.  Jovan Johnson was out there.  So the police know from Lavero Crooks that Mr. Johnson is a witness.

So what do they do.  They get him out of the county jail and sit down and talked with him and they tell him we know you were there.  You're either a defendant or you're a witness.  What do you want to be.

And that's when Mr. Johnson begrudgingly also breaks the code because he's afraid that the police might be looking at him if he doesn't cooperate and tell the truth about who killed Carlton Thomas. That's why he breaks the code.

He's caught.  The police know he's there.  They're confronting him with the facts and he rolls on his friend Mr. Houston.  Remember, Mr. Johnson and Mr. Houston and Mr. Houston's girlfriend they went to the motorcycle club.  They have been drinking.  These are the guys that he hangs out with. These are his friends.  But Mr. Johnson had to overcome his friendship.  He told you, I didn't want any part of this case.  This is my friend.  I don't want to come in and testify.  I wasn't going to cooperate.

He's here to testify on his friend and he tells you who pulls the trigger.  His friend Mr. Michon Houston is the trigger man. That's what you folks have to deal with.   That's why I told you up front, these people are drug dealers. You won't like them, but they're telling the truth.  Based on all evidence you know they are.

How in the world would Mr. Crooks know the victim was shot in the face unless he was

there. He can't just guess and make that up.  How

would he know that there would be this spot of

blood and then the body had been rolled over.  How

would he know that unless he was there.

Is there any other evidence that was put

before you to explain how he would know all the

circumstances of this crime unless he was there and

witnessed it.  There is none. There's no other

explanation.  None. The explanation is he was

there and he witnessed the crime.

Now, Mr. Lankford's going to get up and

tell you tell you, yeah, but there's differences

between what Mr. Johnson told you and what Mr.

Crooks told you.  And there are. There's about

three significant differences and we're going to

go through those.

But the question is does that mean Mr.

Thomas wasn't murdered. Does that mean Mr. Houston

didn't shoot him because there's some differences

between Mr. Crooks and Mr. Johnson's testimony. We

still have somebody who's been murdered, ladies and

gentlemen.  And the thing is their testimony is

consistent about is who pulled the trigger, and

that's really the only issue in this case.  Who

pulled the trigger.  We know somebody was murdered.

1    The only question is who pulled that trigger.

2           Now, why are there differences between

3    the testimony of Mr. Crooks and Mr. Johnson. I

4    think you can figure out from the record that Mr.

5    Johnson, even though he's telling you who the

6    shooter is still doesn't want to really add in

7    every little detail because he's trying to protect

8    his friend to a certain extent. All right.

9           It's worse if he says that Mr. Houston

10   turned the victim over and shot him some more and

11   took his money. That's how Mr. Johnson thinks.

12   That's the way his mind works. It's worse to have

13   to give up all those other details that Mr. Houston

14   had to run and get a gun.  Okay.  It makes Mr.

15   Michon Houston's actions seem even more egregious,

16   even more severe.

17          So yeah, there are some slight

18   differences in the testimony. There are in every

19   case.  The Judge is going to give you an

20   instruction, in fact.  The Judge is going to tell

21   you that people see and hear and remember things

22   differently. Okay.

23          You might be at the same event with

24   another person and they might remember it slightly

25   differently than you.  That doesn't mean they're

1   lying.  The Judge is going to tell you that.

2   That's the way the human mind works.

3          You can accept or reject anything a

4   witness tells you from that witness stand if it

5   doesn't agree with the other facts and evidence in

6   this case.  The issue in this case is very narrow

7   and very limited. Who pulled the trigger.  There is

8   Mr. Michon Houston.  He's the man who pulled the

9   trigger, so he's guilty and he's guilty of First

10  Degree Premeditated Murder. That's what he did to

11  Mr. Thomas.

12          But he's also guilty of two more counts.

13  He's guilty of being a felon in possession of a

14  firearm for shooting Mr. Thomas.  He's also guilty

15  of what's called felony firearm.  That's for

16  possessing a weapon when you commit a crime. Those

17  two counts are easy.  Obviously you've heard the

18  evidence from the medical examiner Mr. Thomas was

19  shot.  Okay.  Whoever did this had a firearm. So

20  those two counts are easy.

21          When I made my opening statement on

22  Thursday I told you what I believed the evidence

23  would be and what you'd hear from that witness

24  stand.  Quite frankly I think it came out pretty

25  much exactly like I told you it would come out.

1          Ladies and gentlemen, I'm asking you to

2     consider all the evidence in this particular case,

3     to come back with three counts of guilty as

4     charged, because that's the right thing to do,

5     because that's what happened, and Mr. Houston

6     should be held accountable for his actions.

7          We had two eye witnesses to this crime

8     who came in here, raised their hand, swore to tell

9     the truth about who killed Mr. Thomas.  And they

10    got up there on the stand and I asked both of them,

11    the last question I asked both of them is, now are

12    you coming in here and committing perjury. They

13    told you no.  They're not doing that.

14          These people told you the truth.  They're

15    honest.  They admitted they're out there grinding

16    all day long, selling drugs out there on west Buena

17    Vista.  There's a code they live by, and they told

18    you why they violated the code.

19          Ladies and gentlemen, come back with one

20    Count of First Degree Premeditated Murder.  One

21    Count of Felon in Possession of a Firearm, and one

22    Count of Felony Firearm.

23          Thank you very much.

24          THE COURT: Defense closing.

25          MR. LANKFORD: Thank you.

1       Good morning once again, ladies and

2   gentlemen of the jury.  Murder cases are always

3   extremely difficult even for people that routinely

4   deal with it, because you have a person who's dead.

5   The more serious thing you can do to a person.

6   There's a natural inclination to want to make

7   somebody pay for that mistake. Logically it's

8   understandable.

9       But what has come in the last few days in

10  this case when you start with the presumption of

11  innocence and burden of proof and if that's beyond

12  a reasonable doubt, they don't have a case.

13      Something that keeps going through my

14  mind over and over in this case.  And during the

15  course of this is why, why is Mr. Houston a better

16  suspect than Mr. Johnson or Mr. Crooks, because

17  they say so.  I'm talking about they say.  You know

18  there's a code out there.  The code is called look

19  out for number one.  Always, first and foremost,

20  you look out for number one. Everybody else can

21  take care of themselves. That's the code.

22      The alleged code you see on old movies,

23  maybe they existed when I was a teenager.  And now,

24  look out for number one.  That's the code.

25      You know, starting off I'm going to try

1    and keep it organized.  I get nervous when I start

2    seeing circumstances that either unexplained or

3    poorly explained because then I start thinking

4    that's not a coincidence. Okay. That's something

5    intentional. If it's a coincidence, so be it, but

6    this isn't.

7         There was some testimony here that I

8    think was a coincidence with a quotation mark.

9    Random chance happens.  When it crosses the line,

10   it's not coincidence anymore, it is people getting

11   together.

12        Now, let's talk about in essence you have

13   two people coming in and saying the exact same

14   thing. Okay. Mr. Houston shot him.  All right.

15   Nothing I can do about two people who came in.  I

16   want to talk about what I think about their

17   testimony.  And remember a couple of things, number

18   one, I do not have to prove that Mr. Houston is not

19   guilty. They have to prove that he is.

20        Number two, I don't have to prove who did

21   it.  Quite frankly, that's beyond my limited

22   capabilities.  I mean we use some things in here,

23   some thoughts that I think are perfectly logical,

24   but I don't have to prove who did it.  That's not

25   my job and I am not able to do that.

1          You know, sometimes pictures can be worth

2    a thousand words.  I think I'm going to refer to

3    some of these during my closing.  And some of them

4    I think make it clear if you would look at the

5    photographs.  Okay.  Some of the things that I'm

6    saying absolutely have to be correct.  Even though

7    I wasn't out there five days out of six, they have

8    to be because those pictures show some of what I'm

9    saying has to be correct.

10         Now, we do know that does it takes two

11   months for anybody to decide that, yeah, we need to

12   tell the police about this. And let's look first

13   that neither make any mention of this for two

14   months. Eight to 10 weeks. Okay.  And those

15   coincidences that I'm talking about -- oh, in fact,

16   both specifically deny it for two months.

17         One guy, Jovan Johnson, denies it.  He's

18   standing in the apartment building at Lee's place

19   within a week, every opportunity, the police are

20   there, every single opportunity, and he says I

21   don't know nothing about nothing.

22         For two months being questioned three

23   times Lavero Crooks says absolutely nothing.  What

24   are the circumstances, one of those little

25   coincidences that bother me. What are circumstances

1   under which they both come forward.  Their

2   conscious gets to them.  Well, it just happened

3   that the one guy Jovan Johnson managed to get

4   arrested on a drug charge. Okay. That coincidently

5   that's when Lavero Crooks now comes forward.  And

6   he gets arrested on a drug charge and he stands

7   there over at county not knowing when he's going to

8   get out, a number of bars, concrete, meals when

9   they give them to you.  Meals are what they give to

10  you.  No toilets.  No seats on the toilets.  These

11  are stainless steel.  It's part of my job is I go

12  in jail and police stations.  I'm always real glad

13  that they let me out at my request because these

14  are not nice places.

15         And what do they say besides sitting

16  there and going okay I'm on a little drug charge,

17  you know they got to let me out now.  Now, while

18  I'm sitting there not knowing when I'm going to get

19  out of this.  Homicide.  Homicide comes over, okay,

20  I don't initiate anything.  They start talking to

21  me.  They tell me what day of the week this

22  shooting occurred. They happened to get it wrong,

23  it wasn't a Saturday it was actually a Friday

24  morning.  But they tell me what day of the week it

25  was.  They tell me what happened. They gave a bunch

of information if I don't then they say, now look,
your name keeps coming up.  Okay.  We got an
unsolved homicide.  And right now you're looking at
who, but you are the number one suspect.

And what's the code on the streets, look
out for number one first.  And you're the one out
on the line Mr. Johnson.  You're the one that we're
questioning.  You're the one and we took the
trouble when we learned you were in county on a
nickel and dime drug charge to come over and see
you.  Mr. Johnson's sitting there thinking, drugs
are bad enough, but I sure don't want a murder
case. Let me give you a name.  Why is Mr. Houston a
better suspect, and those all happened at the same
time.

Now, I think I covered some of Mr.
Johnson, his motive trying to get out from
underneath this charge.  But the other thing is
even a motive and I'm trying to figure out here
what a person who has never done business with a
man, what his motive would be to shoot him.  Well,
he didn't want to do business with him.  Well, you
know, new customers are free to come and go when
they want, the last I thought. Okay.

But who knows, Mr. Thomas because he's

1    done business with him in the past. Who would

2    consider Mr. Thomas to be one of his customers. I

3    think Johnson.  He told you that.  I know the man.

4    I've done business with him on a number of

5    occasions.

6            Now I can understand if a person says

7    wait a minute you can't diss me like that.  You

8    can't tell your supplier that you want to go

9    elsewhere.  Does that make sense.  I mean, within

10   the context.  But two strangers, it just doesn't

11   make sense.  It doesn't add up.

12           You know, pictures, let me walk over here

13   a second and start on some of this.  First of all,

14   if I may remember Officer Melvin Williams he

15   strikes me as a very observant young officer.

16   Okay.  Remember that he says that you have to

17   drive, that he's coming in this direction, that he

18   has to drive, that there's a clump of weeds right

19   somewhere in there that he has to drive beyond this

20   pile of debris because of it's obstructive --

21           THE COURT: We can barely hear your voice.

22           MR. LANKFORD: Sorry.

23           THE COURT: The court reporter does have

24   to take you down.

25           MR. LANKFORD: Yes, ma'am.

1    And he has to, Officer Williams has to

2  cross beyond these two sets of obstructions before

3  he can see clearly into the field. He's an

4  observant young man.  He's impede his view. It's

5  getting light out.  And he hasn't been drinking or

6  smoking, one would presume, and that's when he sees

7  it.  That's when he sees it.  He is incapable, he

8  is unable to see this until he gets to this point.

9  Okay.  Which brings up the photographs.  Please

10  look at these.  Exhibit Number Four, looking north

11  in the field.  I'm looking north onto Buena Vista

12  from the field.  It's real clear what Officer

13  Williams did.

14    He came in the opposite direction from

15  this car.  He goes behind this garage with this

16  clump of weeds.  He passed beyond this debris.  And

17  he gets to a proximate location between the bike

18  and the phone when he can now see into the field.

19  Okay, fine, that's when you can see it.

20    Now, this, okay.  What else does this

21  picture tell us.  That these trees are in full

22  foliage and at 5:00 o'clock in the morning in the

23  dark with the light pole in front of you, not back

24  dropping you, not back lighting you, looking into

25  this dense brush according to Mr. Johnson, and this

1    is what you're able to clearly see from a location

2    on a porch here with brick columns.

3           It's somewhat like sitting at the old

4    Tiger Stadium, you better enjoy the atmosphere

5    because you're not going to see a lot of the game.

6    That's where he says he is.

7           Now that angle, that angle appears to be

8    almost the same angle as that of Mr. Crooks.  And

9    Mr. Crooks, if this angle is correct, Mr. Crooks

10   would be sitting just about right here. He'd be

11   between the two. Okay.

12          And, again, look at the clump of weeds

13   and the debris.  Mr. Crooks says that's where I was

14   and I can see just fine.  All right.

15          Again, Exhibits 4, 3 and 9, distances,

16   angles, obstructions, look at them because these

17   pictures tell a thousand words, ladies and

18   gentlemen.

19          Now, we're going back, okay.  So Mr.

20   Johnson has motive because he's getting nervous

21   that he may be looking at a homicide.  He might

22   have a reason to actually, I don't know if you call

23   it motive, reason, motive and a reason, but he's

24   dissed by, did you do the shooting or it's a lie.

25   There it is in a nutshell.

So now we're going to bring Mr. Crooks in as corroboration. Well, quite frankly I don't think Lavero Crooks was ever there.  How's he come up with this stuff.  He's got two months to talk with guys in the hood. You know when people talk about it for two months. Okay.

Well, how else could he know unless he was there, because he's got two months to talk. And Lavero Crooks I don't believe was there because his testimony -- I mean, look, the both are saying the same thing in the same type of way that back in Puritan days people used to get together and say I saw Sally Smith dancing naked in the moonlight with the devil.  All right. Yeah, they're consistent as far as that goes.

And I understand that people see and hear things differently, but I also know that details are important and realizing things are going different ways.  For example, all right, Lavero and again keep in mind, take a look at that rise, take a look at that clump of weeds.  Think about what you would have been able to see through it or around it, okay, which Officer Melvin Williams wasn't able to do, but maybe Lavero Crooks who's out there smoking a little weed, doing a sale,

maybe he's just got better vision.  Maybe he's got better observation in the dark with obstruction, maybe he's superman, I don't know.

Anyway, he says though that he sees Mr. Houston go, leave, physically leave the field and get a gun from this abandoned house or this house which happens to where Lavero Crooks spent the night.  Coincidence, don't you think.  Along the same lines Jovan Johnson, no, I never saw anybody leave. All right.  I never saw anybody leave.

Now, Javon says I heard a swearing, but I never heard anything racial.  Lavero Crooks says, oh no, they were racial epitaphs, offensive words besides swearing going on.

And despite Jovan Johnson's testimony that well, I called out too, what do you need my friend.  Sure, Lavero Crooks who's in it, if this is true Lavero if you were there and the windows were opened because it's a nice September morning and you're making sales, you're in a good position to hear and you don't hear that.  You only hear what you want to hear.  And I'm giving you the benefit of the doubt that you were even out there Lavero.  Okay.  You don't hear that.

And let me get this straight.  Lavero

Crooks, Jovan Johnson know each another.  I'm
sitting in my car all night long, business is so
good when people that I know show up a short
distance away, I don't even acknowledge their
existence. Jovan Johnson said I never saw Lavero
Crooks or his car which I would recognize. Okay.
Lavero Crooks apparently makes no attempt to even--
think about how strange that is.

Somebody you know, somebody who you are
friends with, somebody you've been grinding
together go who knows how long in the same
neighborhood and you don't even at least, hey,
JW -- I mean, County, how you doing.

Lavero Crooks is attempting to
corroborate something that he never saw.

Well, you know, Lavero, I came forward
because problems with Mr. Houston and it involved a
gun.  And you know it's so easy low and behold,
anybody seen a gun here.  Nope.  We got two
diagrams, seven photos.  That's it.  No gun. Easy.
He came after me with a gun.

And then again, folks, that is something
that's going to be decided if necessary on top of
that.  But think about it in the context how easy
it is.  How easy it is.  Okay.

1    It seems to be always kind of the same

2    thing.  It's either my conscious started bothering

3    me.  Miracle of miracles, my conscious started

4    bothering me the same time my buddy Jovan Johnson

5    got picked up on a drug case and was talked to by

6    homicide about the murder.

7         Or number two, pretty scared out there.

8    That's the other one that always comes out. I'm

9    scared out there.  Yeah, but every single opportunity

10   that you had to talk with the police, when only the

11   police were there, when nobody else was there,

12   okay, you can't take advantage of it. All right.

13   Now think about it for a minute.

14        If that's true, all right, that I'm

15   afraid, look then there's part of this I think

16   about.  If anybody sees me talking to the police,

17   if anybody sees the police approach me, I'm in

18   trouble.  That's not what happened because that

19   wasn't his problem. Okay.

20        Think about it for a second. Now I'm in

21   danger if I say anything but the mere fact the

22   police come up to me and talk to me on a regular

23   basis, that doesn't endanger me.  I'm sorry, but

24   that's ridiculous.  If this stuff went down the way

25   they said it did, and he's afraid of Mr. Houston,

1    he is in danger merely because you got people in

2    the hood know that police called upon three occasions.

3    Okay.

4           They always one of the two things, either

5    their conscious bothers them or somehow they get

6    over the fear. It's always the same nonsense.

7           And with regards to Mr. Crooks, there's

8    nothing any chasing.  Nothing about any chasing.

9    He says the first shot is fired from the porch.

10   From the porch.  Okay.  Well, in and of itself this

11   wound here in the face could be consistent with

12   what Mr. Johnson says in and of itself.

13          But if that happened then we know we

14   absolutely know that the first shot or shots would

15   not have been fired from the porch.  Okay.  And

16   quite frankly when you start adding it all up, what

17   it says Lavero Crooks was not there on September

18   6th, that he is making it up.  He is embellishing

19   it.

20          Along those lines with regards to Mr.

21   Crooks I just want to say that when he finally

22   talked to the police, two significant things that

23   he seemed to leave out.  Well, one, if you're with

24   a young lady, did you ever tell the police that.

25   And number two, do you see, and the answers to that

1    is no. Okay.  Number two, you see Mr. Houston

2    supposedly flip him over and go through his

3    pockets.  Did you ever tell the please that. This

4    is pretty significant here.  He appeared robbing

5    the guy and I got another witness. Okay.  Did he

6    ever tell the police either of those things.  No,

7    he did not.  What's his excuse when he did was

8    asked about, well, I wasn't asked.

9            Wait a minute, homicide detectives don't

10   rush potential witnesses. Take your time.  Here's

11   my card if you remember anything from November

12   until now, here's my card.  Okay.  Were well, he

13   didn't ask me that.  No, but sir, he gave you, the

14   last question he asked you is do you have anything

15   more you want to add. No, man, that's it.

16           It's not until he takes the stand and

17   throws in a couple of other little nasty details.

18   It's embellishing.  He's lying.  And these things

19   from these guys I wouldn't perjure myself.  These

20   are just words.  Words.  Absolutely they're

21   meaningless. You might as well be here reading some

22   first year med school, bio, chem book.  Perjury.

23   Just words.

24           Where is the proof.  What else have they

25   got besides Lavero and Jovan.  That's it.  And I

1    don't want to beat a dead horse, but we're talking

2    about how else would Lavero know.  And let me give

3    you a little scenario here.  The guys grind there

4    every day.  Okay.  And two months ago there's been

5    a shooting.

6            Before that, the police show up and the

7    reality is you can't -- I mean, it's almost like

8    one of those little packs.  You squeeze one end it

9    gets bigger at the other.  Okay.  The police are

10   there, but basically these guys are able to go

11   about their business completely impeded or more or

12   less impeded.

13           However, once there's been a shooting out

14   there, everything changes.  Now think about how

15   good business has been.  Guys are getting repeat

16   customers at 5:00 o'clock in the morning.  Business

17   is so good that I'll sit in my car all night.  It's

18   that profitable. Okay.  It is that good.

19           Now, once there's an unsolved homicide in

20   that field around where everybody congregates, we

21   got two problems.  First of all, the Tenth Precinct

22   is going to show up in uniforms on a regular basis.

23   You can barely make a sale anymore before you see

24   them cruising down Linwood.

25           It's going to attract attention in

1    precinct.  In addition besides the uniform we have

2    a whole another set of problems.  We're going to

3    have people in jackets and ties showing up on a

4    regular basis questioning us.  Do you think that

5    conversation happened.  Something along those lines

6    did.  Two months, they had two months to get this

7    together.

8         And the fact that details are different

9    indicates that one of them for sure wasn't out

10   there.

11        Even if we say that the gun shot wound to

12   the face is consistent with a hypothetical as

13   given by Jovan Johnson but completely opposite that

14   was given by Lavero Crooks, we have a couple of

15   problems.

16        Consistent.  Now he's laying on his back

17   whether he got flipped over or not.  Gun shot wound

18   to the left knee consistent with that.  Yes.  Gun

19   shot wound number two coming in the left flank

20   going out the left flank at a slight angle.  Yes.

21        And I realize that people will move at

22   the last minute trying to save their life. Okay.

23   When he's laying on his back explain coming in

24   here, coming out here.  Explain that.  Boom, boom,

25   what can we do with it.  How do I position a gun to

1  do that. And you know, at some point up to 18 to 24
2  inches we have close-range firing. This is less
3  than perfect because the clothes are still in the
4  hospital.  Okay.  And fabrics can impede this soot,
5  this gun powder gets imbedded.
6       But we do know that 18 to 24 inches where
7  you will see this is just about the distance that
8  Mr. Johnson said he told me to stop.  That's the
9  distance supposedly that these shots were fired
10 from.  No close-range firing.
11       The face, there's a hole.  Okay. Jovan
12 Johnson and Lavero Crooks got a real big interest
13 in business resuming and things getting back to
14 normal. That's not going to happen unless and until
15 the police go away.  Unless and until we give them
16 something so they will go away.
17       A couple of others things that just
18 wasn't mentioned.  I apologize for the length.
19 Let's assume if Jovan Johnson is right.  And I
20 talked about the factor.  Crooks can't be right.
21 He couldn't have seen it.  It's different than what
22 Jovan said, look, why he made it up basically is
23 Lavero wasn't there.
24       I think I've gone over that ad nauseam.
25 I asked, let's go for JJ for a second, Jovan

1       Johnson.  All right.  If what he's saying is

2       correct there's four to six shots fired at

3       different times in the field.

4                   Okay.  Now, I understand when Officer

5       Carpenter goes out there that, you know, this is an

6       unattended field, excuse me, Sergeant, and I

7       understand that.  Look at it, yeah, there's clumps

8       of crabgrass.  You wouldn't run out there because

9       the grounds pretty uneven.  But we're not talking

10      about marshy cattails or elephant grass here.

11      Okay. You can clearly see the ground.  You can

12      clearly see the ground.

13                  Officer Carpenter, the evidence tech goes

14      out there, okay, and if what they're saying that

15      Mr. Houston fired four to six rounds in the field,

16      and according to Lavero Crooks it was a 40 caliber

17      semiautomatic.  I talked to the officer.  What's

18      the projection feature of a semi as opposed to a

19      revolver.  It kicks brass casing out.

20                  All right, now, if this took place some

21      where within ten or 12 feet, I would anticipate

22      finding at least one brass casing. There's

23      nothing.  There's not one brass casing found in

24      that field at all.

25                  And Officer Carpenter is out there when

1    it's daylight.  Brass, even dull metal shines.

2    Okay. Shines.  It will shine in the sunlight, and

3    especially if you are closely looking for

4    something.  If it's there you want to find it.

5          Now, okay, now I guess you kind of flip

6    this both ways.  Well, maybe it was a revolver.

7    Yeah, but Lavero said it was a semi.  Well,

8    maybe -- and that revolver keeps the casings in

9    tact.  They keep them in the cylinder.  Or maybe

10    the shot was fired from across the street with a

11    rifle.  Okay.  That's possible.  And quite frankly

12    I would give a person, even a trained military or

13    law enforcement pretty good odds with a pistol, a

14    handgun at 125 feet. My stupid luck.  Very few,

15    very few people are that good with a pistol or a

16    revolver.

17          As far as bullets go, if they went on

18    through is what it said.  I don't expect Officer

19    Carpenter to be down there on his hands and knees

20    with a trenching tool, you know, doing the old gold

21    dust kind of thing seeing if he can find any

22    casings.  I'm sorry, slugs.  But there are no slugs

23    recovered either.  And I think that what happens is

24    really if look at this and even according to Mr.

25    Johnson's testimony Mr. Houston leaves.  Okay,

1    there's no money, there's no ID.  Coincidently

2    there's no casings, there's no slugs.

3         I have a fairly good theory as to what

4    happened.  Somebody cleaned up.  It can't be Mr.

5    Houston.  He's gone.  If what you're saying is true

6    Jovan.  No casings, no slugs, no ID, no money. This

7    person has no motive to shoot this man whatsoever.

8    Who's left, and manages to get all this stuff that

9    could be helpful, could corroborate.  One of their

10   civilians and it doesn't exist.

11        Some of this I've already covered.  Just

12   one second.  All right. We do know too that Lavero

13   and Jovan have been friends. Regardless of how they

14   would like to put Mr. Houston's relationship as far

15   as why they didn't come through before.  This

16   supposed code of the streets, the bottom line is

17   they both said the same thing.  They've known Mr.

18   Houston for a couple of months.  Not any particular

19   time with him, really got nothing against him, he's

20   been out there, he's been rolling with us for the

21   last couple of months.  That's it.

22        He is not their close friends.  He is not

23   somebody that they would care whether or not they

24   try to help him out or do they try to harm him.

25   He's simply irrelevant to them. It's easy to do

that with somebody that's merely an acquaintance
and not a threat.

Now, a couple of other things and I
think I'm into the home stretch here.  There's
going to be stuff that when you guys go back into
the jury room, things I haven't brought up enough.
Maybe some of it will be helpful.  Okay. I do want
to ask you, people have the tendency to try to be
amateur detectives and I think we all do that.  The
proofs here in this case are the proofs here.
Either it's up or it's down.  Theorizing, even
saying to yourself maybe Mr. Houston was involved.
That's all virtually by definition insufficient,
it's virtually by definition not proof beyond a
reasonable doubt.

Everybody in this case has had a certain
job.  Shortly we're going to turn it over to you
for what I believe is one of the most difficult
jobs in this courtroom, and that is to make a
decision regarding the facts.  You are the persons
who decide the facts and apply the law. That is
your duty. Your obligation.

A couple of legal principals.  When some
of us first started in this business there was a
jury instruction where they attempted to find proof

beyond a reasonable doubt.  It's a somewhat
difficult concept.  But what they did about 10 or
12 years ago because they kind of flipped it and
now there's a definition, a legal instruction which
you must follow as to what reasonable doubt is.

And it goes through a lot of things and
it comes down to that a reasonable doubt is just
that, one that is reasonable under all the
circumstances.

And I think that if you listen fairly to
this, that there are reasonable doubts.  There is a
reasonable doubt. And I guess that definition of
reasonable doubt sometimes maybe when I'm sitting
in a bar having a couple of Heinkens and I can
mumble things about academics, committees, people
that never been in a courtroom, but the bottom line
is that may well be one of the most brilliant things
I've ever heard in my life.  Okay.  It's got a
common sense to it.  Ultimately a reasonable doubt
is just that. One that is reasonable under the
circumstances, and that's a legal definition.

Now, I do know two things about proof
beyond a reasonable doubt. It's actually what you
individually and collectively say it is. Okay.

I also know that proof beyond a reasonable

1    doubt is the highest standard that you can have in

2    a courtroom in this country.   It's not merely maybe

3    or maybe a little more likely than not, it is proof

4    beyond a reasonable doubt.

5            Now, and I want to go through a couple of

6    things here just basically legal principals the

7    important ones in a criminal court. Okay.

8            First of all, folks, Mr. Houston is

9    presumed to be innocent.   He is not presumed to be

10   guilty. He is presumed to be innocent.

11           Number two the burden of proof, it's

12   right over here where it belongs, it doesn't cross

13   this podium.   It doesn't near Mr. Houston or

14   myself. I don't have to prove anything.   And as a

15   result of the fact that the People have the burden

16   of proof, they get two opportunities to talk with

17   you guys.   They get to talk with you first.   I go

18   second and then they're going to get a brief

19   opportunity to talk with you once again.

20           And the reason that we let them go

21   primary and -- they say, memory experts what you

22   remember is what you read first and what you heard

23   last.   But the reason that that is permitted for

24   him to go first and last is because he has the

25   burden of proof.

1      Finally, that burden of proof is, as I

2   have talked about, beyond a reasonable doubt, not

3   maybe, not might have been, not gee I think it's

4   more likely than not.  Their standard what they're

5   held to is proof beyond a reasonable doubt.

6      When you apply those three most

7   fundamental legal principals.  When you seriously

8   reflect upon the evidence or lack of evidence in

9   this case, and I think that there's really only one

10  fair and just verdict and that is it Mr. Houston is

11  not guilty on all three counts.

12      On behalf of Mr. Houston, thank you for

13  your time and your consideration.

14      THE COURT: Rebuttal.

15      MR. HASSINGER: Thank you, Your Honor.

16      This is the last time I get to speak to

17  you, ladies and gentlemen.  And I'm going to be

18  brief, I just want to make some comments about what

19  Mr. Lankford has told you because I like Mr.

20  Lankford.  I've known him a long time and he's a

21  good man.  He's doing his job.  We all appreciate

22  that.  But I do have disagreements about how he

23  remembered the testimony and I'm hoping you can

24  call upon your collective memory to remember what

25  the testimony was.

1              For example, one example, when you heard

2      Officer Williams, he did testify that when he got

3      to about this area he was able to clearly see the

4      body in the field.  Mr. Lankford is twisting that

5      around and arguing that Officer Williams could not

6      see the body from this location. And there's

7      absolutely no testimony to support that.

8              Officer Williams tells you when he makes

9      the observation from here, that does not mean it

10     was impossible for him to make the observation from

11     this location. That's not fair.

12             MR. LANKFORD: Judge, I object. He's

13     specifically said he did not make that  observation.

14             THE COURT: Excuse me, I'll overrule the

15     objection.

16             MR. HASSINGER: Thank you, Your Honor.

17             THE COURT: He's arguing what the evidence

18     tends to show.  You may go ahead.

19             MR. HASSINGER: Thank you, Judge.

20             So you can't say because a man sees

21     something from here, he could not have seen it from

22     here.  And in fact we have the pictures.  You can

23     look at the pictures.  You can judge for yourself.

24     Okay.

25             So you have to listen carefully to the

1    testimony because somebody says X that does not

2    mean that Y is also true.  And another coincidence

3    I thought Mr. Lankford just got up here and he told

4    you well Mr. Crooks and Mr. Johnson had to get rid

5    of this murder investigation so they can get back

6    out to grinding on west Buena Vista.  Then why did

7    they wait two months to come forward.  If this

8    investigation was hurting their business so bad,

9    why did they wait two months.

10        See, this is a contradiction.  It doesn't

11   make sense where someone gets up here and argues

12   two opposite things to you, and then you have to

13   start wondering why they're doing this, and I'll

14   answer that.  Why they're doing this is to try and

15   blow some smoke in front of your eyes so you don't

16   see the real issue in this case. Because the real

17   issue in this case is who shot Carlton Thomas.

18        It's not what words were spoken.  Okay.

19   The issue is who shot Carlton Thomas because, yes,

20   I do have to prove this case beyond a reasonable

21   doubt. But the judge, Judge Jones is going to tell

22   you, the prosecutor has to prove the elements of

23   the crime beyond a reasonable doubt.  I don't have

24   to prove how well the lighting was at that

25   location. I don't have to prove other perhaps

1   inconsistencies about what was said and what was

2   done, simply the elements of the crime, first

3   degree murder.  Somebody was killed.

4          Well, there's no doubt in this case

5   somebody was killed.  Somebody was killed

6   deliberately and intentionally with premeditation

7   as in this case where someone was shot four times.

8          The only other issue is who pulled the

9   trigger. That's what I have to prove to you beyond

10  a reasonable doubt.  And no one has come into this

11  court and contradicted Mr. Johnson or Mr. Crooks

12  about who pulled the trigger.

13         Now, Mr. Lankford has several theories

14  he'd like to throw out there on the table.  And

15  theories are a wonderful thing, but there's no

16  evidence to support of them.

17         Sure, we can all hypothetically while X,

18  Y, Z could have happened, sure, sure.  This could

19  have been a police execution of Carlton Thomas.

20  There's no evidence to support it. You have to make

21  your decision based on the evidence that was

22  brought forward in this case, the testimony, and

23  the exhibits, and the photographs.  Not on Mr.

24  Lankford's theories.  The evidence.

25         Mr. Lankford has some interesting

1  theories.  He says Mr. Johnson is the murderer and

2  so therefore Mr. Crooks is setting up Mr. Houston

3  and protecting Mr. Johnson. He argues to you that

4  perhaps Mr. Crooks was the murderer and Mr. Johnson

5  is lying. Okay.  Why would these people lie.

6  There's no reason for it.  It doesn't make any

7  sense.

8        Mr. Johnson came into court and told you

9  he is Mr. Houston's friend.  He doesn't want to be

10  here. He doesn't want to be cooperating in this

11  case.

12        Another thing Mr. Lankford said that I

13  don't know where he's getting this from, but he's

14  saying that Mr. Houston and Mr. Thomas were

15  strangers.  Well, how do we know that.  We don't

16  know that.  Where is that coming from.

17        Mr. Johnson said he had done business

18  with Mr. Thomas once, maybe twice.  But all the

19  rollers, all the grinders over there know the

20  people who come there.  There's no evidence to

21  support the fact that Mr. Houston and Mr. Thomas

22  were strangers.  We just don't know that.  You

23  can't go out there and just hypotheticalize like

24  that. It doesn't make any sense.  We don't know how

25  many times they had done business, if they have.

1       Okay.  This is the most important thing,

2   ladies and gentlemen. Mr. Lankford tells you that

3   Mr. Crooks had two months to figure out what

4   happened so he could come into court and testify.

5   Okay.  And he had two months to talk to people in

6   the hood to figure out exactly how this murder went

7   down since -- according to Mr. Lankford Mr. Crooks

8   wasn't there, right.  So he's got to go talk to all

9   the people in the hood and figure out how it went

10  down.  What Mr. Lankford leaves out is not only did

11  he have to talk to people in the hood, he must have

12  went and talked to the medical examiner too. And

13  the medical examiner must have given him

14  information to help set up Mr. Houston for a crime

15  he didn't do.  Okay.

16      For example, one of the most important

17  things the medical examiner told us, and let me

18  digress for a minute. When the medical examiner was

19  on the stand he told us that gun shot wounds one,

20  two and three, the three to the body were all

21  consistent with somebody on the ground and somebody

22  shooting over them. Mr. Lankford gets up and tells

23  you, well, no, that's impossible for gun shot wound

24  number three. He says, no, that's impossible.

25      Well, the expert told you it was

1     possible.  Now, who do you believe; an expert, a

2     medical examiner.  And he said all someone has to

3     do is twist their body slightly and that bullet

4     will pass through just like that. We asked the

5     medical examiner specifically those functions.  He

6     said these wounds are consistent with that

7     scenario.  What more can he tell you.

8            Furthermore, the abrasions on the knees.

9     Remember how the medical examiner turned those

10    abrasions, he called them terminal abrasions.

11    Okay.  I asked him what does that mean terminal

12    abrasions.  He said those are abrasions that

13    occurred at the time of death.  What does that

14    mean.  That means Carlton Thomas fell face first

15    and got these abrasions on his knees.

16           How would Mr. Crooks know that.  How

17    would Mr. Crooks know that Mr. Thomas was shot in

18    the face.  How would Mr. Crooks know that when they

19    recovered Mr. Thomas's clothes from the hospital,

20    his money was gone. How he was just able to make up

21    that Mr. Houston must have gone in his pockets and

22    taken his money. How did he know unless the police,

23    and the medical examiner, and the witnesses are all

24    conspiring to set up Mr. Houston, because that's

25    the choice you have to make in this case.  It's

1    very easy.

2              One of two things happened. Either Mr.

3    Crooks, Mr. Johnson, the medical examiner, all the

4    police are conspiring to set up Mr. Houston for

5    something he hasn't done or he did it.  Which

6    choice is there.  That's what you're going to tell

7    us with your verdict.

8              How would Mr. Crooks know that this body

9    was rolled over.  And we know it was because

10   Officer Williams tells you there's the spot of

11   blood that isn't where Mr. Thomas is found.  Mr.

12   Thomas is about a foot over.  And that shows you

13   when Mr. Thomas fell face forward with that

14   horrible wound to his face, there's going to be

15   blood right there.

16             Then when he's rolled over, there's not

17   going to be blood.  He's got on all these clothes.

18   The wound is to his face.  That's why he's not

19   there on the blood.  He was rolled over.  How's Mr.

20   Crooks know this.  Then this is one heck of an

21   elaborate setup, and Mr. Crooks is one heck of a

22   detective, isn't he.  You saw him on the stand.  Do

23   you think that he's that sophisticated.  Do you

24   think he's that good of a detective to set up Mr.

25   Houston in this way.

1    Mr. Lankford tells you well where's the

2    gun.  Well, if Mr. Johnson was the murderer he

3    would have had the gun he could have easily framed

4    Mr. Houston with it. We don't know where the gun

5    is.  That doesn't mean somebody wasn't shot. That's

6    what Mr. Lankford's telling you.

7         Well, if they didn't get a gun so

8    nobody's shot, nobody's murdered.  That doesn't

9    make sense.  You know somebody was shot.

10        Then you know what, I'm not sure Mr.

11   Johnson realized Mr. Crooks was out there either.

12   He had been drinking, doing drugs.  You know, its

13   very possible Mr. Johnson didn't know Mr. Crooks

14   was out there.  And that's actually a lot more

15   likely than the fact that they get together and

16   conspire to set Mr. Houston up and then get that

17   wrong on the stand.  Again, that's one of those

18   choices.  Did they conspire to set up Mr. Houston

19   and then forget that they were both out there.

20   Probably Mr. Johnson didn't see them.

21        Remember, Mr. Johnson told you there's

22   all kinds of traffic going up and down that road.

23   Okay.  All kinds of businesses being conducted. Mr.

24   Crooks told you at one point he did leave that

25   scene.  Probably when he went to get his lady

1    friend, but he told you he did leave that scene.

2    He was coming and going.  So you're not always

3    paying attention to where cars are parked out

4    there. But certainly if you were going to lie,

5    you'd get that part right.

6         Mr. Crooks does cooperate with the police

7    and he told you why.  If he didn't cooperate with

8    them either he was going to have to kill Mr.

9    Houston or Mr. Houston was going to kill him.

10        And when he does help set up Mr. Houston

11   to get him arrested what does Mr. Houston do.  Mr.

12   Houston runs in the house.  Locks himself in

13   somebody else's flat.  Refuses to come out when the

14   police are there yelling police come on out.  Come

15   on out.  He's hiding.  Now, is that what you would

16   do when the police approach you if you've done

17   nothing wrong as a citizen.  Do you go running into

18   anybody else's house, lock the door and when the

19   police actually get the keys to come in, do you try

20   and keep the door closed.  He's doing everything he

21   can from getting caught.

22        Is that the way an innocent person acts,

23   ladies and gentlemen.  He's telling you by his own

24   actions he's done something wrong.  Why is that

25   going on, ladies and gentlemen.  Is this a big

1    conspiracy to set up an innocent man on a murder

2    charge.   Is that what you really think this is, or

3    this is a story of a guilty man running and hiding

4    to the last minute to keep from getting caught.

5                    Yeah, I agree with Mr. Lankford.   There

6    wasn't any good motive to kill this man and

7    unfortunately in most murder cases there are.   It's

8    a senseless, stupid tragedy.   You shouldn't be out

9    there killing people.   We all agree with that.

10   Yet, he did it, and you should hold him accountable

11   for what he did.

12                    Thank you very much, ladies and

13   gentlemen.

14                    THE COURT: Ladies and gentlemen, I'm

15   going to caution you, you may not discuss this

16   matter among yourselves nor with anyone else.

17                    Who is the juror whose daughter has a

18   doctor's appointment?   It's taken care of.   Okay.

19                    You may not discuss among yourselves nor

20   with anyone else.   We're going to let you go out

21   and have a good lunch and ask you to be back here

22   1:30 at which time I will give you your instructions

23   so you'll begin your deliberations.   We'll rise for

24   you to get your things to go to lunch.   Everyone

25   rise Jurors are free to go to lunch.

1      (Jury exits courtroom)

2      THE COURT: Rise for the jury, please.

3      (Jury enters courtroom.)

4      THE COURT: Do I have the stipulation that

5      all of our jurors are here and in their proper

6      places?

7      MR. HASSINGER: Yes, Judge.

8      MR. LANKFORD: Agreed, Your Honor.

9      THE COURT:  Members of the jury, the

10     evidence and arguments in this case are now

11     finished, and I will now instruct you on the law

12     that applies to this case. Remember that you've

13     taken an oath to return a true and just verdict

14     based only on the evidence and my instructions on

15     the law.  You must not let sympathy or prejudice

16     influence your decision.  As jurors you must decide

17     what the facts of this case are. This is your job

18     and no one else's.

19          You must think about all of the evidence

20     and the testimony and then decide what each piece

21     of evidence means, and how important you think it

22     is. This includes whether you believe what each of

23     the witnesses said.

24          What you decide about any fact in this

25     case is final. It is my duty to instruct you on the

law.  You must take the law as I give it to you.
If a lawyer had said something different about the
law, follow what I say.

        At various times I've already given you
some instructions about the law. You should
consider all of my instructions together as the law
that you are to follow.  You should not pay
attention to some instructions and ignore others.
To sum up, it is your job to decide what the facts
of this case are, to apply the law as I give it to
you, and that way decide this case.

        Every person accused of a crime is
presumed to be innocent. This means that you must
start with the presumption that the defendant is
innocent. This presumption continues throughout the
trial and entitles the defendant to a verdict of
not guilty unless you're satisfied beyond a
reasonable doubt that he is guilty.

        Now, every crime is made up of parts
called elements. The prosecution must prove each
element of a crime charged beyond a reasonable
doubt.  The defendant is not required to prove his
innocence or to do anything.

        If you find the prosecution had not
proven every element beyond a reasonable doubt,

1    then you must find the defendant not guilty.  A

2    reasonable doubt is a fair, honest doubt growing

3    out of the evidence or lack of evidence. It is not

4    merely an imaginary or possible doubt, but a doubt

5    based upon reason and common sense.  A reasonable

6    doubt is just that, a doubt that is reasonable

7    after a careful and considered examination of the

8    facts and circumstances of this case.

9         Now, every defendant has the absolute

10   right not to testify. When you decide this case,

11   you must not consider the fact that he did not

12   testify. It must not affect your verdict in any

13   way.  When you discuss this case and decide on your

14   verdict you may only consider the evidence that has

15   been properly admitted in this case.  Therefore, it

16   is important for you to understand what is evidence

17   and what is not evidence.

18        The evidence in this case includes only

19   the sworn testimony of the witnesses, the exhibits

20   that were admitted into evidence, and there was two

21   stipulation of facts, which I will talk to you

22   about later.

23        Now, many things are not evidence and you

24   must be careful not to consider them as such.  I

25   will now describe some of things that are not evidence.

1   The fact that this defendant is charged with a crime

2   and is on trial is not evidence.

3           Also, the lawyers' statements and

4   arguments are not evidence.  They're only meant to

5   help you understand the evidence on each side's

6   legal theory.

7           The questions that the lawyers put to the

8   witnesses are also not evidence. You should

9   consider these questions only as they give meaning

10  to the witness's answers.  You should only accept

11  things a lawyer says that is supported by the

12  evidence or by your own common sense and general

13  knowledge.

14          Also, you have heard testimony about some

15  police reports, I believe, during this trial and

16  maybe some witness statements. Those reports and

17  statements were not admitted as evidence during

18  this trial. What you heard was testimony concerning

19  them.

20          So if you go in the jury room and you

21  send out a note and say, please, send me Officer

22  William's PCR, preliminary complaint report, you

23  will not get that.  That was not admitted into

24  evidence.  What you heard was testimony concerning

25  those items.

1          Now, my comments, my rulings, my

2    questions, and my instructions are also not

3    evidence. It is my duty to see that this trial is

4    conducted according to the law and to tell you the

5    law that applies to this case.

6          However, when I make a comment or give an

7    instruction, I'm not trying to influence your vote

8    or express a personal opinion about the case.

9          If you believe that I have a personal

10   opinion about how you should decide this case, you

11   must pay no attention to that opinion.  You are the

12   only judges of the facts and you should decide this

13   case from the evidence presented.

14         At times during this trial I have

15   excluded evidence that was offered or stricken

16   testimony that was heard. Do not consider those

17   things in deciding this case.  Make your decision

18   only on the evidence that I let in and nothing

19   else.

20         You should use your own common sense and

21   general knowledge in weighing and judging the

22   evidence.  But you should not use any personal

23   knowledge you may have about a particular place or

24   a particular person or a particular event.  To

25   repeat once more, you must decide this case based

1    only on the evidence admitted during this trial.

2            Now, you should not decide this case

3    based on which side presented more witnesses.

4    Instead you should think about each witness and

5    each piece of evidence and whether you believe

6    them.  Then you must decide whether the testimony

7    and evidence you believe prove beyond a reasonable

8    doubt that the defendant is guilty.

9            Now, facts can be proven by direct

10   evidence from a witness or an exhibit. Direct

11   evidence is evidence about what we actually see or

12   hear.

13           For example, if you look outside and see

14   rain falling, that is direct evidence that it is

15   raining. Facts can also be proven by indirect or

16   circumstantial evidence.  Circumstantial evidence

17   is evidence that normally or reasonably leads to

18   other facts.

19           So, for example, if you see a person come

20   in from outside wearing a rain coat covered with

21   small drops of water, that would be circumstantial

22   evidence that it is raining.

23           You may consider circumstantial evidence

24   by itself or a combination of circumstantial

25   evidence, and direct evidence can be used to prove

1    the elements of a crime.  In other words, you

2    should consider all the evidence that you believe.

3           You may consider whether the defendant

4    had a reason to commit the alleged crime, but a

5    reason by itself is not enough to find a person

6    guilty of a crime.

7           The prosecution does not have to prove

8    that the defendant had a reason to commit the

9    alleged crime. The prosecution only has to show

10    that the defendant actually committed the crime and

11    that he meant to do so.

12           Now, when the lawyers agree upon a

13    statement of facts, these are called stipulated

14    facts, and you may regard such stipulated facts as

15    true, but are not required to do so.

16           And there were two stipulations entered

17    in this matter.  The last stipulation being that on

18    September 6th, which I believe was the date of this

19    event, 2002, the defendant was ineligible to

20    possess a firearm and that he had been convicted of

21    a felony, and that his eligibility had not been

22    restored; is that a correct statement?

23           MR. HASSINGER: Yes, Your Honor.

24           MR. LANKFORD: Yes, Your Honor.

25           THE COURT: The other stipulation is that,

1    Cynthia Thomas, the mother of the deceased had

2    testified, she would have testified that she

3    identified the body of Mr. Carton Thomas on

4    September 7, 2002 to the medical examiner.   Is that

5    a correct statement of the stipulation?

6              MR. HASSINGER: That is, Judge.

7              MR. LANKFORD: Again, Your Honor.

8              THE COURT: Okay.

9              When the lawyers agree upon statement of

10   facts, these are called stipulated facts. You may

11   regard such stipulated facts as true but are not

12   required to do so.

13             Now, there's been some evidence that the

14   defendant tried to run away at the time the police

15   tried to arrest him.   This evidence does not prove

16   guilt.   A person may run or hide for innocent

17   reasons such as panic, mistake, or fear.

18             However, a person may also run or hide

19   because a consciousness of guilt. You must decide

20   whether this evidence is true, and if true, whether

21   it shows the defendant had a guilty state of mind.

22             As I said before, it is your job to

23   decide what the facts of this case are.   You must

24   decide which witnesses you will believe and how

25   important you think their testimony is.   You do not

1    have to accept or reject everything a witness says.
2    You are free to believe all, none, or part of any
3    person's testimony. In deciding which testimony you
4    believe, you should rely on your own common sense
5    and every day experience.
6        However, in deciding whether you believe
7    a witness's testimony, you must set aside any bias
8    or prejudice you may have based on race, gender or
9    national origin of the witness.
10       Now, there's no fixed set of rules for
11   judging whether you believe a witness, but it may
12   help you to think about these questions.  Was the
13   witness able to see or hear clearly?  How long was
14   the witness watching or listening?  Was anything
15   else going on that might have distracted the
16   witness?  Did the witness seem to have a good
17   memory?  How did the witness look and act while
18   testifying?  Did the witness seem to be making an
19   honest effort to tell the truth or did the witness
20   seem to evade the questions or argue with the
21   lawyers?  Does the witness's age and maturity
22   effect how you judge his or her testimony?  Does
23   the witness have any bias, prejudice or personal
24   interest in how this case is decided?  Had there
25   been any promises, threats, suggestions or other

1   influences that effect on how the witness testified?

2   In general, does the witness have any

3   special reason to tell the truth or any special

4   reason to lie?

5   All in all, how reasonable does the

6   witness's testimony seem when you think about all

7   of the other evidence in this case.

8   Now, sometimes the testimony of different

9   witnesses will not agree.  You must decide which

10   testimony you accept. You should think about

11   whether the disagreement is about something

12   important or not and whether you think someone is

13   lying or simply mistaken.

14   People see and hear things differently,

15   and witnesses may testify honestly but simply be

16   wrong about what they thought they saw or remembered.

17   It is also a good idea to think about

18   which testimony agrees best with all of the other

19   evidence in this case.

20   However, you may conclude that a witness

21   deliberately lied about something that is important

22   to how you decide this case.  If so, you may choose

23   not to accept anything that witness said.

24   On the other hand, if you think the

25   witness lied about something but told the truth

about others, you may simply accept the part you
think is true and ignore the rest.

Now, you have heard that the lawyers or
lawyer's representative have talked to some of the
witnesses.  There is nothing wrong with this.  A
lawyer or lawyer's representative may talk to
witnesses to find out what the witness knows about
the case and what the witness's testimony will be.

You have heard testimony from Dr. Paul
Nora who has given his opinion as an expert in the
field of forensic pathology. Experts are allowed to
give opinions in courts about matters they are
experts on.

However, you do not have to believe an
expert's opinion.  Instead you should decide
whether you believe in it, and how important you
think it is.

When you decide whether you believe an
expert's opinion, think carefully about the reasons
he or she gave for his or her opinion and whether
those reasons and facts are true. You should also
think about the expert's qualification and whether
his opinion makes sense when you think about all of
the other evidence in this case.

You have heard testimony from several

1  witnesses who are police officers.   That testimony

2  is to be judged by the same standard as you use to

3  evaluate the testimony of any other witness.

4            Now, there's been some testimony or some

5  evidence that Jovan Johnson made an earlier

6  statement that did not agree with his testimony

7  during this trial. You must be very careful how you

8  consider this evidence.

9            This statement was not made during this

10  trial, so you may not consider it when you decide

11  whether the elements of the crime have been

12  proven.   But I will go on and there is a caveat to

13  that.

14            On the other hand, you may use it to help

15  you decide whether you think Jovan Johnson is a

16  truthful witness. Consider this statement carefully.

17            Ask yourself if the witness made the

18  statement and whether it differs from the witness's

19  testimony here in court.   Then remember you may

20  only use it to help you decide whether you believe

21  Jovan Johnson's testimony here in court.

22            However, in this case if the witness

23  testified that the earlier statement was true, or

24  as in this case, if the earlier inconsistent

25  statement was given under oath subject to the

1   penalty of perjury at the hearing, it was a

2   preliminary examination if I remember correct, it

3   may be considered as proof of the facts in the

4   statement.   And I believe that the question was

5   what Mr. Johnson thought he might be charged with.

6           Now, the defendant in this case is

7   charged with several counts.   The first Count is a

8   Count of First Degree Premeditated Murder. In order

9   to establish this charge, the prosecution must

10   prove each of the following elements beyond a

11   reasonable doubt:

12           First, that the defendant caused the

13   death of Carlton Thomas.   That is, that Mr. Thomas

14   died as a result of being shot.

15           Second, the People have to establish that

16   the Defendant intended to kill Carlton Thomas.

17           Third, the People have to establish that

18   this intent to kill was premeditated, that is,

19   thought out beforehand.

20           Fourth, the People have to establish that

21   the killing was deliberate, which means that the

22   Defendant considered the pros and cons of the

23   killing and thought about it and choose his actions

24   before he did it.   There must have been real and

25   substantial reflection for long enough to give a

1    reasonable person a chance to think twice about the

2    intent to kill.

3             Our law does not state how much time is

4    needed.  It is for you to decide if enough time

5    passed under the circumstances of this case. The

6    killing cannot be the result of a sudden impulse

7    without thought or reflection.

8             And fifth, the killing cannot be

9    justified, excused, or done under circumstances

10    that would reduce it to the lessor crime to Second

11    Degree Murder which I will explain to you in a few

12    moments.

13             In order to show the Defendant is guilty

14    of First Degree Premeditated Murder, the People

15    have to establish first that the Defendant caused

16    the death of Carlton Thomas.  That is that Mr.

17    Thomas died as a result of being shot.

18             Second, the People have to establish the

19    Defendant intended to kill Carlton Thomas.

20             Third, the People have to establish that

21    this intent to kill was premeditated, that is,

22    thought out beforehand.

23             Fourth, the People have to establish that

24    the killing was deliberate, which means that the

25    Defendant considered the pros and cons of the

killing and thought about it and choose its actions
before he did it.  There must have been real and
substantial reflection for long enough to give a
reasonable person a chance to think twice about the
intent to kill.

Our law, once again does not state how
much time is needed. It is for you to decide if
enough time passed under the circumstances of this
case.  The killing cannot be a result of a sudden
impulse without thought or reflection.

And fifth, the killing cannot be
justified, excused, or done under circumstances
that would reduce it to the lessor crime of Second
Degree Murder.

Now, in order to convict the Defendant of
First Degree Premeditated Murder requires proof of
a specific intent. This means that the prosecution
must prove not only that the Defendant did certain
acts, but that when he did so he did so with the
intent to cause a particular result.

For the crime of First Degree Premeditated
Murder, this means that the Prosecution must prove
that the Defendant intended to kill Mr. Carlton
Thomas.

Now, this is where we're talking about

1   the circumstantial evidence because you see nobody

2   can cut open a person's mind and say look here,

3   this is what the person intended.

4   The person's intent may be proven by what

5   he said, what he did, how he did it, or any other

6   fact or circumstances in evidence.

7   Now, you may also consider the lessor

8   offense of Second Degree Murder.  In order to

9   establish this charge, the Prosecution must prove

10  the following elements beyond a reasonable doubt:

11  First, that the Defendant caused the

12  death of Carlton Thomas; that is, that Mr. Thomas

13  died as a result of being shot.

14  Second, the People have to establish that

15  the Defendant had one of these three states of mind

16  at the time of the act.

17  Now, listen to me very carefully.

18  Second, the People have to establish the

19  Defendant had one of these three states of mind at

20  the time of the act.  The People have to establish

21  either that the Defendant intended to kill Mr.

22  Thomas, or the Defendant intended to do great

23  bodily harm to Mr. Thomas, or the Defendant

24  knowingly created a very high risk of death or

25  great bodily harm knowing that death or such harm

1   would be the likely results of his actions.

2          Now, the two elements the People would

3   have to establish beyond a reasonable doubt to show

4   the Defendant is guilty of Second Degree Murder is,

5   first, the Defendant caused the death of Carlton

6   Thomas; that is, that Mr. Thomas died as a result

7   of being shot.

8          Second, the People have to establish that

9   at the time of the act that caused the death of Mr.

10  Thomas, the Defendant had one of these three states

11  of mind.  The People have to establish either the

12  Defendant intended to kill Carlton Thomas or the

13  Defendant intended to do great bodily harm to

14  Carlton Thomas, or that the Defendant knowingly

15  created a very high risk of death or great bodily

16  harm, knowing that death or such harm would be the

17  likely result of his actions.

18         Now, you must think about all of the

19  evidence and decide what the Defendant's state of

20  mind was at the time of the alleged killing.

21         The Defendant's state of mind may be

22  inferred from the kind of weapons used, the type of

23  wounds inflicted, the act of words of the

24  Defendant, and any other circumstances about the

25  alleged killing.  You may infer the Defendant

intended to kill and he used a dangerous weapon in
a way that was likely to cause death.

Likewise, you may infer the Defendant
intended the usual result that's from the use of a
dangerous weapon.  A gun is a dangerous weapon.

Premeditation and deliberation may be
inferred from any action of the Defendant which
shows planning or from any other circumstances
surrounding the killing.  The Prosecution need not
prove a motive for killing, but you may consider
evidence of motive in deciding whether there was
premeditation and deliberation.  Motive by itself
does not prove premeditation and deliberation.

The next Count is the Count of Possession
of a Firearm by a Felon.  In order to establish
this charge, the Prosecution must prove the
following elements beyond a reasonable doubt:

First, that the Defendant possessed a
firearm in this state.  It should be first, that
the Defendant possessed, used, transported, sold,
or received a firearm in this state.

Second, the People have to establish that
the Defendant was convicted of a felony.

Third, the People have to establish that
less than five years had passed since all

imprisonment was served or any term of probation was completed.

And there was a stipulation that the Defendant's eligibility had not been restored. So first, the People would have to establish that the Defendant possessed, or used, or transported, or sold, or received a firearm in this state.

Second, the People have to establish the Defendant was convicted of a felony.

And third, that less than five years had passed since all fines were paid and all imprisonment served or any term of probation was completed.

The final charge again, is that the Defendant is charged with the possession of a firearm at the commission or attempt to commit a felony.

In order to establish this charge, the Prosecution must prove the following elements beyond a reasonable doubt.

First, that the Defendant committed or attempted to commit the crime of Murder in the First Degree Premeditated or Second or Possession of a Firearm by a Felon which I've already defined for you. It's not necessary, however, that the Defendant be convicted of that crime.

1    And second, the People have to establish
2 that at the time the Defendant committed or attempted
3 to commit any of those crimes, he knowingly carried
4 or knowingly possessed a firearm.
5    A firearm includes any weapon from which
6 a dangerous object can be shot or propelled by the
7 use of explosives, gas, or air.
8    To establish the Defendant is guilty of
9 possession of a firearm in the commission or an
10 attempt to commit a felony, the People have to
11 establish:
12    First, the Defendant committed or
13 intended to commit the crime of Murder in the First
14 Degree, Premeditated or Second Degree Murder or
15 Possession of a Firearm by a Felon.
16    Second, the People have to establish
17 that if the Defendant committed or attempted to
18 commit any of these crimes, he knowingly possessed
19 or knowingly carried a firearm.
20    Now, once you go to the jury room, you
21 should first choose a foreperson, he or she should
22 see to it discussions are carried on in a
23 businesslike way and that everyone has a fair
24 chance to be heard.
25    The verdict in a criminal case must be

116

1    unanimous in order to return a verdict.   It's

2    necessary that each of you agree upon that verdict.

3            In the jury room you will discuss this

4    case amongst yourselves, but ultimately each of you

5    will have to make up your own minds.   The verdict

6    must represent each individual considered judgment

7    of each juror.

8            It is your duty as jurors to talk to each

9    other and make every reasonable effort to reach an

10   agreement.   Express your opinions and reasons for

11   them, but keep an open mind as you listen to your

12   fellow jurors.   Rethink your opinions and do not

13   hesitate to change your mind if you decide you were

14   wrong.   Try your best to work out your differences.

15           However, although you should try to reach

16   an agreement, none of you should give up your

17   honest opinions about the case just because other

18   jurors disagree with you, or just for the sake of

19   reaching a verdict.   In the end your vote must be

20   your own.

21           Now, when you consider the First Count,

22   that is, First Degree Premeditated Murder, you must

23   first consider the charge of First Degree Premeditated

24   Murder.   If you also agree that the Defendant is

25   guilty of a crime, you may stop your deliberations

1   and go onto the other Count or return your verdict.

2        If you believe the Defendant is not guilty

3   of Murder in the First Degree, Premeditated, or if

4   you're unable to agree about that crime, you may

5   then consider the lesser serious offense of Murder

6   in the Second Degree.

7        It is up to you to decide how long this

8   Defendant took on the principal charge, that is,

9   First Degree Premeditated Murder before discussing

10  the lesser offense of Second Degree Murder. Of

11  course, you may go back to the original offense

12  after discussing the lesser offense.

13       If you want to communicate with me from

14  this point forward, simply have the foreperson

15  write a note and give it to the officer. Do that

16  by writing a note. Come to the jury room door,

17  knock on the door, do not open the door because I

18  may be disposing of other cases.

19       Knock on the door, in a few moments when

20  we're able, one of the officers will give you an

21  answer knock and we'll accept the note. It's not

22  proper from this point on for you to talk directly

23  to the judge, the lawyers, court officers, or other

24  persons involved in this case, so unless you're in

25  the courtroom where we can take down every word

1    that's said, or you have written a note, you cannot

2    disclose any information.

3           When you discuss this case, you must not

4    let anyone, even me, know how your voting stands.

5    Therefore, until you return with an unanimous

6    verdict, do not reveal this information to anyone

7    outside the jury room.  And when you have reached a

8    unanimous verdict, please write a note stating

9    we've reached a verdict and give that to the

10   officer.

11          We have prepared a verdict form for you.

12   Mark your verdict on the form when you've reached

13   your verdict.

14          It is the duty of the Judge to fix the

15   penalty within the limits provided by law.  If you

16   want to look at any of the exhibits that have been

17   admitted into evidence, just ask for them and we

18   will deliver them to you.

19          Now, on Count I there are three possible

20   verdicts; Not Guilty, or Guilty of Murder in the

21   First Degree Premeditated, or Guilty of Murder in

22   the Second Degree.

23          On Count II, there are two possible

24   verdicts.  They are Not Guilty or Guilty of

25   Possession of a Firearm by a Felon.

1        On Count II, there are two possible

2   verdicts, they are, Not Guilty or Guilty of

3   Possession of a Firearm in Committing or Attempting

4   to Commit a Felony.

5        Gentleman, any problems with the charge?

6        MR. HASSINGER: I'm satisfied, Judge.

7        MR. LANKFORD: Likewise, Your Honor.

8        THE COURT: You've seen the verdict form

9   with the discrepancy I just called on Count number

10  two which I'm going to have to change.  Any problem

11  with the verdict form?

12       MR. HASSINGER: No, Judge.

13       MR. LANKFORD: No, Your Honor.

14       THE COURT: Please swear the officers.

15       (Whereupon Officers sworn)

16       THE COURT: Now, ladies and gentlemen, the

17  Clerk is about to pull two jurors who will not be

18  deliberating.  I want to tell those jurors ahead of

19  time we do appreciate your services, but you will

20  not be able to talk about this case until you get a

21  telephone call from my clerk or secretary telling

22  you that a verdict has been rendered, because if

23  somebody gets the flu or sick before the verdict is

24  reached, we can always bring back one of those or

25  two of those jurors to reconstitute the jury of 12,

1    so we don't have to go and retry the case again.

2         So what's going to happen is once your

3    name is called, you will step down and one of the

4    officers will take you to the clerk's office where

5    you will leave a telephone number where we can

6    reach you.

7         And after the verdict is rendered, you

8    will be told that you may discuss this case.  But

9    until that time, we'd ask you just not to discuss

10   this case both here and at home.

11        All right, you're ready to pull the two

12   jurors?

13        THE CLERK: Kenneth Hagen, and Katherine

14   Hoeft.

15        THE COURT: To the both of you and to all

16   the parties in this matter, we appreciate your

17   services as jurors.  Thank you ladies and

18   gentlemen, we're going to rise and have you step

19   into the jury room. You may begin your deliberations

20   as soon as you are all inside the jury room.

21             (Jury exits courtroom)

22             (Court is in recess)

23             (Court reconvenes)

24        THE COURT: We're going to bring the jury

25   in.

1              (Jury enters courtroom)

2              THE COURT: Do I have the stipulation that

3       all of our jurors are here and in their proper

4       places?

5              MR. HASSINGER: So stipulated Judge.

6              MR. LANKFORD: Agreed.

7              THE COURT: Would you please take the

8       verdict.

9              THE CLERK: Members of the jury, have you

10      agreed upon a verdict, if so, who shall speak for

11      you?  Your name for the record, please.

12             JUROR MORRIS: John Morris.

13             THE CLERK: Thank you. How do you find the

14      Defendant, Michon Houston as to Count IV?

15             JUROR MORRIS:  Guilty of first degree

16      murder.

17             THE CLERK: As to Count two?

18             JUROR MORRIS: Guilty of possession of a

19      firearm by a felon.

20             THE COURT: And Count III?

21             JUROR MORRIS: Guilty of Possession of

22      Firearm in the Commission or Attempt to Commit a

23      Felony.

24             THE CLERK: Thank you.  Members of the

25      jury could you please all stand. Raise your right

1    hand and listen to your verdict as recorded by the

2    court.

3              You solemnly swear or affirm that you

4    find the Defendant Michon Houston guilty of Count

5    one, first degree murder, guilty of Count two

6    possession of a firearm by a felon, and guilty of

7    Count three, possession of a firearm in a

8    commission or attempt to commit a felony, so say

9    you Mr. Foreman, and so say you all members of the

10   jury?

11             JURY PANEL: Yes.

12             THE CLERK: Thank you.

13             THE COURT: Please be seated.  Poll the

14   jurors.

15             THE CLERK: Juror in seat number one, was

16   that and is that your verdict?

17             JUROR #1: Yes.

18             THE CLERK: Seat two, was that and is that

19   your verdict?

20             JUROR #2: Yes.

21             THE CLERK: Seat three, was it and is that

22   your verdict?

23             JUROR #3: Yes.

24             THE CLERK: Seat four, was this and is

25   this your verdict?

```
 1                    JUROR #4: Yes.

 2                    THE CLERK: Seat five, was that and is

 3       that your verdict?

 4                    JUROR #5: Yes.

 5                    THE CLERK: Seat six, was that and is that

 6       your verdict?

 7                    JUROR #6: Yes.

 8                    THE CLERK: Seat seven, was that and is

 9       that your verdict?

10                    JUROR #7: Yes.

11                    THE CLERK: Seat eight, was that and is

12       that your verdict?

13                    JUROR #8: Yes.

14                    THE CLERK: Seat nine, was that and is

15       that your verdict?

16                    JUROR #9: Yes.

17                    THE CLERK: Seat ten, was that and is that

18       your verdict?

19                    JUROR #10: Yes.

20                    THE CLERK: Seat eleven, was that and is

21       that your verdict?

22                    JUROR #11: Yes.

23                    THE CLERK: And seat thirteen, was that

24       and is that your verdict?

25                    JUROR #13: Yes.
```

1         THE CLERK: Thank you.

2         THE COURT: Ladies and gentlemen of the

3    jury, the court and all the parties in this matter

4    and the People of the state of Michigan appreciate

5    the services that you've rendered to the justice

6    system in arriving at your verdict.  We appreciate

7    you taking time out your busy lives to come and

8    serve on jury duty.  Were not the person like

9    yourselves willing to make the sacrifice, our

10   system of justice would fail because then we could

11   not have any jury trials.

12        In just a few moments we're going to rise

13   and have you step back into the jury room. When

14   things are secured, you will be permitted to go

15   home.  I'm going to ask the foreperson to hand me

16   the verdict forms as you're stepping back inside.

17   Everyone rise.  Jurors are free to step back into

18   this jury room.

19        (Jury exits courtroom)

20        THE COURT: You may be seated.  He's

21   remanded to the jail.  The disposition date?

22        THE CLERK: That will be April the 22nd.

23   That's a Tuesday.

24        MR. LANKFORD: That's a fine date.  Thank

25   you.

THE COURT: April 22nd is good.  Okay, he

can go back with the officers.  Gentlemen, I'm

going to talk to my jurors and then I'll have you

take them out.  Okay.

          (Proceeding concluded)

127

R E P O R T E R ' S     C E R T I F I C A T E

        I do hereby certify that I have recorded stenographically the proceedings had and testimony taken in the above-entitled matter at the time and place hereinbefore set forth, and that the foregoing is a full, true and correct transcript of the proceedings had in the above-entitled matter; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

Debra L.   Finch
Certified Shorthand Reporter - 5702

Dated:   August 9 , 2003